**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **CAROLYN DAVIS, et al.,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | )        **Civil Action No. 07-01302 (RCL)** |
| | ) |
| **THE ISLAMIC REPUBLIC OF IRAN, et al,** | ) |
| | ) |
| **Defendants.** | ) |

_____)

**REPORT OF SPECIAL MASTER**
**PURSUANT TO ORDER OF REFERENCE**
**CONCERNING COUNTS LXXXIII - LXXXVI**
**(Thomas Hoke)**

This is action is brought pursuant to 28 U.S.C. 1605A seeking damages for the injuries

sustained by Seaman Thomas Hoke on October 23, 1983 while stationed at the United States

Marine Barracks in Beirut, Lebanon.  In accordance with the Order of Reference entered

pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received

evidence with regard to all issues of compensatory damages from Mr. Hoke as set forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of

explosives broke through a series of steel fences and sandbag barricades and ripped through the

heart of the Marines' administrative headquarters building.  That building, nicknamed the BLT,

housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and

soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40

feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest

single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day

of the Tet Offensive during the Vietnam War.  The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages.  See, e.g., Glenn E. Dolphin, 24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon (2005); Eric Hammel, The Root: The Marines in Beirut August 1982 ó February 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a very recent opinion of this Court, see In re: Islamic Republic of Iran Terrorism Litigation, (659 F.Supp.2d 31 D.D.C. 2009), as well as in the U.S. Congressional Research Serviceøs Suits Against Terrorist States by Victims of Terrorism (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983.  See, e.g., Valore v. Islamic Republic of Iran, 478 F.Supp.2d 101, 110 (D.D.C. 2007); Peterson v. Islamic Republic of Iran, 264 F.Supp.2d 46, 61 (D.D.C. 2003).  In these opinions, the Court has determined that the surviving family members have suffered and will continue to suffer mental anguish and loss of society.  Id.

On January 20, 2010, Plaintiffs filed a motion requesting that õthe Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30, 2003, in the related case of Peterson v. Iran, Civil Action No. 01-2094ö and õenter judgment

liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security.ö

The Court granted that motion on February 1, 2010.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.      Thomas Hoke was born on February 6, 1961 and is a United States citizen.

2.      On October 23, 1983, Mr. Hoke was a member of the United States Navy, having enlisted in November 3, 1980, and was stationed aboard the USS Iwo Jima off the coast of Beirut, Lebanon.

3.      On October 23, 1983, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.  Upon impact, the explosives detonated, collapsing the building and resulting in the deaths of 241 American personnel.

4.      At the time of the terrorist attack, Mr. Hoke was aboard the USS Iwo Jima.

5.      Mr. Hoke suffered emotional injuries as a result of the explosion.

The following testimony clearly establishes that Mr. Hoke has never recovered from the traumatic effects of the terrorist attack and that the anguish he suffered is permanent.

**Testimony of Thomas Hoke**

Mr. Hoke currently resides in North Carolina. He is divorced with two sons, aged 19 and 17.

Mr. Hoke testified that he enlisted in the Navy in 1980; his decision to do so was influenced by his father and brother who were also in the military.  He did not intend to make the

Navy a permanent career, but thought it would give him a "good start." Mr. Hoke testified that while in the Navy, he served as a data-processing technician, "the equivalent of a modern IT position today." He still works in this field. He received his GED in 1978 and never attended college.

Mr. Hoke testified that as of May 1983, he was on a six-month Mediterranean "cruise" aboard the USS Iwo Jima, assigned at the time to a few miles off the coast of Beirut. Mr. Hoke was never required to go to shore. He recalled that the Beirut mission was becoming more dangerous, noting that two soldiers were killed in June or July of 1983.

Mr. Hoke testified that in the early morning of 1983, an announcement was made over the ship's public address system that the Barracks had been bombed and that the men aboard the ship should prepare for a mass of incoming casualties. Within 20 or 30 minutes, Mr. Hoke recalled, helicopters began landing carrying the casualties to be treated by the surgical units and medical staff aboard the Iwo Jima. After two to three hours, "one helicopter after another" started transporting the bodies of deceased soldiers. Mr. Hoke testified that he volunteered to identify both the wounded and the deceased and did so for approximately two days. "It was almost like a dream," Mr. Hoke testified. He recalled hearing the survivors screaming and crying aboard the ship and seeing a soldier whose "entire face was burnt off" but had managed to survive. The victims' bodies were kept in the deep freezers on the ship that were normally used for food storage.

Later that day, Mr. Hoke flew over the wreckage. He described the four-story building as little more than a pile of rubble and twisted steel. It was still smoking and there was a "very bad smell."

Mr. Hoke's brother, who was a Marine at the time, arrived in Beirut shortly after the bombing to assist with the investigation.  Mr. Hoke remembered being relieved to see his brother who would, upon returning home, inform their parents and report that Mr. Hoke was not hurt.

Mr. Hoke suffered no physical injuries as a result of the bombing.  He has a 30% disability rating by the Veterans Administration for Post Traumatic Stress Disorder ("PTSD").  Mr. Hoke testified that he did not realize the emotional toll the bombing had on him until several years afterward.  Mr. Hoke has been under the care of a psychiatrist at a VA outpatient facility in North Carolina for the last three years.

During the last 15 years, Mr. Hoke has worked six to eight different jobs.  He attributes his instability to the fact that he has difficulty concentrating and has a "temper."  His marriage ended – a fate he believes was a casualty of his "temperament and irritability" which manifested following the bombing.  His relationship with his children has also deteriorated.   Although he admits having always been somewhat of a "loner," he testified that his inability to socialize has become more prevalent as a result of the bombing.

**ANALYSIS**

Standard of Review

To recover damages, "a FSIA default winner must prove damages ‗in the same manner and to the same extent' as any other default winner."  Hill v. Republic of Iraq, 328 F.3d 680, 684-85 (D.C.Cir. 2003) (citation omitted).   Upon consideration of the facts presented and, in light of the aforementioned legal framework, the Special Master considers whether Mr. Hoke is entitled to compensatory damages for the pain and suffering he has endured.[1]

---

[1] Mr. Hoke is not making a claim for economic damages nor are any members of his family seeking solatium damages.

### a.    Pain and Suffering

In determining appropriate damages for Mr. Hoke, the Special Master is informed not only by prior decisions awarding damages for pain and suffering, but also by those awarding damages for solatium.  Valore v. Islamic Republic of Iran, 700 F.Supp.2d 52 (D.D.C. 2010). Solatium is awarded to compensate the "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." Id., at 85. (Citations omitted).

Damages for surviving victims are typically determined based upon an assessment of the following factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." Peterson, 515 F.Supp.2d at 52 n. 26 (quoting Blais v. Islamic Republic of Iran, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

The Special Master is mindful that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award." Brewer v. Islamic Republic of Iran, 664 F.Supp.2d 43, 57 (D.D.C. 2009).  As Judge Huvelle noted, "it is ‒undeniably difficult‒to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved" Id. (quoting Blais, 459 F.Supp.2d at 59).  That said, the damages awarded to servicemen wounded in Peterson and reaffirmed in Valore are instructive.  In both instances, the Court appeared to employ a baseline award of $5 million for pain and suffering of the surviving servicemen.  The Court found that amount appropriate, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars

(Marvin Albright); or where the servicemen suffered a broken jaw, severe flesh wounds and scars on his arms, legs and face, a loss of teeth who suffered (Pablo Arroyo); or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems, internal maladies and physical scarring (Danny Wheeler); or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

The Court has departed upward from this baseline when confronted with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million – Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million – Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million – Truman Dale Garner); or a broken neck resulting in permanent quadriplegia ($12 million – Larry Gerlach).

The Court has similarly departed downward in the face of lesser injuries such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million – Glenn Dolphin); nerve pain and foot numbness ($2 million – Charles Frye) and no physical injuries but "severe and lasting psychological harm" ($1.5 – Frank Comes, Jr.).  It bears mentioning that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above and the records provided to the Special Master amply demonstrates that Mr. Hoke suffered, and continues to suffer, symptoms of PTSD resulting from his participation in the Beirut bombing.  Applying the precedential framework outlined in Peterson and its progeny and, in light of the comparably moderate 30% disability rating he was given by the VA, the Special Master concludes that a downward departure is mandated and Mr.

Hoke is entitled to compensatory damages for injuries caused in the Marine Barracks Bombing in the amount of $1,500,000 (One Million Five Hundred Dollars).

Dated:  November 18, 2010                    Respectfully submitted,

                                             /s/ Alan L. Balaran
                                             Alan L. Balaran, Esq.
                                             Special Master