UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

CAROLYN DAVIS, et al.,         )
          )
    Plaintiffs        )
          )
v.          )        Civil Action No. 07-01302 (RCL)
          )
THE ISLAMIC REPUBLIC OF IRAN, et al,         )
          )
    Defendants.        )
          )

---

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## CONCERNING COUNTS LXX - LXXII
### (Michael Corrigan)

This action is brought pursuant to 28 U.S.C. 1605A seeking damages for the injuries sustained by Marine Michael Corrigan on October 23, 1983 as a result of the bombing at the United States Marine Barracks in Beirut, Lebanon.  In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received evidence with regard to all issues of compensatory damages from the witness as set forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marinesø administrative headquarters building.  That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War.  The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages.  See, e.g., Glenn E. Dolphin, 24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon (2005); Eric Hammel, The Root: The Marines in Beirut August 1982 ó February 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a very recent opinion of this Court, see In re: Islamic Republic of Iran Terrorism Litigation, (659 F.Supp.2d 31 D.D.C. 2009), as well as in the U.S. Congressional Research Serviceøs Suits Against Terrorist States by Victims of Terrorism (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983.  See, e.g.,Valore v. Islamic Republic of Iran, 478 F.Supp.2d 101, 110 (D.D.C. 2007); Peterson v. Islamic Republic of Iran, 264 F.Supp.2d 46, 61 (D.D.C. 2003).  In these opinions, the Court has determined that the surviving family members have suffered and will continue to suffer mental anguish and loss of society.  Id.

On January 20, 2010, Plaintiffs filed a motion requesting that õthe Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30,

2003, in the related case of <u>Peterson v. Iran</u>, Civil Action No. 01-2094ö and õenter judgment liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security.ö

That motion was granted on February 1, 2010.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Michael Corrigan was born on January 29, 1962 and is a United States citizen.

2.      On October 23, 1983, Mr. Corrigan was a member of the United States Marine Corps, having enlisted in 1982, and was stationed in Beirut, Lebanon.

3.      On October 23, 1983, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.  Upon impact, the explosives detonated, collapsing the building and resulting in the deaths of 241 American personnel.

4.      Mr. Corrigan was injured as a result of the explosion.

The following testimony clearly establishes that Mr. Corrigan never recovered from the emotional effects of the terrorist attack and that the trauma he suffered is permanent and significant.

**<u>Testimony of Michael Corrigan</u>**

Mr. Corrigan currently resides in Tampa, Florida and is a retired police officer and firefighter.  He has been married to his current wife since 2007 and has a twenty-one year old son from a previous marriage.

Mr. Corrigan was raised in Long Island, New York and relocated with his family to Virginia at the age of 13.  He joined the Marine Corps on April 1, 1982.  Mr. Corrigan's decision to enlist followed a family tradition of military service – his father was a Marine who saw combat in World War II and his brother was in the Navy.  Mr. Corrigan testified that he wanted to serve his country with "the best" so he elected to join the Marine Corps where he served as a field radio operator.

Mr. Corrigan testified that his unit, the 24th Marine Amphibious Unit "MAU", replaced the 22nd MAU in May of 1983.  His unit was responsible for the "line of communications for the MAU Commander," headquarters and ground and air support.  At the beginning of his tour, Mr. Corrigan recounted, there was occasional "spillover fire" which soon escalated into direct sniper attacks.

Mr. Corrigan testified that on October 23 he was manning a post aboard the USS Iwo Jima off the coast of Beirut.  According to Mr. Corrigan, it was common for his commanders to reassign Marines from his unit to the Iwo Jima for a three or four day rotation to allow them to "get away from the fighting for a few days."  He was on radio watch and was relieved of his post at 6 a.m. and left the landing force operations area to return to his bunk.  Shortly afterwards, a call went out over the public address system directing all servicemen not on duty to report to the hangar deck because the Marine Barracks Headquarters had been attacked and mass casualties would be transferred onto the Iwo Jima for medical treatment.  Anyone with first aid training was asked to volunteer.  Mr. Corrigan, having received some training in the boy scouts, stepped forward.  He was placed with a few other Corpsmen to the hangar deck and they were told to "wait for the helicopters to come in."

Mr. Corrigan recalled the entire hangar deck being covered with stretchers and bunks. Some Marines were lying on poncho liners. "They were all covered in a grayish, white chalky stuff." He remembered, "there was a lot of blood. A lot of crying; moaning." Mr. Corrigan's assignment was to remove their dog tags and begin identifying the casualties while the Corpsmen began triaging the survivors before they were sent to the hospital. The helicopters continued bringing aboard the injured until nightfall. "I saw some pretty hurt people." He recalled a lot of broken bones and crush injuries, and testified, "we did what we could for them."

After Mr. Corrigan woke the next morning, he "snuck aboard a helicopter that was going ashore." Upon landing, he observed the deceased and dying soldiers lying on one side of the landing zone. He reported to combat operations headquarters and checked in with his chief of staff. Assisted by other Marines from his unit, Mr. Corrigan went through the remains of the Barracks and its immediate surroundings, collecting all of the communications and cryptographic gear – "top secret stuff" – that was just floating around. At that point, he testified, it was no longer a rescue operation but a search operation for those who had been crushed under "huge slabs of concrete." Large cranes were brought in to free the bodies from the rubble. Underneath, "you'd find a Marine there or part of a Marine, when they had been cut in half by the falling cement." The bodies were placed in bags and transferred to the temporary mortuary set up off of the landing zone. Mr. Corrigan testified that he was "out on the pile for days." He described seeing a Marine on a stretcher who "did not look terribly injured" – his arms and legs were intact. When Mr. Corrigan got closer to the Marine, he could see blood streaming from his nose; hear a wheezing rasp coming from his mouth and noticed pink foam forming around the man's lips. The Corpsmen triaged him and then the Marine was "moved to the black area" because

"there was nothing they could do" for him.  Mr. Corrigan testified that he was "overwhelmed," explaining that it was "a lot to take in."

Because he had been aboard the ship when the bombing happened and they were doing the headcount of the people in his unit back on shore, he was listed as "missing" for three days. His parents frantically called the Marine Corps hotline and eventually, Mr. Corrigan was able to notify his parents that he was alive by using the phone banks provided to allow the survivors to call home.

Mr. Corrigan testified that he suffered no physical injuries.  He did, however, endure severe psychological trauma which made him always angry, "on a spring trigger." He was unable to sleep very well; suffered from nightmares and flashbacks. He did "a lot of drinking" and "a lot of avoiding people."

He arrived stateside in November 1983 and went on leave to see his parents.  Mr. Corrigan felt that he frightened his mother and that his father was saddened by what his son had "been through."  Mr. Corrigan "didn't want to have anything to do with anybody."

Mr. Corrigan remained in the Marine Corps, reenlisting for two more deployments in Beirut "to get revenge."  He returned to Beirut six months after the bombing, where he was assigned to provide external security for the American embassy.  After returning stateside for approximately six months, he returned to the Mediterranean aboard a ship and assisted in training operations.  He completed his deployments in 1985 and remained in the Marine Corps until 1993.  He received the Navy Achievement Medal for his service in Beirut; as well as several letters of commendation and good conduct medals.

Mr. Corrigan testified that he did not receive treatment until 2002 for his psychological injuries, explaining that "back then you didn't do that, you would be labeled as crazy and kicked

out of the Marine Corps.ö  An encounter with a fellow veteran diagnosed with Post Traumatic

Stress Disorder (õPTSDö) convinced Mr. Corrigan to seek medical treatment.  Mr. Corrigan was

first diagnosed with PTSD in early 2003. He has received individual therapy; completed a

substance abuse program for drinking; completed a stress treatment program for combat PTSD in

2004 and continues with group and individual therapy to this day.  He is on several medications

for PTSD.  He still avoids õrelationships that go beyond the superficial.ö

 Mr. Corrigan explained that he did eventually marry and was subsequently divorced ó a

situation he attributes directly to the psychological effects he suffered from the bombing.  He

testified that he felt happiest undertaking õvery stressful jobsö such as a fire fighting and police

work.  In July 2002, his current wife took a new job in Florida and he resigned his position to

relocate with his wife.  He õhad a meltdownö when they first arrived which Mr. Corrigan

believes is due to the fact that he no longer worked õadrenaline laced jobs.ö  He has not worked

since 2002.

 According to the records provided to the Special Master, Mr. Corrigan has a 70% VA

disability rating and is labeled õdisabledö by the Social Security Administration due, in part, to

physical injuries unrelated to his service in Beirut.

**ANALYSIS**

Standard of Review

 To recover damages, õa FSIA default winner must prove damages ÷in the same manner

and to the same extentø as any other default winner.ö  Hill v. Republic of Iraq, 328 F.3d 680,

684-85 (D.C.Cir. 2003) (citation omitted).   Upon consideration of the facts presented and, in

light of the aforementioned legal framework, the Special Master considers whether Mr. Corrigan

is entitled to compensatory damages for the pain and suffering he has endured.[1]

### a.  Pain and Suffering

In determining appropriate damages for Mr. Corrigan, the Special Master is informed not only by prior decisions awarding damages for pain and suffering, but also by those awarding damages for solatium.  Valore v. Islamic Republic of Iran, 700 F.Supp.2d 52 (D.D.C. 2010). Solatium is awarded to compensate the õthe mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort.ö Id., at 85. (Citations omitted).

Damages for surviving victims are typically determined based upon an assessment of the following factors: õthe severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life.ö Peterson, 515 F.Supp.2d at 52 n. 26 (quoting Blais v. Islamic Republic of Iran, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

The Special Master is mindful that õthere is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award.ö Brewer v. Islamic Republic of Iran, 664 F.Supp.2d 43, 57 (D.D.C. 2009).  As Judge Huvelle noted, õit is ÷undeniably difficultø to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involvedö Id. (quoting Blais, 459 F.Supp.2d at 59).  That said, the damages awarded to servicemen wounded in Peterson and reaffirmed in Valore are instructive.  In both instances, the Court appeared to employ a baseline award of $5 million for pain and suffering of the surviving

---

[1] Mr. Corrigan is not making a claim for economic damages nor are any members of his family seeking solatium damages.

servicemen.  The Court found that amount appropriate, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars (Marvin Albright); or where the servicemen suffered a broken jaw, severe flesh wounds and who suffered scars on his arms, legs and face and loss of teeth (Pablo Arroyo); or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems, internal maladies and physical scarring (Danny Wheeler); or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

The Court has departed upward from this baseline when confronted with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million – Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million – Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million – Truman Dale Garner); or a broken neck resulting in permanent quadriplegia ($12 million – Larry Gerlach).

The Court has similarly departed downward in the face of lesser injuries such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million – Glenn Dolphin); nerve pain and foot numbness ($2 million – Charles Frye) and no physical injuries but "severe and lasting psychological harm" ($1.5 – Frank Comes, Jr.).  It bears mentioning that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above and the records provided to the Special Master clearly indicate that Mr. Corrigan may not have suffered any physical trauma but that his experiences in Beirut resulted in PTSD as well as a rash of other severe psychological problems. Applying the

precedential framework outlined in <u>Peterson</u> and its progeny, the Special Master concludes that the evidence amply demonstrates that the psychological trauma suffered by Mr. Corrigan is comparable to any physical wound he may have endured.  As such, the Special Master finds Mr. Corrigan is entitled to compensatory damages for injuries resulting from the Marine Barracks Bombing in the amount of $2,000,000 (Two Million Dollars).

Dated:  November 29, 2010                   Respectfully submitted,

                                            <u>/s/ Alan L. Balaran</u>
                                            Alan L. Balaran, Esq.
                                            Special Master