**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

| | |
|---|---|
| **CAROLYN DAVIS, et al.,** | ) |
| | ) |
| **Plaintiffs** | ) |
| | ) |
| **v.** | )   **Civil Action No. 07-1302 (RCL)** |
| | ) |
| **THE ISLAMIC REPUBLIC OF IRAN, et al,** | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

_____

**REPORT OF SPECIAL MASTER**
**PURSUANT TO ORDER OF REFERENCE**
**CONCERNING COUNTS CXLVII - CLI**
**(David Sharp)**

This action is brought by Marine David Sharp pursuant to 28 U.S.C. 1605A, seeking

damages for the injuries he sustained on October 23, 1983 as a result of the bombing at the

United States Marine Barracks in Beirut, Lebanon.  In accordance with the Order of Reference

entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has

received evidence with regard to all issues of compensatory damages from the witness as set

forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of

explosives broke through a series of steel fences and sandbag barricades and ripped through the

heart of the Marinesø administrative headquarters building.  That building, nicknamed the BLT,

housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and

soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40

feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest

single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day

of the Tet Offensive during the Vietnam War.  The Beirut bombing remains the deadliest post-

World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be

repeated except as relevant to an assessment of individuated damages.  See, e.g., Glenn E.

Dolphin, 24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon

(2005); Eric Hammel, The Root: The Marines in Beirut August 1982 ó February 1984 (1999).

Similarly, the historical overview of the statutory scheme by which actions against the Islamic

Republic of Iran have been brought has been exhaustively recounted in a very recent opinion of

this Court, see In re: Islamic Republic of Iran Terrorism Litigation, (659 F.Supp.2d 31

D.D.C. 2009), as well as in the U.S. Congressional Research Serviceøs Suits Against Terrorist

States by Victims of Terrorism (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need

for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of

Information and Security legally responsible for providing material financial and logistical

support to help carry out the attack on the servicemen in Beirut in 1983.  See, e.g., Valore v.

Islamic Republic of Iran, 478 F.Supp.2d 101, 110 (D.D.C. 2007); Peterson v. Islamic Republic of

Iran, 264 F.Supp.2d 46, 61 (D.D.C. 2003).  In these opinions, the Court has determined that the

surviving family members have suffered and will continue to suffer mental anguish and loss of

society.  Id.

On January 20, 2010, Plaintiffs filed a motion requesting that this Court õenter an Order

taking judicial notice of the factual findings set forth in the decision of this Court dated May 30,

2003, in the related case of <u>Peterson v. Iran</u>, Civil Action No. 01-2094, and on the basis of such facts as already proven therein to the Court, that the Court enter judgment as to liability against both Defendants, the Islamic Republic of Iran and the Iranian Ministry of Information and Security.ö

The Court granted Plaintiffsø motion on February 1, 2010.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.      David Sharp was born on June 10, 1963 and is a United States citizen.

2.      On October 23, 1983, Mr. Sharp was a member of the United States Marine Corps, having enlisted in July 16, 1982, and was stationed in Beirut, Lebanon.

3.      On October 23, 1983, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.  Upon impact, the explosives detonated, collapsing the building and resulting in the deaths of 241 American personnel.

4.      At the time of the terrorist attack, Mr. Sharp was billeted in the Marine Barracks building.

5.      Mr. Sharp was injured as a result of the explosion.

The following testimony clearly establishes that the Mr. Sharp has never recovered from the emotional effects of the terrorist attack and that the trauma he suffered is permanent and significant.

**Testimony of David Sharp**

Mr. Sharp testified that he currently resides in Bentonville, Arkansas.  Mr. Sharp is the son of Tom and Davene Sharp; he has an older brother, Tom, and a younger brother, Curtis. Mr. Sharp is married to Jennifer Sharp and they have a daughter who was born in 1999.[1]  He is currently unemployed due to his disabilities and has not been gainfully employed since he separated from WalMart in 2007.

Mr. Sharp testified that he enlisted in the Marine Corps while still in high school because he õneeded something to doö after he graduated and his parents expected him to õbe out of the houseö when he turned 18.  Mr. Sharp began his service on July 16, 1982.  He anticipated a career as a Marine, but the events in Beirut drastically curtailed those plans; he served for only four years.

Mr. Sharp attended boot camp in San Diego, California and received additional training in Texas.  He signed up to be a machine gunner in the infantry, but when he õgraduated from boot camp with honors,ö he was instead assigned to the Military Police.  When the company commander asked for volunteers for the Beirut deployment, Mr. Sharp recalled being the first member of his company to do so.

Mr. Sharp testified that he wrote to his parents while he was in Beirut õevery once in a while.ö  He sent home money to pay off a motorcycle he bought before his tour.  õThey didnøt have phones back then like they do today,ö he testified, so he did not call home.

Mr. Sharp testified that on October 22, 1983, he was on õguard duty all nightö at the main gate of the õMSSGö building.  At the end of his duty, he went to the BLT for a Sunday morning õhot breakfast.ö  It was quiet, he recalled; no one was awake.  He learned that breakfast service

---

[1] None of Mr. Sharpøs family are claimants in this lawsuit.  Although his parents, Tom and Davene Sharp, were initially named as Plaintiffs in Count CLI, a representative from Plaintiffsø counseløs office has advised that they are no longer pursuing their claim.

was delayed that morning due to the USO concert the night before.  Mr. Sharp returned to the

MSSG building and later went back to the Barracks building looking for a friend.  As he walked

away from the rear of the Barracks building (opposite to the side where the suicide bomber

struck), he testified, that he felt õpressureö and õthe next thing I knew I was picking myself up

off the ground.ö  He was blown away from the stairs of the Barracks building.  Mr. Sharp

testified that he ran back to the MSSG building that contained a bunker on the roof for shelter in

the event of attack.  Another Marine ran up beside Mr. Sharp, saying õthey took the whole

building down.ö  They went up to the MSSG bunker together only to find that the BLT was no

longer standing.

Mr. Sharpøs First Sergeant, who was also in the MSSG bunker, ordered Mr. Sharp to

accompany him back to the BLT to investigate what happened.  Mr. Sharp testified that as soon

as they approached the Barracks, he saw a dead Marine with no arms, legs and his head split

open.  Mr. Sharp tried to compose himself while his First Sergeant ordered him to keep going

toward the building to try and help any survivors.  Mr. Sharp grabbed a cart and put the next

Marine he saw onto the cart.  The Marine was dead by the time Mr. Sharp transported him to the

medics who were posted at the MSSG building.  The medics asked Mr. Sharp if he needed

medical attention when they noticed he was limping and his arm was bleeding; Mr. Sharp told

them he õwas fine.ö  The medics made a cursory examination of Mr. Sharp and told him he had

õbusted blood veinsö and cement stuck in his arm.   Mr. Sharp õwasnøt worried about it and just

went on.ö  Mr. Sharp testified that later, when people put in for Purple Hearts, he declined to do

so, thinking about the other men who were hurt more badly than he.

For the rest of the day, Mr. Sharp along with other able-bodied survivors dug people out

of the rubble and transported bodies to airplane hangars.  He testified that they tried to find

õwhatever body part we couldö as well as any dog tags for identification.  Mr. Sharp testified that

he also õran a bunch of reporters offö who were trying to come into the compound and take

pictures of õdead Marines.ö  Mr. Sharp was assigned to transporting and identifying the dead.

Mr. Sharp testified that his family saw him on television, õyelling at the reportersö and

õthat is how they knew I was alive.ö  He believes that toward the end of that week, after almost

all of the õBLT was cleaned up, they started making phone calls to homeö and it was then that he

spoke with his parents for the first time since the bombing.  He testified that his parents õwere

relieved I didnøt get killed in the blast.ö

Mr. Sharp testified that he õbegan to have medical problemsö as soon as he returned

stateside.  He described having headaches and getting õthe shakes.ö  He was sent to several

physicians, including a psychiatrist at Camp Lejeune and there was discussion of giving him a

general discharge õon psychiatric grounds.ö  Mr. Sharp testified that he managed to persuade

them nothing was wrong with him because he did not õwant to be sent out on a medical

discharge.ö  He õjust dealt with it.ö  The doctors also offered to õstrip the blood veinsö out of his

legs that were damaged in the blast, but he refused treatment.  Mr. Sharp testified that Beirut

õchanged everybodyö from the õway we were before.ö  He noted the Marines went õover thereö

and õhad their hands tiedö and õcouldnøt do anything but sit there like a bunch of ducks.ö

Mr. Sharp testified and provided documents attesting to the fact that he has a 50%

disability rating for Post Traumatic Stress Disorder (õPTSDö).  He also was diagnosed with

traumatic brain injury sustained as a result of the explosion.  He continues to have õshaky handsö

and headaches.  He worked as a police officer on the Bentonville Police Department from 1986

to 1997 and then again on its Drug Task Force from 1999 to 2000.  He explained that he had to

leave the police force as the shaking in his hands prevented him from being able to fire his

weapon.  When going through the impact his injuries have had on his life, Mr. Sharp testified, õI donøt know how to tell you all that stuff because I donøt remember all of that stuff.ö  He has lived on social security/disability since leaving his position as an assistant store manager from Wal Mart in 2007 ó a position he held since 2004.

Mr. Sharp testified, õI will never be how I was before.ö

**ANALYSIS**

Standard of Review

To recover damages, õa FSIA default winner must prove damages –in the same manner and to the same extentø as any other default winner.ö  Hill v. Republic of Iraq, 328 F.3d 680, 684-85 (D.C.Cir. 2003) (citation omitted).  To demonstrate future damages, it is incumbent upon claimants to satisfy their claim by a preponderance of the evidence and prove the amount of damages by a reasonable estimate.  Id.  For past economic losses, they need only õreasonably proveö the amount of damages they request mindful that the Special Master will consider any õspecial problems of proof arising from the defendantøs absence.ö Id.

Upon consideration of the facts presented and, in light of the aforementioned legal framework, the Special Master considers Mr. Sharpøs claim for compensatory damages for pain and suffering.  Mr. Sharp has not made a claim for economic losses nor have any members of his family sought solatium damages.

In determining appropriate damages for Mr. Sharp, the Special Master is informed by prior decisions awarding damages for pain and suffering. Valore v. Islamic Republic of Iran, 700 F.Supp.2d 52 (D.D.C. 2010).  Damages for surviving victims are typically determined based upon an assessment of the following factors: õthe severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the

victim for the rest of his or her life.ö <u>Peterson</u>, 515 F.Supp.2d at 52 n. 26 (<u>quoting</u> <u>Blais v.</u>

<u>Islamic Republic of Iran</u>, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

The Special Master is mindful that õthere is no exact comparison, and, indeed, strict

application of precedent could lead to conflicting conclusions about an appropriate award.ö

<u>Brewer v. Islamic Republic of Iran</u>, 664 F.Supp.2d 43, 57 (D.D.C. 2009).  As Judge Huvelle

noted, õit is ‑undeniably difficultøto assess the amount of compensatory damages for the pain

and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is

involvedö <u>Id.</u> (quoting <u>Blais</u>, 459 F.Supp.2d at 59).  That said, the damages awarded to

servicemen wounded in <u>Peterson</u> and reaffirmed in <u>Valore</u> are instructive.  In both instances, the

Court appeared to employ a baseline award of $5 million for pain and suffering of the surviving

servicemen.  The Court found that amount appropriate, for example, where the evidence revealed

a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars

(Marvin Albright); or where the servicemen suffered a broken jaw, severe flesh wounds and

scars on his arms, legs and face and a loss of teeth (Pablo Arroyo); or where shrapnel caused soft

tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems,

internal maladies and physical scarring (Danny Wheeler); or in the presence of a shoulder injury

and continuous neck, shoulder and back pain (Joseph P. Jacobs).

The Court has departed upward from this baseline when confronted with evidence of

more severe injuries such as: loss of sight and hearing ($7.5 million ó Anthony Banks); skull

fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg,

bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million

ó Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed

left lung, and other shrapnel wounds that became infected ($7.5 million ó Truman Dale Garner);

or a broken neck resulting in permanent quadriplegia ($12 million ó Larry Gerlach).

The Court has similarly departed downward in the face of lesser injuries such as

unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million ó Glenn

Dolphin); nerve pain and foot numbness ($2 million ó Charles Frye) and no physical injuries but

õsevere and lasting psychological harmö ($1.5 ó Frank Comes, Jr.).  It bears mention that, in

rendering these awards, the Court observed that all of these servicemen suffered õlasting and

severe psychological problems from the attack.ö

The testimony cited above clearly indicates that Mr. Sharp suffered, and continues to

suffer symptoms of post traumatic stress disorder as a result of the Beirut bombing.  Applying

the precedential framework outlined in Peterson and its progeny, the Special Master concludes

that a downward departure is mandated and Mr. Sharp is entitled to compensatory damages for

injuries caused in the Marine Barracks Bombing in the amount of Three Million Dollars

($3,000,000).


Dated:  February 23, 2011                              By:/s/ Alan L. Balaran
                                                              Alan L. Balaran, Esq.
                                                              Special Master