UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAROLYN DAVIS, et al., )<br>)<br>   Plaintiffs )<br>)<br>v. )<br>)<br>THE ISLAMIC REPUBLIC OF IRAN, et al, )<br>)<br>   Defendants. )<br>) | Civil Action No. 07-1302 (RCL) |

**REPORT OF SPECIAL MASTER
PURSUANT TO ORDER OF REFERENCE
CONCERNING COUNTS XCVI - XCIX**
(Donald Long)

This action is brought by Marine Donald Long pursuant to 28 U.S.C. § 1605A seeking damages for the injuries he sustained on October 23, 1983 as a result of the bombing at the United States Marine Barracks in Beirut, Lebanon.  In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received both testimonial and documentary evidence with regard to all issues of compensatory damages from the witness as set forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marinesø administrative headquarters building.  That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War.  The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages.  See, e.g., Glenn E. Dolphin, 24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon (2005); Eric Hammel, The Root: The Marines in Beirut August 1982 ó February 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a recent opinion of this Court, see In re: Islamic Republic of Iran Terrorism Litigation, (659 F.Supp.2d 31 D.D.C. 2009), as well as in the U.S. Congressional Research Serviceøs Suits Against Terrorist States by Victims of Terrorism (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983.  See, e.g.,Valore v. Islamic Republic of Iran, 478 F.Supp.2d 101, 110 (D.D.C. 2007); Peterson v. Islamic Republic of Iran, 264 F.Supp.2d 46, 61 (D.D.C. 2003).  In these opinions, the Court has determined that the surviving family members have suffered and will continue to suffer mental anguish and loss of society.  Id.

On January 20, 2010, Plaintiffs filed a motion requesting that õthe Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30,

2003, in the related case of <u>Peterson v. Iran</u>, Civil Action No. 01-2094" and "enter judgment liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security."  The Court granted that motion on February 1, 2010.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    1.    Donald Long was born on October 5, 1954 and is a United States citizen.

    2.    He enlisted in the United States Marine Corps in 1973.

    3.    On October 23, 1983, while Mr. Long was deployed to Lebanon, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.  Upon impact, the explosives detonated, collapsing the building and resulting in the deaths of 241 American personnel.

    4.    Mr. Long never recovered from the physical and emotional trauma he suffered as a result of the terrorist attack.

**<u>Testimony of Donald Long</u>**

Mr. Long resides in High Point, North Carolina.  He graduated from high school in Springfield, Ohio and joined the Marine Corps immediately after graduation.

Mr. Long testified that he chose the Marine Corps because he "wanted to join the best" and wanted to "work on my career and my life."  His goal was to serve twenty to twenty-five years until he was eligible for retirement.  Mr. Long testified that after boot camp, he was promoted to Private First Class and was sent to Infantry Training School at Camp Pendleton, California.  His next duty station was with the 2nd Battalion, Third Marines Brigade in Kanawaeha, Hawaii.  After his tour in Hawaii ended, he transferred to Quantico where he served

as a Marksmanship Instructor; from there he transferred to Camp Lejeune. Mr. Long served as a Squad Leader at Camp Lejeune until transferring to Headquarters Battalion Administration. He subsequently transferred back to an infantry assignment shortly before deploying to Beirut in May 1983. Mr. Long testified that he was not apprehensive about serving in Beirut.

While stationed in Lebanon, Mr. Long was a Squad Leader; was assigned some administrative duties and served on Guard Duty. At the time of the bombing, Mr. Long was serving as a Patrol Sergeant. Mr. Long's understanding of the Rules of Engagement in Beirut was that the American troops were "not allowed to fire back at anyone" – a situation that "was hard on us emotionally and spiritually because we were there on a peacekeeping mission; not there to fight."

Mr. Long recounted that between May and October of 1983, the fighting "progressed on a daily basis," noting that the enemy was "trying to figure out our next position, trying to figure out what evasive action we would take." Mr. Long testified that on October 22, 1983, the night before the explosion, there was a USO show, "which we most definitely needed." He noted that they went on a "high state of alert" during the show due to some "incoming RPG [Rocket Propelled Grenade] fire," but "once the coast was clear we resumed the concert."

Mr. Long testified that in the days prior to the attack, several of the Marines felt like "something was going to happen." He recounted a young Marine named Lyons who insisted on wearing his flak jacket and his helmet even to sleep. Lyons kept telling Mr. Long that Lyons felt that he was going to die.

Mr. Long testified that he was in his room on the top floor of the BLT when he heard "some firing" and heard someone yelling, "get down" and then a crash. He ran to the Battalion Aid Station and was looking over the banister when he saw a truck crashing into the gate and the

"Universal System." He turned and ran back to his room. He heard "a whirring up;" a noise that sounded like something "was working into an explosion." Mr. Long testified that the whirring sound was the last thing he remembered before waking up on a hospital ship on its way to Germany. Mr. Long was one of only a handful of men on the fourth floor of the BLT who survived.

He next recalled waking up in an Intensive Care Unit in Germany, but remembers very little from his time in the hospital, only a doctor telling him he "could not talk because he had a tracheotomy." Medical records show that he was air lifted on November 10, 1983 to Camp Lejeune for treatment and to be closer to his wife, who was expecting their second child. Weeks after the bombing, Mr. Long learned of the extent of his injuries: both of his shoulders were dislocated; loss of consciousness for 24 hours; memory loss; fractured sternum; both of his lungs collapsed; a skull fracture in four places; shrapnel in his abdomen; burns to over 11% of his body and a gash in his arm. Medical records show that when he arrived at Camp Lejeune, he had a bronchoscopy and underwent "aggressive treatment" for the second degree burns.

Mr. Long noted that his long-term memory came back very slowly although his short-term memory is still impaired. For example, when he was recovering, he had no recollection that he was married and only vague memories of his brother, Curtis. He has no memory of his other siblings. He noted that his memory loss has caused him many difficulties, noting that he can only remember snippets of conversations he engaged in moments before. He continues to suffer from the ligament damage in his right arm and severe back pain.

Mr. Long testified, "I was a good husband, father, took care of my business" but when he returned from Lebanon, his wife saw that he "wasn't the same person anymore." People thought

Mr. Long "wasn't normal" and "wasn't right." Mr. Long and his wife divorced in 1988. He attributes the divorce to the problems he returned with after Lebanon.

Mr. Long testified that getting medical attention when he returned "was difficult." He began abusing alcohol which had "never had a problem with before." Mr. Long was unable to resume active-duty in the Marine Corps when he returned stateside and was medically retired after "getting into some trouble and being imprisoned in a military facility." Mr. Long testified that he "never had any trouble" in the military until he returned from Beirut. His "life was different from that point on."

He lost his veterans' benefits as a result of his incarceration and was able to secure them again after many years of appealing to the Veterans Administration ("VA"). Medical records and documents provided by Mr. Long from the VA attest to the fact that he has a 100% disability rating as a result of Post Traumatic Stress Disorder; impairment to his clavicle, migraine headaches, vertebral fracture and second degree burns. Medical records also show that Mr. Long attempted suicide on four occasions and continues to experience flashbacks and depression. It was noted that his impaired memory has a "significant impact on his functional capacity." Mr. Long testified that since Beirut, he has "tried two or three times" to work, but "just can't handle it." His only source of income is the payments he receives from disability.

He testified that "I wake up in pain and go to sleep in pain." Mr. Long noted, "my life is miserable now."

**ANALYSIS**

Standard of Review

To recover damages, "a FSIA default winner must prove damages –in the same manner and to the same extent' as any other default winner." Hill v. Republic of Iraq, 328 F.3d 680,

684-85 (D.C.Cir. 2003) (citation omitted).   Upon consideration of the facts presented and, in light of the aforementioned legal framework, the Special Master considers whether Mr. Long is entitled to compensatory damages for the pain and suffering he has endured.

### a.     Pain and Suffering

In appropriating damages for Mr. Long, the Special Master is informed not only by prior decisions awarding damages for pain and suffering, but also by those awarding damages for solatium.  Valore v. Islamic Republic of Iran, 700 F.Supp.2d 52 (D.D.C. 2010). Solatium is awarded to compensate the "the mental anguish, bereavement[,] and grief that those with a close personal relationship to a decedent experience as the result of the decedent's death, as well as the harm caused by the loss of the decedent['s] society and comfort." Id., at 85 (internal citations omitted).

The Special Master is mindful that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award." Brewer v. Islamic Republic of Iran, 664 F.Supp.2d 43, 57 (D.D.C. 2009).  As Judge Huvelle correctly noted, "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved," id. (quoting Blais v. Islamic Republic of Iran, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

A review of court decisions visiting similar issues is, however, instructive and reveals a trend to have assessed damages for surviving victims on several factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." Peterson, 515 F.Supp.2d at 52 n. 26 (quoting Blais, 459 F.Supp.2d at 59).

Similarly instructive, are the damages awarded to wounded servicemen in <u>Peterson</u> and reaffirmed in <u>Valore</u>. In both instances, the Court appeared to employ a baseline award of $5 million for pain and suffering of the surviving servicemen. The Court deemed that amount appropriate, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars (Marvin Albright); or where the servicemen suffered a broken jaw, severe flesh wounds and who suffered scars on his arms, legs and face and loss of teeth (Pablo Arroyo); or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems, internal maladies and physical scarring (Danny Wheeler); or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

Courts have departed upward from this baseline when presented with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million – Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million – Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million – Truman Dale Garner); or a broken neck resulting in permanent quadriplegia ($12 million – Larry Gerlach).

The Court has similarly departed downward in the face of lesser evidence such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million – Glenn Dolphin); nerve pain and foot numbness ($2 million – Charles Frye) and no physical injuries but "severe and lasting psychological harm" ($1.5 million – Frank Comes, Jr.). It bears noting that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above coupled with and reinforced by the documentation provided to the Special Master plainly indicate that Mr. Long suffered severe physical and psychological trauma as a result of his experiences in Beirut. Applying the precedential framework outlined in <u>Peterson</u> and its progeny, the Special Master finds that Mr. Long is entitled to compensatory damages for injuries resulting from the Marine Barracks Bombing in the amount of Eight Million Dollars ($8,000,000).

### b. Economic Losses

28 U.S.C. § 1605A, like its predecessor 28 U.S.C. § 1605(a)(7), establishes a cause of action for economic damages caused by an act of state-sponsored terrorism. In this instance, claimant put forward in support of his demand for economic losses an Earnings Losses Report by Dr. Jerome Paige – an acknowledged expert in the field of forensic economics. Dr. Paige's detailed calculation – adjusted for inflation, rise in productivity, job advancement and personal consumption – is premised on Mr. Long's testimony that he intended to retire from the military. Having reviewed the testimony and the information sheet completed by Dr. Paige, it is obvious Dr. Paige's conclusions are supported by the facts. The Special Master will therefore adopt Dr. Paige's Earnings Losses Calculations and accordingly, the Special Master finds that the appropriate amount of economic losses, discounted to present value is $1,710,395 (One Million Seven Hundred Ten Thousand and Three Hundred Ninety-Five Dollars).

Dated:  February 25, 2011                    Respectfully submitted,

<u>/s/ Alan L. Balaran</u>
Alan L. Balaran, Esq.
Special Master