UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
CAROLYN DAVIS, et al.,                      )
                                            )
    Plaintiffs                              )
                                            )
v.                                          )    Civil Action No. 07-1302 (RCL)
                                            )
THE ISLAMIC REPUBLIC OF IRAN, et al,        )
                                            )
    Defendants.                             )
_____)

### REPORT OF SPECIAL MASTER
### PURSUANT TO ORDER OF REFERENCE
### CONCERNING COUNTS CXXXIX - CXLII
**(Paul Segarra)**

This action is brought by Marine Paul Segarra pursuant to 28 U.S.C. § 1605A seeking damages for the injuries he sustained on October 23, 1983 as a result of the bombing at the United States Marine Barracks in Beirut, Lebanon. In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master received both testimonial and documentary evidence from those witnesses who might facilitate the Court's decision concerning the propriety and amount of compensatory and other damages.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marines' administrative headquarters building. That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others. It represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War. The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages. See, e.g., Glenn E. Dolphin, 24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon (2005); Eric Hammel, The Root: The Marines in Beirut August 1982 – February 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a recent opinion of this Court, see In re: Islamic Republic of Iran Terrorism Litigation, (659 F.Supp.2d 31 D.D.C. 2009), as well as in the U.S. Congressional Research Service's Suits Against Terrorist States by Victims of Terrorism (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983. See, e.g., Valore v. Islamic Republic of Iran, 478 F.Supp.2d 101, 110 (D.D.C. 2007); Peterson v. Islamic Republic of Iran, 264 F.Supp.2d 46, 61 (D.D.C. 2003). In addition to ascribing culpability, the Court in those cases has determined that the surviving family members have suffered and will continue to suffer mental anguish and loss of society. Id.

On January 20, 2010, Plaintiffs filed a motion requesting that "the Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30,

2003, in the related case of <u>Peterson v. Iran</u>, Civil Action No. 01-2094" and "enter judgment liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security."  The Court granted that motion on February 1, 2010.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

    1.    Paul Segarra was born on August 12, 1960 and is a United States citizen.

    2.    Mr. Segarra enlisted in the United States Marine Corps in 1981.

    3.    On October 23, 1983, while Mr. Segarra was stationed in Lebanon, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.  Upon impact, the explosives detonated, collapsing the building and resulting in the deaths of 241 American personnel.

    4.    Mr. Segarra never recovered from the trauma he suffered as a result of the terrorist attack.

**Testimony of Paul Segarra**

Mr. Segarra testified that he was born on August 12, 1960 and is a United States citizen. He currently resides in Connecticut and is a supervisor for the local electric company.  Mr. Segarra has two brothers with whom he is very close.  Mr. Segarra married for the first time in 1988 and had three daughters with his first wife.  They divorced in 2002; he is estranged from his daughters.  He remarried his current wife, Terri, in 2007.

Mr. Segarra recalls having a happy childhood; he excelled at football and baseball.  He testified that he and his brothers "always hung out together."  Mr. Segarra graduated from high school in 1979 and although he wanted to attend college, his family could not afford the tuition.

He hoped for a football scholarship but that "did not pan out." He began to "work in construction" immediately after graduation and decided to enlist in the Marine Corps in 1981 after learning that he was going to be laid off. "It was the best decision I ever made in my life,"

Mr. Segarra went through basic training at Paris Island and became a "radio man." He was initially deployed to Okinawa in September of 1981 for one year. Upon his return, he was assigned to the 2nd Air Naval Gunfire Liaison. Mr. Segarra testified that in February 1983, when his company command asked for volunteers to go to Beirut on a "peacekeeping" mission, he signed up. Mr. Segarra was part of the "advance party" charged with loading all of the equipment; radio gear and batteries on the ship, USS El Paso. He arrived in Beirut in March of 1983. Mr. Segarra testified that his unit was billeted in the "24 MSSG Platoon" building about 300 yards from the BLT.

Mr. Segarra was on the midnight shift of "radio watch" when the BLT blew up. He testified that he was about to be relieved when the explosion occurred. He described clearing the sand off of his radio equipment as he tried to raise his counterpart at the BLT. Mr. Segarra remembered his captain running into the room and asked him to put out a radio call for "all hands on." Mr. Segarra "jumped in a jeep and drove to the BLT."

At this point during his deposition, Mr. Segarra became very emotional rendering much of his testimony difficult to comprehend. What was comprehensible was his recalling seeing "parts of people in trees." Mr. Segarra saw a man with a "boulder in his gut, all of his stuff was hanging out there." Mr. Segarra pushed the man's intestines back inside his stomach cavity and wrapped a blanket around him. People were screaming for help all around him. Mr. Segarra ran into what was left of the BLT and tried pulling people out. He noted that the relief workers were taking sniper fire while they were clearing the rubble.

When he was clearing the rubble, Mr. Segarra testified, he came across a "cubby hole" or a pocket under the debris. There was a fire burning to his right and when Mr. Segarra crawled back in with a fire extinguisher, the extinguisher exploded. He returned to the area again and came across a Staff Sergeant. Mr. Segarra recounted that he yelled to the Staff Sergeant that the building was going to blow and everyone who could needed to get out. With the help of another survivor, he pulled the Staff Sergeant from the rubble. Mr. Segarra testified that the wounded all around him were crying "help me" and he thought "where do I start?"

Mr. Segarra recalled that they rooted through the rubble for a week, all day long. "I lost a lot of close friends," he testified.

Mr. Segarra remained in Beirut until November 15, 1983. When he returned to the States, he took a mandatory 30-day leave. He recounted that he slept in his bedroom at his parents' house for most of that time. Mr. Segarra testified that he would leave $10 on the kitchen table for his Dad to buy him beer every night, which he would take back to his room and drink it alone. He could not fall asleep until after 6:30 am without fear of being bombed. At the end of the mandatory leave period, his contract with the Marine Corps ended and he elected not to extend.

Mr. Segarra testified, "I didn't feel like I was a Marine anymore." He "couldn't deal with people," describing himself as "a drunk." Mr. Segarra remained in his bedroom until March or April 1984, when he realized he had to continue with his life. He took a job as a lineman, climbing 100 foot tall electric poles to install wires. But he continued to struggle with a "a $300 a day coke habit" that he acquired after Beirut. "I wanted to do some much coke that I could die and see God and ask him why he did this to me – why he let me live and all the guys die." Mr. Segarra did not seek medical attention, as he "did not know where to go."

In October 1987, he finally sought treatment. At the time, he was "doing so much coke and drinking," he ended up in a big fight with his live-in girlfriend who called his parents and his brother. They took him to the Veterans Administration ("VA") hospital "to detox." At the VA, while strapped down to his hospital bed, the Vietnam veteran in the bed next to Mr. Segarra told him about Post Traumatic Stress Disorder ("PTSD"). Mr. Segarra "told the veteran everything" and believes he must have told the medical staff because Mr. Segarra was transferred to the "Psych Ward" shortly afterward. Mr. Segarra testified that he was there for two weeks and was then transferred to another VA center for approximately 5 months.

He married in 1988 and testified that the relationship eventually deteriorated because he "would go into seclusion" for weeks at a time and would "discipline[] my kids pretty hard." He attributes his eventual divorce in 2001 from his first wife to the emotional trauma he suffered as a result of the Beirut bombing. Through the years, he continued with treatment for PTSD; he was never re-admitted to the hospital. Mr. Segarra testified that he eventually overcame his cocaine habit and for almost a decade, stopped drinking. He started again when his "marriage was going downhill."

Mr. Segarra married his current wife in 2007. He met her at the gym where he worked out every day. He slowly began confiding in her and eventually, he testified, she became "like my crutch." Mr. Segarra noted that if he starts "sliding into seclusion," his wife will bring him out of it.

Mr. Segarra recounted that he opted to be a lineman because he could work alone. His supervisor knew what he had been through and when he could see that Mr. Segarra was going through a dark period, he would let Mr. Segarra take out a truck and "do the trouble calls" by himself.

Mr. Segarra has a 70% disability rating for PTSD as confirmed by records from the VA.

<u>Testimony of Terri Segarra, Paul Segarra's Wife</u>

Although Terri Segarra is not a claimant in this lawsuit, her testimony sheds additional insight into Mr. Segarra's trauma.

Ms. Segarra is an accountant with three adult children from a previous marriage. Ms. Segarra testified that she met Paul Segarra in 1998 at the gym, noting that the couple "hit it off" because they "had similar lives." He eventually told her about the bombing. She noted that every year beginning in September, Mr. Segarra "would start losing it." His "moods would be all over the place." She testified that Mr. Segarra "had such guilt about them dying" recalling how he "was supposed to wake someone up to relieve him [from duty on the day of the bombing] and that man died."

To this day, "certain things set him off." They cannot watch any television program that is related to war. If Mr. Segarra hears a loud noise, "he will jump out of his skin." Ms. Segarra noted that she tries to "keep him stable" and help him to "enjoy life a little more" – they take vacations and work out together. She noted that Mr. Segarra is "a very personable person" but that can "change in a heartbeat."

Ms. Segarra also explained that Mr. Segarra's divorce from his first wife was very bitter and "his daughters seem not to want a relationship with him because of what the first wife told them." The estrangement from his daughters has had a "huge" impact on Mr. Segarra. Ms. Segarra testified, "he was a father and that was a very important part of him and that just got ripped out."

**ANALYSIS**

<u>Standard of Review</u>

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." Hill v. Republic of Iraq, 328 F.3d 680, 684-85 (D.C.Cir. 2003) (citation omitted).  Upon consideration of the facts presented and, in light of the aforementioned legal framework, the Special Master considers whether Mr. Segarra is entitled to compensatory damages for the pain and suffering he has endured.

### a. Pain and Suffering

In appropriating damages for Mr. Segarra, the Special Master is informed by prior decisions awarding damages for pain and suffering to victims of terrorist attacks. Valore v. Islamic Republic of Iran, 700 F.Supp.2d 52 (D.D.C. 2010).  The Special Master is mindful that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award." Brewer v. Islamic Republic of Iran, 664 F.Supp.2d 43, 57 (D.D.C. 2009).  As Judge Huvelle correctly noted, "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved," id. (quoting Blais v. Islamic Republic of Iran, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

A review of court decisions visiting similar issues is, however, instructive and reveals a trend to have assessed damages for surviving victims on several factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." Peterson, 515 F.Supp.2d at 52 n. 26 (quoting Blais, 459 F.Supp.2d at 59).

Similarly instructive, are the damages awarded to wounded servicemen in Peterson and reaffirmed in Valore.  In both instances, the Court appeared to employ a baseline award of $5 million for pain and suffering of the surviving servicemen.  The Court deemed that amount

- 8 -

appropriate, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars (Marvin Albright); or where the servicemen suffered a broken jaw, severe flesh wounds and who suffered scars on his arms, legs and face and loss of teeth (Pablo Arroyo); or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems, internal maladies and physical scarring (Danny Wheeler); or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

Courts have departed upward from this baseline when presented with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million – Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million – Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million – Truman Dale Garner); or a broken neck resulting in permanent quadriplegia ($12 million – Larry Gerlach).

The Court has similarly departed downward in the face of lesser evidence such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million – Glenn Dolphin); nerve pain and foot numbness ($2 million – Charles Frye) and no physical injuries but "severe and lasting psychological harm" ($1.5 million – Frank Comes, Jr.).  It bears noting that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above coupled with and reinforced by the documentation provided to the Special Master plainly indicate that Mr. Segarra suffered psychological trauma as a result of his experiences in Beirut. Applying the precedential framework outlined in <u>Peterson</u> and its

progeny, the Special Master finds that Mr. Segarra's situation most analogous to Mr. Combs, cited above, and finds, as a matter of law, that he is entitled to compensatory damages for injuries resulting from the Marine Barracks Bombing in the amount of One Million Five Hundred Thousand Dollars ($1,500,000).

Dated:  April 19, 2011                                Respectfully submitted,

/s/ Alan L. Balaran
Alan L. Balaran, Esq.
Special Master