**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

—————————————————————————

| | |
|---|---|
| **CAROLYN DAVIS, et al.,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **Civil Action No.: 07-1302 (RCL)** |
| | ) |
| **THE ISLAMIC REPUBLIC OF IRAN, et al,** | ) |
| | ) |
| **Defendants.** | ) |

—————————————————————————

**REPORT OF SPECIAL MASTER**
**PURSUANT TO ORDER OF REFERENCE**
**CONCERNING COUNTS CVIII - CXI**
**(Ronald Moore)**

This action is brought by Marine Ronald Moore pursuant to 28 U.S.C. § 1605A seeking

damages for the injuries he sustained on October 23, 1983 as a result of the bombing at the

United States Marine Barracks in Beirut, Lebanon.  In accordance with the Court's Order of

Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special

Master has received both testimonial and documentary evidence with regard to all issues of

compensatory damages from the witness as set forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of

explosives broke through a series of steel fences and sandbag barricades and ripped through the

heart of the Marines' administrative headquarters building.  That building, nicknamed the BLT,

housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and

soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40

feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest

single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War.  The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages.  *See*, *e.g.*, Glenn E. Dolphin, *24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon* (2005); Eric Hammel, *The Root: The Marines in Beirut August 1982 – February 1984* (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a recent opinion of this Court, *see In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 D.D.C.  2009), as well as in the U.S. Congressional Research Service's *Suits Against Terrorist States by Victims of Terrorism* (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983.  *See*, *e.g.*, *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003).  In these opinions, the Court has determined that the surviving family members have suffered and will continue to suffer mental anguish and loss of society.  *Id.*

On January 20, 2010, Plaintiffs filed a motion requesting that "the Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30,

2003, in the related case of *Peterson v. Iran*, Civil Action No. 01-2094ö and öenter judgment liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security.ö  The Court granted that motion on February 1, 2010.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Ronald Moore was born on August 10, 1963 and is a United States citizen.

2.      Mr. Moore enlisted in the United States Marine Corps in 1982.

3.      On October 23, 1983, while Mr. Moore was deployed to Lebanon, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.  He was not in the BLT at the time of the bombing.

4.      Mr. Moore suffered permanent psychological injuries as a result of the terrorist attack.

## **Testimony of Thomas Moore**

Mr. Moore was born in Iowa where he currently resides and works as a yard manager for a transportation company.  His parents are deceased.  He has two brothers and three sisters, none of whom are participating in this lawsuit.  His first marriage in 1984 ended in divorce the following year.  He married his current wife in 1991 and he has four step-children.

Mr. Moore received his GED and left high school to join the Marine Corps in 1982.  He testified that he aspired to be a Marine from the age of 12.  He graduated from boot camp in San Diego and his first tour duty was as a field radio operator.  He testified that öthe Marine Corps flows through my blood.ö  Mr. Moore was stationed at Camp Lejeune, North Carolina when his

commanding officers asked for "for volunteers to go on a Med Cruise." The "Med Cruise," he learned after volunteering, was actually a "peacekeeping mission" to Beirut, Lebanon.

Mr. Moore's unit, a Shore Party platoon was based on the beach near the BLT. Mr. Moore recounted that he was on the beach, having been relieved of radio duty at 4 a.m. the morning of October 23. He went "to the rack to get some sleep and was violently awoken by a massive explosion." He had "no idea what happened;" saw a "massive plume of smoke" and "realized that something within our Marine compound had been directly hit." He recalled that his Lieutenant was one of the first men to the bombing site. Around 7:15 his Lieutenant called and asked for volunteers to go the bombing site; Mr. Moore and others agreed to go. "At that point my life changed drastically," Mr. Moore testified. He recalled that when he arrived, he saw that "the building had collapsed on these people; the screams; the concrete dust; the smoke." He started working with the corpsmen, bringing bodies and survivors to a temporary triage site.

Mr. Moore testified that his "track of time was lost." He thought to himself, "[n]ow we have a mission. Let's get these survivors out of here." Mr. Moore and other able-bodied survivors worked around the clock for the first 72 hours after the bombing retrieving survivors and body parts. After three days, they realized that there were no more survivors, just "body parts and fallen Marines." Mr. Moore recounted how they "used torches to cut re-rod from both sides of a body so they could send it home." He scavenged through the rubble, trying to find dog tags and going through the victims' pockets looking for anything to identify the bodies. "The smell is something you never get rid of – the smell of the concrete and the smell of decaying flesh." Mr. Moore recounted finding what he believed was a survivor, pulling him from the rubble and taking the Marine to triage. He told the doctor there that the man's chest was rising and falling; that he was alive. The doctor started chest compressions and Mr. Moore

administered mouth-to-mouth only to pull back from the man with a mouth full of maggots.  The Marine was dead and his body infested with bugs.

Mr. Moore testified that he handled many body bags containing only body parts.  He recalls there were "lots and lots of people just unidentifiable."  Those were the "longest 7 days of my life."  They shut off the flood lights after a week realizing that they would not be able to recover any other bodies.

"Twenty-five years later and I still feel it every day," Mr. Moore testified.  He has difficulty sleeping for which he takes medication.  Mr. Moore recounted that his first wife left him soon after he returned from Beirut as he "was not the same person" when he returned.  Mr. Moore testified that when he felt relieved when his unit returned stateside and initially did not feel that he suffered any problems.  The returning Marines were ordered by their commanding officers to refrain from talking to anyone about the bombing and its aftermath.  The emotional impact "really didn't show because I had good things to look forward to."  He began to spiral downward, he testified, "then the emotional impact started – the nightmares, the sleeplessness nights."  For the past 25 years he has been "afraid to close my eyes because I can see these men."  He feels guilty that he is alive.  Mr. Moore started "self-medicating" because "I didn't know how to handle it."  It took many years "to understand how this young man who wanted to dedicate his life to being a Marine could go so far south."  Mr. Moore was discharged from the Marine Corps on May 30, 1986 due to a "pattern of misconduct."

Mr. Moore's clinical records provided to the Special Master confirm his admittance to the hospital in October 1985 for expressing suicide ideation to some of his Marine Corps friends with whom he had been drinking with at a bar.  He was subsequently hospitalized for ten days in the psychiatric ward. The medical records from his hospitalization note that "outpatient

psychiatry records reveal a diagnosis of marital problem with no clear evidence for post traumatic stress disorder.ö

Mr. Moore testified that he öhas tried every psychological drug out there to make tomorrow a better dayö but has yet to find any effective medication.  The drugs he was prescribed simply made him önumb.ö  He underwent psychotherapy for many years until his therapist passed away.  Mr. Moore resumed therapy in 2004 and, in support of his claim, his current psychiatrist provided a letter attesting to the fact that after Mr. Mooreøs psychiatrist passed away, öthe medical records were destroyed.ö  The letter also observes that Mr. Moore öhas a history of post traumatic stress disorder resulting from his combat experience.ö

Mr. Moore testified that he is a loner, noting that öno one wants to be around someone everybody thinks is crazy.ö  Mr. Moore explained that since the terrorist attack, he has had trouble maintaining employment because öit is hard to stay stable.ö  He testified that he has fibromyalgia which he believes öis a direct cause of the PTSD.ö

Mr. Moore does not currently have a VA disability rating confirming his PTSD.  He is appealing his discharge status, which if successfully challenged, would allow him to apply for VA benefits and disability.

## ANALYSIS

Standard of Review

To recover damages, öa FSIA default winner must prove damages ÷in the same manner and to the same extentøas any other default winner.ö  *Hill v. Republic of Iraq*, 328 F.3d 680, 684-85 (D.C.Cir. 2003) (citation omitted).   Upon consideration of the facts presented and, in light of the aforementioned legal framework, the Special Master must considers whether Mr. Moore is entitled to compensatory damages for the pain and suffering he has endured.

### a.    Pain and Suffering

In appropriating damages for Mr. Moore, the Special Master is informed by prior decisions awarding damages for pain and suffering to victims of terrorist attacks. *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010). The Special Master is particularly mindful of Judge Huvelle's poignant observation that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009). On that score, the *Brewer* court correctly noted, "it is —undeniably difficult—to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Id.* (quoting *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

A review of court decisions visiting similar issues is, however, instructive and reveals a trend to have assessed damages for surviving victims on several factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson*, 515 F.Supp.2d at 52 n. 26 (*quoting Blais*, 459 F.Supp.2d at 59).

Similarly instructive, are past damages awarded to wounded servicemen discussed in *Peterson* and *Valore*. In both instances, the Court appeared to employ a baseline award of Five Million ($5,000,000) for pain and suffering of the surviving servicemen. The Court deemed that amount appropriate, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars (Marvin Albright); or where the servicemen suffered a broken jaw, severe flesh wounds and who suffered scars on his arms, legs and face and loss of teeth (Pablo Arroyo); or where shrapnel caused soft tissue damage to the

chest and sternum area, flash burns, resulting in lingering back problems, internal maladies and physical scarring (Danny Wheeler) or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

Courts have departed upward from this baseline when presented with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million – Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million – Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million – Truman Dale Garner); or a broken neck resulting in permanent quadriplegia ($12 million – Larry Gerlach).

The Court has similarly departed downward in the face of lesser evidence such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million – Glenn Dolphin); nerve pain and foot numbness ($2 million – Charles Frye) and no physical injuries but "severe and lasting psychological harm" ($1.5 million – Frank Comes, Jr.).  It bears noting that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above is somewhat contradictory in terms of the psychological impact Mr. Moore suffered as a result of his experiences in Beirut.  While the medical records from his admission to the hospital in 1985 indicated there was no evidence Mr. Moore suffered from PTSD, his private psychiatrist concluded otherwise.  The lost medical files from Mr. Moore's original psychotherapist only exacerbate this deviation of diagnoses.  However, the Special Master is mindful of this Court's finding in *Peterson* that all survivors of the murderous attack of October 23, 1983 – whether physically wounded or not – were entitled to compensatory

damages for emotional injuries resulting from õsevere and lasting psychological harm.ö *Peterson*, 515 F.Supp.2d 25, 55.  Indeed, it would be difficult to review the events of that day and find otherwise, as a matter of common sense.

As such, the Special Master finds that Mr. Moore is entitled to compensatory damages for injuries resulting from the Marine Barracks Bombing in the amount of One Million Five Hundred Thousand Dollars ($1,500,000).

Dated:  May 23, 2011                          Respectfully submitted,

                                              /s/ Alan L. Balaran
                                              Alan L. Balaran, Esq.
                                              Special Master