## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CAROLYN DAVIS, et al.,                    )
                                          )
    Plaintiffs,                           )
                                          )
v.                                        )          Civil Action No. 07-1302 (RCL)
                                          )
THE ISLAMIC REPUBLIC OF IRAN, et al,      )
                                          )
    Defendants.                           )
_____)

## REPORT OF SPECIAL MASTER
## PURSUANT TO ORDER OF REFERENCE
## CONCERNING COUNTS CLXX - CLXXIV
### (Bryan Westrick)

This action is brought pursuant to 28 U.S.C. § 1605A by Marine Bryan Westrick.  Mr. Westrick is seeking damages for the injuries he sustained on October 23, 1983 as a result of the bombing at the United States Marine Barracks in Beirut, Lebanon.  In accordance with the Order of Reference entered into by the Court pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received both testimonial and documentary evidence with regard to all issues of compensatory damages from the witnesses as set forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marines’ administrative headquarters building.  That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War.  The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages.  *See*, *e.g.*, Glenn E. Dolphin, *24 MAU 1983: A Marine Looks Back at the Peacekeeping Mission to Beirut, Lebanon* (2005); Eric Hammel, *The Root: The Marines in Beirut August 1982 – February 1984* (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a recent opinion of this Court, *see In re: Islamic Republic of Iran Terrorism Litigation*, (659 F.Supp.2d 31 D.D.C. 2009), as well as in the U.S. Congressional Research Serviceøs *Suits Against Terrorist States by Victims of Terrorism* (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983.  *See*, *e.g.*, *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003).  In these opinions, the Court held that the surviving family members have suffered and will continue to suffer mental anguish and loss of society.  *Id.*

On January 20, 2010, Plaintiffs filed a motion requesting that õthe Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30, 2003, in the related case of *Peterson v. Iran*, Civil Action No. 01-2094ö and õenter judgment

liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security.ö  The Court granted that motion on February 1, 2010.

In accordance with this directive, and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Bryan Westrick was born on October 19, 1964 and is a United States citizen.

2.      He enlisted in the United States Marine Corps in 1982.

3.      On October 23, 1983, while Mr. Westrick was deployed to Lebanon, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.

4.      At the time of the impact, Mr. Westrick was located in the building housing the Military Stabilization Support Group (öMSSGö).

5.      Mr. Westrick never recovered from the emotional trauma he suffered as a result of the attack.

## Testimony of Bryan Westrick

Mr. Westrick testified that he was born on October 19, 1964 and is a United States citizen.  He currently resides in Florida with his second wife whom he married in 1985 and together they have two sons aged 23 and 20.  Mr. Westrick testified that he owns his own air conditioning supply business.  Mr. Westrick testified that his first marriage, in 1983 lasted for approximately 18 months before ending in divorce.  His older sister, Whitney and his parents, Patricia and John are claimants in this lawsuit.[1]

---

[1] Mr. Westrickøs sons are listed as claimants in the complaint but the record submitted to the Special Master contains no testimonial or other evidentiary evidence supporting their claim.  In any event they were born after the Beirut bombing.

Mr. Westrick left high school a month before graduation to attend boot camp.  Shortly after completing boot camp, he contacted the principal of his high school and explained that even though he left school a few credits shy to earn his degree, he wished to do what was necessary to receive his high school diploma.  Mr. Westrick's principal graciously agreed to "twist the rules" and allow Mr. Westrick to obtain his diploma if he took a college course to make-up the missing credits.  Mr. Westrick followed his principal's advice and received his diploma in 1983.

Mr. Westrick testified he wanted to join the Marines because, "I wasn't sure where I was headed" and "I wanted to do my own thing."  When he graduated boot camp, his first duty assignment was to a recruitment post in Indiana after which he was transferred to Twentynine Palms, California where he trained as a radio operator.

After completing his training, Mr. Westrick was assigned to Iwakuni, Japan, but after explaining to his commanding officer that he had just married his high-school girlfriend and was reluctant to transfer overseas, Mr. Westrick was allowed to trade his deployment with another Marine bound for Camp Lejeune.  Three months later, however, Mr. Westrick deployed to Beirut.

Mr. Westrick recalls enjoying life in the Marine Corps and he considered himself to be an "above-average" Marine.  He testified that he was not nervous about going to Lebanon, but was reluctant to leave his new wife.  Mr. Westrick testified that when they pulled ashore in Beirut in early Spring 1983, he observed that "all the buildings looked like Swiss cheese" and felt a little apprehensive.

He recounted that the first month or so, "it was quiet" until "the fire fights became more frequent; RPGs landed in our courtyard."  The hostilities escalated leading to heavier engagement by the Marines.  Mr. Westrick was assigned to the radio auxiliary in Military

Affairs; part of his duties included placing calls home for the troops which afforded him the opportunity to make calls to his own family once every few weeks.

Mr. Westrick testified that he was asleep in the MSSG building on the morning of October 23, 1983 when the bombing occurred.  He recounted that he and the others in his unit were "thrown out of the rack" from the blast and that they "scrambled around trying to get our gear" and get to that area of the basement designated in the event of attack.  He recalled that no one knew what happened and remembered that "it got dark and we couldn't see."  They were in the basement for about 15 to 20 minutes when the company commander came down to ask for volunteers to survey the damage and determine what had happened.  Mr. Westrick volunteered.

Mr. Westrick became very emotional when testifying about what he observed when he left the basement of the MSSG.  He recalled that "the entire [BLT] building was gone."  He remembers seeing someone's "limb in a tree; a hand in a bush; vehicles thrown everywhere on top of each other."  Mr. Westrick and another Marine "grabbed a stretcher and came across a guy in pieces" which they gathered and took back to the MSSG building.  Mr. Westrick testified, "the stretchers kept coming bringing bodies back."  He finally became somewhat detached and focused on his duty which was to "load[] the bodies into bags."  "[A]t the time, it's just something you gotta do."  He recalled walking by a soldier on a stretcher whose head was impaled by a concrete rod.  The soldier reached up to him and asked for his canteen of water.  The medics told Mr. Westrick not to give him anything.  "Ten minutes later the guy was gone."

Mr. Westrick and his unit had the radio system operating on the third day following the bombing.  He testified that he placed a few hundred calls that night.  On the third or fourth night, he broke down for a few hours.  Mr. Westrick contacted his parents to let them know he had survived.  Mr. Westrick noted that the stench of decomposition remained in the air almost two

weeks following the bombing.  Finally, heavy equipment was brought in to remove whatever concrete was left.

Mr. Westrick and his unit returned stateside several weeks after the bombing, coinciding with the end of his Marine Corps contract.  He considered re-enlisting because he was having trouble finding a job, but when his father offered him a job as a plumber, Mr. Westrick accepted, opting not to serve another tour in the military.

Mr. Westrick testified that did not realize how bad his psychological problems were until he went to the first reunion for the survivors of the bombing.  He does not discuss what he saw in the aftermath of the bombing with anyone other than his fellow survivors. õI look at life a whole lot differently seeing how quickly it can be snatched up.ö  He testified that, although he has tried to keep his emotional difficulties in check, õ[a]s I get older, the fuse is getting shorter.ö

Counsel for Mr. Westrick provided the Special Master with a 2008 VA disability rating indicating a 30% service related disability attributed to Post Traumatic Stress Disorder (õPTSDö).

Testimony of John Westrick Bryan Westrickøs Father

Bryanøs father, John Westrick, currently resides in Tennessee.  He owned his own business, Corrosion Solutions, in Florida which he õturned over to Bryanö when Mr. Westrick retired.  He is married to Patricia Westrick and together they have two children, Whitney, born in 1962 and Bryan, born in 1964.  Mr. and Mrs. Westrick were residing in Indianapolis, Indiana in October 1983.  They are United States citizens.

Mr. Westrick recalled that Bryan elected to join the Marine Corps in approximately 1981 or 1982.  He remembers that Bryan chose the Marines because he developed a close friendship with a local Marine recruiter.  Mr. Westrick testified that Bryan was active in sports in school

and was a "good student" who "learned things pretty easily and pretty well." Mr. Westrick

recalled that Bryan "really enjoyed" the Marine Corps, and that he "really enjoyed boot camp."

Mr. Westrick recounted receiving a letter from Bryan's commandant inviting Bryan's parents to

his boot camp graduation. The letter emphasized that Bryan almost set the base record for

marksmanship during his stay at boot camp.

Mr. Westrick testified that upon learning that his son was deploying to Lebanon, neither

he nor Bryan were concerned as it was described as "a peacekeeping mission." Bryan spoke

often with his parents via radio. They also received several letters from Bryan while he was

based in Beirut.

Early one morning in October 1983, John Westrick received a call from his father telling

him to turn on the television. This was the first time John and his wife Patricia learned of the

terrorist attack. Mr. and Mrs. Westrick listened to the news coverage all day, waiting for news of

their son. Finally, at about 7 or 8 one evening, a radio operator called to relay a message from

Bryan that he "was okay" and that he would get in touch with his parents when he could. They

knew that Bryan was working round the clock to rescue survivors.

The following day, the media converged on their home. Mr. Westrick believes that Bryan

might have been the only Marine from Indianapolis in Beirut at the time of the bombing. Both

John and Patricia granted a few interviews with local newscasters, recalling the entire process as

"very nerve wracking" and "extremely emotional."

Mr. and Mrs. Westrick traveled to Camp Lejeune to greet their son upon his return. Mr.

Westrick testified, "I saw some changes coming." He recounted an incident immediately after

Bryan returned to Camp Lejeune when he and Bryan were out driving and some of Bryan's

Marine colleagues from Beirut had been in a car accident. Mr. Westrick and Bryan drove around

searching for the men.  They found the car but could not find the men.  Bryan was extremely despondent during their search and needed to go back to the base soon after.  Mr. Westrick testified that after Bryan discharged from the Marine Corps, Bryan worked for the family business for a short time before he left to work at the Post Office.[2]

John Westrick testified that the Beirut bombing has given his family a greater appreciation for life and for "what you have."  Mr. Westrick feels that Bryan's emotional trauma became more severe after "he took the job with the Post Office."  He noted that although Bryan was married at the time, he did not see his wife very often.  And when Bryan joined the family business in Florida, Mr. Westrick noticed that his emotional state had deteriorated further.  "As a seventeen year old Marine, he was startled by what had happened especially when he was there for the recovery especially from the people that were so disorientated from the explosion and he would try and give them water but not know where to put it."

Bryan did not speak extensively to his father about the bombing, although he did speak to his friends who, in turn, relayed the information back to John Westrick.  Mr. Westrick does not believe that Bryan suffers from survivors' guilt, adding that Bryan is "still a dyed-in-the-wool Marine."

Mr. Westrick testifies that he still thinks about what happened to Bryan often and believes that Bryan also thinks about Beirut on a daily basis, noting that Bryan would not express that to his parents.

Patricia Westrick, Bryan Westrick's Mother

Mrs. Westrick testified that she is currently married to John Westrick and together they have a son, Bryan, and a daughter, Whitney.  Mrs. Westrick is a United States citizen.

---

[2] Bryan Westrick did not testify regarding his employment at the Post Office.

She testified that Bryan's best friend joined the Marine Corps and after Bryan became friendly with the recruiter, he soon followed.  She is unsure if Bryan wanted to make a career of the Marine Corps, but she does know that Bryan aspired to become a professional bass fisherman when he grew up, noting that it is something he still aspires to.

Mrs. Westrick testified that Bryan would radio messages home and send the family letters during his Beirut deployment.  She recalled that he told them that the Marines were being shot at but were not allowed to fire back.

On October 23, 1983, Mrs. Westrick recounted, her father-in-law called and told them to turn on the television.  She and Mr. Westrick did not speak much as they watched television and waited.   In late afternoon they received a call from a Marine radio operator relating information from Bryan that he was okay and that he would call when he could.  She testified that she felt "very very sorry for all those families who lost their boys" but very relieved that Bryan was okay.

The Westricks travelled to Camp Lejeune to welcome Bryan home.  While attending the homecoming parade at the base with Bryan, Mrs. Westrick recounted, there was a loud explosion and Bryan immediately fell to the ground, crouching and holding his head.

She noted Bryan "went over there a boy and came back a man" from having survived "all of that."  Mrs. Westrick "knows" that it affects him "constantly."  Mrs. Westrick recounted that Bryan still has difficulty sleeping.  She testified that Bryan tries to cover up his emotions by "going out alone to fish and getting away from the day-to-day life."  She thinks about what happened to Bryan often.  She noted that her grandson, Bryan's son, is considering enlisting and this dredges up even more memories of the Beirut bombing for the family.

Testimony of Whitney Westrick, Bryan Westrick's Sister

Whitney Westrick is Bryan's older sister.  She currently resides in Tennessee and is employed by the Post Office.  She is a United States citizen.

Whitney was also in the Marine Corps when Bryan learned about his deployment to Beirut.  She explained that she was not concerned, noting that he was a Marine and as "a Marine he had to do what he had to do."  She testified that she heard from Bryan approximately once a week mainly due to his position as a radio operator which enabled him to contact her easily at her barracks at Camp Lejeune.

On October 23, 1983, Ms. Westrick woke up in her room to find her roommates watching the television news which featured coverage of the bombing in Beirut.  She was annoyed that her roommates did not wake her.  It was about 4 or 5 pm the same day, she testified, that her commanding officer delivered a message to her from a radio operator that "Bryan was alright."

"The extent of my trauma was those particular hours that I didn't know he was okay." She explained that she was worried that "another bomb would happen" and also concerned about the fact that he was "cleaning up the mess" and "having lost so many friends."  Ms. Westrick explained that her parents "probably had the same concerns that I had" and were "worried to death."

She testified that "to this day, [Bryan] doesn't sleep well and has PTSD [] any loud noises that happens he hits the deck."  She added that Bryan "seems a lot more stressed than most people."

Whitney recounted that she went to welcome Bryan home when his ship arrived from Beirut.  She recalled that "he seemed relieved to be back in the States."  Whitney began noticing "changes in him" after his discharge from the Marine Corps.  She "thinks about it every day and the memory of it and he has to live with it."  She testified that after he left the Marine Corps,

Bryan was employed by the Post Office, which was "a daily reminder of being in the military."
Whitney testified that her brother was employed at the Post Office for fifteen years before he left
to work with their father.

**ANALYSIS**

Standard of Review

To recover damages, "a FSIA default winner must prove damages ‒in the same manner
and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680,
684-85 (D.C.Cir. 2003) (*citation omitted*).  Upon consideration of the facts presented, and in
light of the aforementioned legal framework, the Special Master must consider whether Mr.
Westrick, his parents and sister are entitled to compensatory damages for the pain and suffering
they have endured.

**a.     Pain and Suffering**

In determining an appropriate amount of damages for Mr. Westrick, his parents and his
sister, the Special Master is informed by prior decisions awarding damages for pain and suffering
to victims of terrorist attacks.  *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C.
2010).  The Special Master is mindful that "there is no exact comparison, and, indeed, strict
application of precedent could lead to conflicting conclusions about an appropriate award").  As
Judge Huvelle correctly noted, "it is ‒undeniably difficult' to assess the amount of compensatory
damages for the pain and suffering of surviving victims of terrorist attacks, especially where
severe mental anguish is involved," *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57
(D.D.C. 2009 (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

A review of court decisions confronted with similar issues is instructive and reveals a
trend to take into account several factors when assessing damages for surviving victims: "the

severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life.ö *Peterson*, 515 F.Supp.2d at 52 n. 26 (*quoting Blais*, 459 F.Supp.2d at 59)).

Similarly instructive are the reference points courts have employed for assessing damages owed to wounded servicemen.  For example, both in *Peterson* and reaffirmed in *Valore*, the Court appeared to award a baseline amount of $5 million for pain and suffering of the surviving servicemen.  The Court deemed that amount appropriate, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars (Marvin Albright); or where the serviceman suffered a broken jaw, severe flesh wounds and who suffered scars on his arms, legs and face and loss of teeth (Pablo Arroyo); or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems, internal maladies and physical scarring (Danny Wheeler) or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

Courts have departed upward from this baseline when presented with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million ó Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million ó Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million ó Truman Dale Garner) or a broken neck resulting in permanent quadriplegia ($12 million ó Larry Gerlach).

The Court has similarly departed downward in the face of lesser evidence such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million ó Glenn Dolphin); nerve pain and foot numbness ($2 million ó Charles Frye) and no physical injuries but

"severe and lasting psychological harm" ($1.5 million – Frank Comes, Jr.).  It bears noting that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above coupled with and reinforced by the documentation provided to the Special Master indicate that three years ago, Bryan Westrick received a VA disability rating of 30% attributable to PTSD.  The Special Master finds that Mr. Westrick, as a matter of law, "suffered lasting and severe psychological problems from the attack" without physical trauma. *Peterson*, 515 F.Supp.2d 25, 54-55.  As such, the Special Master finds Bryan Westrick's situation most analogous to that confronted by Frank E. Comes, *id.* at 515 F.Supp.2d at 55, who was not physically wounded but was held entitled to compensatory damages for his "severe and lasting psychological harm."  Accordingly, the Special Master finds that Mr. Westrick is entitled to compensatory damages for injuries resulting from the Marine Barracks Bombing in the amount of One Million Five Hundred Thousand Dollars ($1,500,000).

### b. Solatium

Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to those closely related to and impacted by a victim of terrorism. 28 U.S.C. §1605A(c)(4).  *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12-13 (D.D.C. 1998).  Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror [.]" *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

Unlike a claim for lost wages, however, the amount to be awarded for the loss of solatium "cannot be defined through models and variable." *Flatow*, 999 F.Supp. at 32.  Accordingly,

courts look to previous awards for guidance.  *See Jenco v. Islamic Republic of Iran,* 154
F.Supp.2d 27, 39640 (D.D.C. 2001).  *See also* Amended Administrative Plan Governing
Appointed Special Masters (directing that the Special Masters be õguidedö in their decisions by
the *Flatow*, *Eisenfield* (*Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (2000)) and *Jenco*
decisions).

As stated, the testimonial and documentary record before the Special Master amply
demonstrate that Bryan Westrickøs emotional trauma as a result of the bombing has had a
permanent impact on his parents and sister.  The general framework for compensatory awards for
the parents, spouses, siblings and children of surviving victims of terrorist attacks has been
established by the *Peterson* Court which opined that, õthe appropriate amount of damages for
family members of surviving servicemen are as follows: spouse ($4 million); parents ($2.5
million); children ($2.5 million); siblings ($1.25 million).  *Id.* 515 F.Supp.2d at 52.

The dilemma facing the Special Master rests with the concept of awarding family
members an amount greater than that awarded to the victim.  Recognizing this quandary, the
Court in *Haim v. Islamic Republic of Iran*, 425 F.Supp.2d 56, 75 (D.D.C. 2006), adopted the
formulation articulated in *Campuzano v. Islamic Republic of Iran,* 281 F.Supp.2d 258, 268
(D.D.C. 2003), where Judge Urbina reasoned that compensatory damages awards to members for
their pain and suffering must be guided by the nature of the relationship and the severity and
duration of the pain suffered by the family member as interpreted through the lens of the
following three considerations: (1) õspouses typically receive greater awards than parents,ö who,
in turn, õreceive greater awards than siblingsö; (2) õfamilies of hostage or captivity victims are
also typically awarded greater damages than are the families of a single attack;ö and (3) courts

õtypically awarded greater damages than families of victims who remain alive.ö *Haim*, 425 F.Supp.2d at 75 (internal citations and quotations omitted).

The record demonstrates that the Westrick family was impacted by the events that took place on October 23, 1983.  There is, however, nothing in the record before the Special Master compelling a finding that they deserve a more generous award than their son who was forced to collect body parts of his friends and to endure the stench of decaying flesh.  For these reasons, the Special Master concludes, as a matter of law that the appropriate monetary compensation is as follows:  John Westrick ó One Million Dollars ($1,000,000); Patricia Westrick ó One Million Dollars ($1,000,000) and Whitney Westrick ó One Million Dollars ($1,000,000).

Dated:  May 25, 2011                           Respectfully submitted,

                                               /s/ Alan L. Balaran
                                               Alan L. Balaran, Esq.
                                               Special Master