## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____

CAROLYN DAVIS, et al.,                )
                                       )
        Plaintiffs,                    )
                                       )
v.                                     )        Civil Action No.: 07-1302 (RCL)
                                       )
THE ISLAMIC REPUBLIC OF IRAN, et al.,  )
                                       )
        Defendants.                    )
_____)

### REPORT OF SPECIAL MASTER
### PURSUANT TO ORDER OF REFERENCE
### CONCERNING COUNT CCX
### (Siblings of Jeffrey Nashton)

This action is brought pursuant to 28 U.S.C. § 1605A by Cataldo Nashton, Mark

Nashton, Myles Nashton and Claudia Comino.  These claimants are seeking solatium damages

for injuries their brother, Marine Jeffrey (ðJeffö) Nashton sustained in the October 23, 1983

bombing at the United States Marine Barracks in Beirut, Lebanon.  In accordance with the Order

of Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the

Special Master has received evidence with regard to all issues of compensatory damages from

the witnesses as set forth below.

Background

Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of

explosives broke through a series of steel fences and sandbag barricades and ripped through the

heart of the Marinesø administrative headquarters building.  That building, nicknamed the BLT,

housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and

soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40

feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest

single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War. The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages. *See, e.g.*, Glenn E. Dolphin, 24 MAU 1983: A MARINE LOOKS BACK AT THE PEACEKEEPING MISSION TO BEIRUT, LEBANON (2005); Eric Hammel, THE ROOT: THE MARINES IN BEIRUT AUGUST 1982 ó FEBRUARY 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a recent opinion of this Court, *see In re: Islamic Republic of Iran Terrorism Litigation*, (659 F.Supp.2d 31 D.D.C. 2009), as well as in the U.S. Congressional Research Serviceós SUITS AGAINST TERRORIST STATES BY VICTIMS OF TERRORISM (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

In an unbroken chain of decisions, this Court has found defendants Islamic Republic of Iran and its Ministry of Information and Security responsible for providing financial and logistical support necessary to carry out the October 23rd attack. *See*, *e.g.*, *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003). In these opinions, the Court determined that the surviving family members have suffered and will continue to suffer mental anguish and loss of society. *Id.* This Court previously awarded compensatory damages to Jeff Nashton, his mother and his fatherós estate in *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007). His siblings were not claimants in that matter.

On January 20, 2010, Plaintiffs filed a motion requesting that "the Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30, 2003, in the related case of *Peterson v. Iran*, Civil Action No. 01-2094" and "enter judgment liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security."  The Court granted that motion on February 1, 2010.

In accordance with this directive, and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

1.      Jeff Nashton was born on May 4, 1959 and is a United States citizen.

2.      On October 23, 1983, while Jeff Nashton was deployed to Lebanon, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.

3.      As found in *Peterson v. Islamic Republic of Iran,* 515 F.Supp. 2d 25 (2007), Jeff Nashton was injured as a result of the terrorist attack.

### <u>Testimony of Cataldo Nashton, Jeff Nashton's Brother</u>

Cataldo Nashton testified that he currently resides in New York with his two children. He recounted that his brother Jeff enlisted in the Marines in approximately 1979 or 1980 while Cataldo was serving in the Army.  Cataldo believed Jeff always wanted to join the military and selected the Marine Corps "because he wanted to be one of the best."  According to Cataldo, Jeff "loved serving in the Marine Corps."

Cataldo recalled that he felt anxious about his brother's deployment to Beirut but added that the family was proud and supportive.  While Jeff was deployed, the family received letters from him at least once a month.

On October 23, 1983 Cataldo received an urgent telephone call from his mother asking him to come to her house right away.  When he arrived, Cataldo testified, his parents and brothers were anxiously watching the news on television.  They told him that the Marine Barracks in Beirut had been bombed and that Jeff was likely to have been in the building.  "We stayed in front of that television until we heard and it was a long time before we heard anything." Cataldo recounted that the family received a telephone call either from the Red Cross or Marine Corps informing them that Jeff was in the rubble of the building and they were trying to dig him out.  The next day, Cataldo testified, his parents received another telephone call from one of Jeff's "Marine Corps buddies" who informed them that Jeff had been found alive but the extent of his injuries were as yet undetermined.   Cataldo recalled that his brother was transported to Weisbaden Air Force Base for treatment.

Cataldo testified that his parents flew to Germany to see Jeff.  When they arrived at Jeff's hospital room, "my father fell onto his knees because my brother was hooked up to 21 machines."  Cataldo testified that Jeff had a crushed skull, a collapsed lung, burns on his legs and neck.  Seeing Jeff "tore my father apart" and his mother despaired that "she couldn't take care of him."

Cataldo testified that, since the bombing, Jeff "is different."  He recalled visiting Jeff in North Carolina and hearing his brother screaming in his sleep at night.  He recounted another incident when he awoke to find Jeff crawling on his knees asking to be taken to the hospital because he was in terrible pain.  Cataldo testified that Jeff had to undergo another surgical procedure to remove a piece of his skull as that injury was not healing properly.  Cataldo believes his brother suffered from memory loss as a result.  Whenever Cataldo tries to discuss

the bombing with Jeff, his brother responds, "I don't want to talk about it.  I lost too many friends over there."

Cataldo does not believe his brother will ever recover "because he will always remember."

**Testimony of Mark Nashton, Jeff Nashton's Brother**

Mark Nashton, Jeff's younger brother, currently resides in New York and is married with three children.

Mark testified that Jeff enlisted in the Marine Corps in or about 1979 – approximately six months or so after Mark.  Mark believes that his discussions with Jeff about the Marine Corps led to Jeff's decision to enlist.

Mark was on deployment when Jeff graduated from high school and is not sure if Jeff graduated or obtained a GED.  He remembers Jeff taking Infantry Training and "anti-tank training" before being deployed overseas.  Mark testified that he believes Jeff enjoyed being in the Marine Corps, especially the travel involved.  Jeff had served in Japan, Hawaii and the West Coast before the Beirut deployment.  Mark believes it was Jeffrey's intent to stay in the Marine Corps for twenty years.

Mark was concerned about Jeff's deployment to Beirut because "I knew what was over there regarding terrorists."  He explained that immediately before Jeff's deployment, Mark served in Spain and Greece where he witnessed anti-American protests directed at the Marines.  Mark would learn the details of Jeff's tour mainly through their father.  He was alarmed to learn that "because they couldn't shoot back if anything came back at them."  The Marines were frequently under sniper and rocket fire "and there was nothing they could do about it."  Mark knew that Beirut "was a hot zone" and "morale was up and down" as a result.

At the time the bombing took place, Mark was living a few miles from his parents' house. He recalled his father calling him early in the morning and asked him to come over.  He did so and "that's when my father told me what happened."  Mark felt sick to his stomach and thought, "it was my fault" because he encouraged Jeff to join the Marine Corps. The family stayed together that entire day.  "It seemed like forever" until they found out that Jeff had survived the attack.

Mark testified that Jeff suffered a collapsed lung and something fell on his back during the bombing, breaking it and requiring him to wear a cast.  Jeff was also emotionally and mentally different.  "Even today he goes out, like he is looking into outer space."

The week of October 23, Mr. and Mrs. Nashton flew to Germany to see their son.  Mark testified that Mr. Nashton had an aneurysm the following January – an event Mark attributes to the stress brought on by Jeff's considerable injuries.  He noted that their father was very proud of his sons for serving and of Jeff for "trying to make a world over there . . . make it better."

Upon his return from Beirut, Jeff "seemed like he was out there."  He "had a lot of anger because of what happened" that negatively affected his personality and demeanor.  Mark testified that "Jeff changed a lot of ways from family" and "seemed to alienate himself."  Mark believes Jeff suffers from "survivor's guilt," noting in particular that Jeff lost his best friend and was the only member of his platoon to survive.  Mark does not believe Jeff will ever recover.  The impact of the bombing on the Nashton family has been enormous.

**Testimony of Myles Nashton, Jeff Nashton's Brother**

Myles Nashton, Jeff's younger brother, currently resides in New York with his wife and three children.  He was born in New York on April 6, 1965 and is a United States citizen.

Myles testified that Jeff was "fun to be with and kind of on the wild side." Myles recounted that Jeffrey "was the outdoorsman of the family" and the two would often hunt and fish together.

Myles recounted that Mark and Jeff were very close and Mark influenced Jeff to join the Marines which he did in approximately 1980.  Jeff graduated from boot camp, skilled as a sharpshooter.  Myles noted that Jeff loved the Marine Corps and "was all Marine once he got in."

Myles recalled his parents sharing some reservations about Jeffrey's deployment overseas "in general" but were proud of Jeffrey "standing up for the country."  Myles was unsure what Jeff's duties were while he was deployed.  The two did not exchange letters directly, although Jeff wrote to their parents.

When he first learned about the bombing, Myles "was astounded that it had happened." "We all were in shock," knowing that the destroyed BLT building shown on the news was the one in which Jeff lived.  Myles does not recall when the family learned that Jeff was one of the few survivors. He similarly does not recall his parents' trip to Germany.  He does, however, remember that the family was "shaken up" not knowing "if Jeff was going to live or die."  From Myles' perspective "the thought of losing a brother was on the tip of your mind absolutely.  That is something you never want to happen."  Myles believes the stress brought on by the bombing contributed to their father's premature death in January 1984.

When Jeff returned home, Myles testified, "he was banged up" and was no longer "the Jeff that I knew when he left."  Myles testified that his brother became "an introvert, wasn't outspoken," but instead was "depressed, quiet."  Jeff and Myles discussed what took place overseas and Myles recalls distinctly that Jeff believed "it was a problem" that the Marines could not shoot back while they were there.  After the bombing and following their father's death,

Myles recounted, "there was a huge change with everyone" in his family – especially with respect to trust "of the government, in Jeff's health and because of our father's passing." Myles believes that the bombing "has done that much damage to Jeff, mentally and physically" and that neither he nor the Nashton family "will ever be the same."

**Testimony of Claudia Comino, Jeff Nashton's Sister**

Claudia Comino[1] testified that she was born on August 12, 1957 and resides in New York with her third husband.

Claudia testified that she "always got along" with her brothers and she "was very very close" with Jeff. She recounted that she was "very sick" when she was small and feels she took her parents away from her brothers somewhat. She does recall sledding and playing outside with her brothers. Jeff, she recounted, was "very outgoing," "loved making us laugh" and "enjoyed doing anything outdoors."

Claudia and Jeff exchanged letters while he was deployed to Beirut. She recalled Jeff initially writing "how he didn't like the environment at all" and he felt "something was going to happen." A few months later, Jeff wrote "something to the effect that the air was getting heavy over there." She was only able to speak to Jeff a few times by telephone while he was deployed.

Recalling the events of October 23, Claudia testified that she spent the day at her parents' house watching the news on television, waiting any information about Jeff. "It was a sad day." She remembered the family receiving a telephone call informing them only that Jeff had been found. "It was not until several days later that we learned Jeff was severely burned" and that he was transferred to a hospital in Germany. Claudia recounted that her parents traveled overseas to

---

[1] The Special Master notes that the sound quality of Ms. Comino's video deposition was poor, at best, and at times was completely inaudible. Fortunately, the sound quality improved at the points in her deposition when she testified about her relationship with her brother and the impact the bombing had both on Jeff and the Nashton family. The Special Master was thus able to make a determination as to the validity of her claim for solatium damages.

see Jeff and when her parents came home they told Claudia and her brothers that they were not

sure if "Jeff was going to make it."

When Jeff finally returned home, Claudia testified, "he didn¢t look like my brother."  She

noted in particular that "he was very swollen" and it took him "a long time to recover" from his

physical wounds.  Mentally, however, it was clear "[h]e definitely was not the same." She

recounted him pulling away from her when she first tried to hug him when he returned from the

hospital.  "I lost a lot of my life with him," Claudia noted.  She testified that their father died in

January 1984 and "I know in my heart what happened to Jeff killed him."

The bombing and its impact on her brother, Claudia testified, "affected me a lot."  Jeff¢s

memory is substantially impaired.  Claudia observed that Jeff is no longer as active as he once

was and does not seem as happy.  Claudia testified that she while loves Jeff very much, she feels

as though she has lost the brother to whom she was once so close.

**ANALYSIS**

Standard of Review

To recover damages, "a FSIA default winner must prove damages ¬in the same manner

and to the same extent¢ as any other default winner."  *Hill v. Republic of Iraq*, 328 F.3d 680,

684-85 (D.C.Cir. 2003) (citation omitted).[2]  Upon consideration of the facts presented and, in

light of the aforementioned legal framework, the Special Master considers whether solatium

damages are available for Jeff Nashton¢s siblings ó Cataldo Nashton, Mark Nashton, Myles

Nashton and Claudia Comino.

---

[2]  The Foreign Sovereign Immunities Act (FSIA) of 1976, codified at 28 U.S.C. §§ 1330, 1332, 1391(f), 1441(d), and 1602-11, provides the exclusive means to bring a lawsuit against a foreign sovereign (or its political subdivisions, agencies, or instrumentalities) in United States courts. It also establishes specific procedures for service of process and attachment of property for proceedings against a foreign state.

**Solatium**

Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to those closely related to and impacted by a victim of terrorism. 28 U.S.C. §1605A(c)(4).  *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12-13 (D.D.C. 1998).  Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as õacts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror[.]ö *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

Unlike a claim for lost wages, the solatium damages õcannot be defined through models and variables.ö *Flatow*, 999 F.Supp. at 32.  For guidance, therefore, courts examine previous awards.  *See Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27, 39õ40 (D.D.C. 2001); s*ee also* Amended Administrative Plan Governing Appointed Special Masters (directing that the Special Masters be õguidedö by the *Flatow*, *Eisenfield* and *Jenco* decisions).

The Special Master finds that the testimonial and documentary record amply demonstrate that Jeff Nashtonøs physical and emotional trauma resulting from the October 23, 1983 bombing has had a permanent impact on his siblings.  The general framework for compensatory awards for the parents, spouses, siblings and children of surviving victims of terrorist attacks established by the *Peterson* Court suggests that, õthe appropriate amount of damages for family members of surviving servicemen are as follows: spouse ($4 million); parents ($2.5 million); children ($2.5 million); siblings ($1.25 million).  *Peterson*, 515 F.Supp.2d at 52.

The record demonstrates that Jeff Nashtonøs siblings were devastated by the events that took place on October 23, 1983 and the mental and physical trauma their brother has undergone as a result.  That said there is nothing in the record before the Special Master compelling a

finding of greater damages than those set forth in *Peterson*.  For these reasons, the Special

Master concludes, as a matter of law that the appropriate monetary compensation for Jeff

Nashton's siblings is as follows: Cataldo Nashton – One Million Two Hundred and Fifty

Thousand Dollars ($1,250,000); Mark Nashton – One Million Two Hundred and Fifty Thousand

Dollars ($1,250,000); Myles Nashton – One Million Two Hundred and Fifty Thousand Dollars

($1,250,000) and Claudia Comino – One Million Two Hundred and Fifty Thousand Dollars

($1,250,000).

Dated:  July 3, 2011                                     Respectfully submitted,

                                                        /s/ Alan L. Balaran
                                                        Alan L. Balaran, Esq.
                                                        Special Master