UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
CAROLYN DAVIS, et al.,                      )
                                            )
      Plaintiffs,                          )
                                            )
v.                                          )    Civil Action No.: 07-1302 (RCL)
                                            )
THE ISLAMIC REPUBLIC OF IRAN, et al,        )
                                            )
      Defendants.                          )
_____)

**REPORT OF SPECIAL MASTER
PURSUANT TO ORDER OF REFERENCE
CONCERNING COUNTS LXV - LXIX**
(Thomas Brown)

      This action is brought pursuant to 28 U.S.C. § 1605A by Marine Thomas Brown seeking damages for the injuries he sustained on October 23, 1983 as a result of the bombing at the United States Marine Barracks in Beirut, Lebanon. In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received both testimonial and documentary evidence with respect to compensatory and other damages from the witnesses identified below.

Background

      Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marines' administrative headquarters building. That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others. It represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War. The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages. *See, e.g.*, Glenn E. Dolphin, 24 MAU 1983: A MARINE LOOKS BACK AT THE PEACEKEEPING MISSION TO BEIRUT, LEBANON (2005); Eric Hammel, THE ROOT: THE MARINES IN BEIRUT AUGUST 1982 – FEBRUARY 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a recent opinion of this Court, *see In re: Islamic Republic of Iran Terrorism Litigation*, (659 F.Supp.2d 31 D.D.C. 2009), as well as in the U.S. Congressional Research Service's SUITS AGAINST TERRORIST STATES BY VICTIMS OF TERRORISM (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut. *See*, *e.g.*, *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003). In these opinions, the Court determined that the surviving family members have suffered and will continue to suffer mental anguish and loss of society. *Id.*

On January 20, 2010, Plaintiffs filed a motion requesting that "the Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30, 2003, in the related case of *Peterson v. Iran*, Civil Action No. 01-2094" and "enter judgment

liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security."  The Court granted that motion on February 1, 2010.

In accordance with this directive and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1. Thomas Brown, Jr. was born on January 18, 1962 and is a United States citizen.

2. Mr. Brown enlisted in the United States Marine Corps in 1980.

3. On October 23, 1983, while Mr. Brown was deployed to Lebanon, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.

4. Mr. Brown was in BLT at the time of the explosion and suffered both physical and psychological injuries as a result of the attack.

**Testimony of Thomas Brown**

Mr. Brown was born in Florida on January 18, 1962 where he still resides although presently retired. His mother, Jeanette Odom and his sister, Deborah Vogt, both residents of Florida, are claimants in this lawsuit. Mr. Brown's father passed away when he was eleven. Mr. Brown has been married three times – to his first wife Vicki in December 1983; to his second wife Alicia in 1998; and to his current wife, Vivian in 2002. He has one biological daughter, Barbie Miller (nee Brown), born on October 23, 1985 as well as two step-children.

Mr. Brown testified that he joined the Marine Corps upon graduating high school in 1980. After successfully completing boot camp, Mr. Brown's first duty assignment was as an auto mechanic. He testified that he did not have specific career aspirations and "just took it as it came."

Mr. Brown testified that he was not apprehensive about the Beirut deployment. He equated the assignment with a "Med Cruise," a routine tour that would stop at several locations in the Mediterranean before returning to the States. His unit arrived in Beirut in approximately May of 1983, scheduled to return to the United States in December. While in Lebanon, Mr. Brown called and wrote to his family often. Mr. Brown provided no testimony indicating what his duties were while in Beirut.

On the morning of October 23, Mr. Brown testified, he woke up on his cot in the BLT, spitting out "a bunch of dirt and dust." He recalled lying on his stomach and hearing someone yell, "help me" before "passing out." He regained consciousness the following Tuesday or Wednesday to find himself in a hospital bed in Cyprus where he first learned about the BLT bombing.

Mr. Brown testified that he was hospitalized in Cyprus for approximately two weeks for treatment of a puncture wound in his right leg; a head wound and multiple abrasions. He was transferred from Cyprus to Germany, finally arriving in the United States on November 4, where he was admitted to the naval hospital at Camp Lejeune for three days. He recounted that his physical injuries healed in approximately six months.

After returning stateside, Mr. Brown recounted, he had developed an "attitude problem." He began to "get in trouble a lot" and "was kicked out of the motor pool" for two to three months until his supervisor was replaced with a new Lieutenant. He was honorably discharged from the Marine Corps in 1988 and moved to Colorado.

After moving to Colorado, he took a job as a cook supervisor for the Department of Corrections which at times required him to make special meal preparations for the Muslim prisoners, a task that Mr. Brown was unable to master due to his profound distrust and dislike of

Muslims all of whom he blamed for the Beirut bombing. He was subject to disciplinary action as a result. In 1997, Mr. Brown joined the Federal Bureau of Prisons, again serving as a cook supervisor. In approximately 2000, Mr. Brown recounted, he began psychiatric treatment at his local Veterans Administration ("VA") hospital for Post Traumatic Stress Disorder. Around this same period, records provided by Mr. Brown indicate that he requested several accommodations from his employer in order to avoid having to interact with inmates. After realizing that the accommodations were not helping him to perform his job, Mr. Brown requested and was granted a medical retirement in 2003. His request for medical retirement was backed by a letter from the VA that was provided to the Special Master by Mr. Brown's counsel. The letter indicates that Mr. Brown suffered from PTSD and concurred with his request for medical retirement, noting that he was "unable to work with individuals of Aram ethnicity or Muslim faith" because he "views people of the background as the enemy, his enemy . . ."

     Mr. Brown continues to be afflicted by psychiatric problems. He testified, "I just don't like people" and "I get real attitude problems." He "holds the anger in" which causes him to "withdraw away." He testified that "I really can't get close to anybody, it made my heart get really hard." Mr. Brown still attends group therapy at the VA hospital and he currently takes anti-depressants and medications to alleviate his "mood swings." He does not believe his psychological makeup has improved despite the years of treatment.

     Mr. Brown provided additional documentation from the VA confirming that he is 100% disabled. According to the records provided by Mr. Brown's counsel, he was admitted to the hospital for two days in July 2005 after his wife took him to the Emergency Room after finding he fell from a sitting position on his bed to the floor. When his wife woke him, she observed her husband's speech was slurred and incoherent. He was admitted for treatment for delirium and

subsequently released.  The Special Master notes that Mr. Brown provided no testimony about the 2005 hospitalization during his deposition.

**Testimony of Jeanette Odom, Thomas Brown's Mother**

Mrs. Odom testified that she was born on May 7, 1940 and is currently a resident of Florida.  She is married to Robert Blaine and they have three children, Deborah, Thomas and James.  James passed away in 1998.

Thomas did "fairly good" in school, Mrs. Odom recounted.  She recalls Thomas and his brother James enlisting in the Marine Corps in 1980, before their high school graduation.  She signed the necessary paperwork allowing them to enlist, believing the Marine Corps was "just something they wanted to do."  Mrs. Odom "was a little bit reluctant" about the enlistment, but later thought, "going into the service is probably the best thing for them."  She attended Thomas' graduation from boot camp at Paris Island.

Mrs. Odom testified that she felt "very apprehensive" about Thomas' deployment to Beirut.  She recounted receiving two to three letters per month from Thomas while he was overseas.

Mrs. Odom was at home the day the bombing occurred, watching television while getting ready to attend church, when the news reports started showing pictures of the destroyed Marine Barracks Building and the ensuing rescue efforts.  Mrs. Odom recalled telling her husband, "Tommy is in that building."  She was glued to the television, "watching for them to bring him out."  She testified, "I was tore up."  She did not learn that Thomas survived the attack until two uniformed officers came to her house approximately a week to a week and half later early one morning.  Her husband looked out the window, saw the two uniformed men and told her, "Tommy's alive."  She asked how he knew to which he responded that there would have been a

chaplain accompanying the officers if their son had not survived. The officers informed them that Thomas "was stable." They could not tell them anything else, and she wondered if he was "laid up in bed with no arms and no legs." She recalled Thomas telephoning her several days later to let her know that he had a head injury and some cuts and bruises. Mrs. Odom described how relieved she was to talk to her son.

Several days later, Mrs. Odom and her husband traveled to Camp Lejeune to welcome Thomas home. She testified, "we were treated like VIPs." They were taken to the hospital where they watched the plane carrying the survivors land nearby. Mrs. Odom was standing in the window of the hospital watching the injured disembark from the plane. One of the men got down on his knees and kissed the ground, "it turns out that was Tommy." When she saw him at the hospital, she recalled that he had bandages on his head and legs. She testified that "he acted mostly confused."

Mrs. Odom testified that she feels "angry" and "hurt" because her son was injured by the "terrorist group." "It affected everybody in the family."

### Testimony by Debbie Vogt, Thomas Brown's Sister

Debbie Vogt was born on September 20, 1960 and currently resides with her husband and son in Florida. She is the daughter of Jeanette Odom and Thomas Brown, Sr.

Debbie believes Thomas was "not interested in going to college." He "liked to do things" and the Marine Corps would allow him to be active and to travel. She testified, "he seemed to enjoy" the Marine Corps and "looked forward to doing something with it." Debbie recounted that she was not overly concerned about her brother's deployment to Beirut and "hoped for the best that things would not escalate to a major situation like it eventually did." She testified that his letters described what a beautiful country Lebanon was and how nice the people were.

Debbie was at her parents' home on the day of the bombing, when the pastor from their church called to tell the family to turn on the television as there was something they needed to see. Later that night, Debbie recalled, two officers arrived at the front door to tell the family that Thomas was alive and in stable condition.

She testified that when Thomas returned home, she noticed he was less outgoing, "withdrawn" and "things bothered him a lot more." Debbie noted that "we lost part of him; there was a part of him that didn't come back."

**ANALYSIS**

Standard of Review

To recover damages, "a FSIA default winner must prove damages 'in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 684-85 (D.C.Cir. 2003) (citation omitted). Upon consideration of the facts presented and, in light of the aforementioned legal framework, the Special Master considers whether Mr. Brown is entitled to compensatory damages for the pain and suffering he has endured.

**a.     Pain and Suffering**

In appropriating damages for Mr. Brown, the Special Master is informed by prior decisions awarding damages for pain and suffering to victims of terrorist attacks. *Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010). The Special Master is mindful that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009). On that score, Judge Huvelle correctly observed, "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Id*.

(quoting *Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

A review of court decisions visiting similar issues is, however, instructive and reveals a trend to have assessed damages for surviving victims on several factors: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson*, 515 F.Supp.2d at 52 n. 26 (quoting *Blais*, 459 F.Supp.2d at 59).

Similarly instructive are the damages awarded to wounded servicemen in *Peterson* and *Valore*.  In both instances, the Court employed a baseline award of $5 million for pain and suffering of the surviving servicemen.  The Court deemed that amount an appropriate award, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars (Marvin Albright); or where the servicemen suffered a broken jaw, severe flesh wounds and who suffered scars on his arms, legs and face and loss of teeth (Pablo Arroyo); or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back problems, internal maladies and physical scarring (Danny Wheeler) or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

Several courts have departed upward from this baseline when confronted with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million – Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million – Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million – Truman Dale Garner) or a broken neck resulting in permanent quadriplegia ($12 million – Larry Gerlach).

Courts have similarly departed downward in the face of lesser evidence such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million – Glenn Dolphin); nerve pain and foot numbness ($2 million – Charles Frye) and no physical injuries but "severe and lasting psychological harm" ($1.5 million – Frank Comes, Jr.). It bears noting that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above coupled with and reinforced by the documentation provided to the Special Master plainly indicate that Mr. Brown suffered, and continues to suffer, both physical and psychological injuries as a result of his experiences in Beirut. Applying the precedential framework outlined in *Peterson* and its progeny, the Special Master finds that Mr. Brown is entitled to compensatory damages for injuries resulting from the Marine Barracks Bombing in the amount of Five Million Dollars ($5,000,000).

### b. Economic Losses

28 U.S.C. § 1605A, like its predecessor 28 U.S.C. § 1605(a)(7), establishes a cause of action for wrongful death proximately caused by an act of state-sponsored terrorism. It is "designed to compensate decedent's heirs-at-law for economic losses which result from decedent's premature death." *Flatow*, 999 F.Supp. 1 at 27. In this instance, Thomas Brown put forward, in support of his claim for economic losses, a detailed report by Dr. Jerome Paige, an acknowledged expert in the field of forensic economics. Dr. Paige's detailed calculation – adjusted for inflation, rise in productivity, job advancement and personal consumption – is premised on the assumptions that Mr. Brown would have spent the majority of his working life in the military. The Special Master thus finds, as a matter of law, that the appropriate monetary compensation for Thomas Brown's lost earnings, after discount to present value, to be

$1,836,042 (One Million Eight Hundred Thirty-Six Thousand and Forty-Two Dollars).

### b. Solatium

Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to those closely related to and impacted by a victim of terrorism. 28 U.S.C. §1605A(c)(4).  *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12-13 (D.D.C. 1998).  Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror[.]" *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

Unlike a claim for lost wages, however, the amount to be awarded for the loss of solatium "cannot be defined through models and variable." *Flatow*, 999 F.Supp. at 32.  Accordingly, courts look to previous awards for guidance.  *See Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27, 39-40 (D.D.C. 2001).  *See, also*, AMENDED ADMINISTRATIVE PLAN GOVERNING APPOINTED SPECIAL MASTERS (directing the Special Masters to be "guided" in their decisions by the *Flatow*, *Eisenfeld* (*Eisenfeld v. Islamic Republic of Iran*, 172 F.Supp.2d 1 (2000)) and *Jenco* decisions).

The Special Master sees no reason to deviate from this paradigm.

The record clearly demonstrates that Mr. Brown's mother and sister were impacted by the events that took place on October 23, 1983.  The general framework for compensatory awards for the parents and siblings of surviving victims of terrorist attacks, as established by the *Peterson* Court is that, "the appropriate amount of damages for family members of surviving servicemen are as follows: spouse ($4 million); parents ($2.5 million); children ($2.5 million); siblings ($1.25 million).  *Id.* 515 F.Supp.2d at 52.

Applying this paradigm to the present situation, the Special Master concludes, as a matter of law, that the appropriate monetary compensation for Jeanette Odom is Two Million Five Hundred Thousand Dollars ($2,500,000) and for Debbie Vogt is One Million Two Hundred Thousand Dollars ($1,250,000).

Dated: July 12, 2011                                  Respectfully submitted,

                                                            /s/ Alan L. Balaran
                                                            Alan L. Balaran, Esq.
                                                            Special Master