UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
CAROLYN DAVIS, et al.,                            )
                                                  )
    Plaintiffs,                                  )
                                                  )
v.                                                )    Civil Action No. 07-1302 (RCL)
                                                  )
THE ISLAMIC REPUBLIC OF IRAN, et al.,             )
                                                  )
    Defendants.                                  )
_____)

**REPORT OF SPECIAL MASTER
PURSUANT TO ORDER OF REFERENCE
CONCERNING COUNTS LXXIV - LXXVII
(EARL GUY)**

    This action is brought pursuant to 28 U.S.C. 1605A seeking damages for the injuries sustained by Marine Earl Guy on October 23, 1983 as a result of a terrorist bombing of the United States Marine Barracks in Beirut, Lebanon.  In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule of Civil Procedure 53, the Special Master has received both testamentary and documentary evidence with respect to all issues of compensatory and other damages.

Background

    Shortly after dawn on October 23, 1983, a Mercedes truck filled with 2,500 pounds of explosives broke through a series of steel fences and sandbag barricades and ripped through the heart of the Marinesø administrative headquarters building.  That building, nicknamed the BLT, housed nearly 400 members of Battalion Landing Team 1/8 and attached Marines, sailors and soldiers. The explosion collapsed all four floors of the BLT, leaving a crater 30 feet deep and 40 feet wide and killing 241 servicemen and wounding 81 others.  It represented the deadliest single-day death toll for the United States Marine Corps since the Battle of Iwo Jima and the

deadliest single-day death toll for the United States military since January 21, 1968, the first day of the Tet Offensive during the Vietnam War. The Beirut bombing remains the deadliest post-World War II attack on Americans overseas.

The events of that day and its aftermath have been amply documented and will not be repeated except as relevant to an assessment of individuated damages. *See*, *e.g.*, Glenn E. Dolphin, 24 MAU 1983: A MARINE LOOKS BACK AT THE PEACEKEEPING MISSION TO BEIRUT, LEBANON (2005); Eric Hammel, THE ROOT: THE MARINES IN BEIRUT AUGUST 1982 – FEBRUARY 1984 (1999). Similarly, the historical overview of the statutory scheme by which actions against the Islamic Republic of Iran have been brought has been exhaustively recounted in a recent opinion of this Court, *see In re: Islamic Republic of Iran Terrorism Litigation*, 659 F.Supp.2d 31 (D.D.C. 2009), as well as in the U.S. Congressional Research Service's SUITS AGAINST TERRORIST STATES BY VICTIMS OF TERRORISM (RL31258, August 8, 2008) by Jennifer Elsea, obviating the need for recapitulation.

Procedural History

This Court has repeatedly found defendants Islamic Republic of Iran and its Ministry of Information and Security legally responsible for providing material financial and logistical support to help carry out the attack on the servicemen in Beirut in 1983. *See*, *e.g.*, *Valore v. Islamic Republic of Iran*, 478 F.Supp.2d 101, 110 (D.D.C. 2007); *Peterson v. Islamic Republic of Iran*, 264 F.Supp.2d 46, 61 (D.D.C. 2003). The Court, in these opinions and others, has held that the survivors of the Beirut bombing and their family members have suffered and will continue to suffer mental anguish and loss of society. *Id.*

On January 20, 2010, Plaintiffs filed a motion requesting that "the Court enter an Order taking judicial notice of the factual findings set forth in the decision of this Court dated May 30,

2003, in the related case of *Peterson v. Iran*, Civil Action No. 01-2094" and "enter judgment liability against both Defendants, The Islamic Republic of Iran and the Iranian Ministry of Information and Security."

The Court granted Plaintiffs' motion on February 1, 2010.

In accordance with these holdings and in keeping with the Federal Rules of Evidence, the Special Master makes the following findings and recommendations.

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1.    Earl Guy was born on June 16, 1963 in England and is in the process of obtaining his United States citizenship.[1]

2.    He enlisted in the United States Marine Corps on July 23, 1981.

3.    On October 23, 1983, while Mr. Guy was deployed to Lebanon, the Marine Barracks in Beirut was attacked by a suicide bomber who drove a truck carrying a large cache of explosives into the building.

4.    At the time of the impact, Mr. Guy was inside the BLT and suffered physical and psychological trauma as a result.

5.    Mr. Guy never recovered from the injuries he suffered as a result of the attack.

---

[1] Earl Guy's status as a non-citizen does not foreclose his right to seek an award pursuant to the "state sponsored terrorism" exception of the FSIA providing that a plaintiff may recover if he or she can demonstrate: (1) that the State Department has designated the foreign sovereign as a "state sponsor of terrorism"; (2) that the plaintiff was a United States national when the event took place; and (3) that "the foreign sovereign engaged in conduct that falls within the ambit of the statute." *Prevatt v. Islamic Republic of Iran*, 421 F.Supp.2d 152, 158 (D.D.C. 2006). As this Court has already established the Islamic Republic of Iran's liability, the first and third requirements are satisfied. Mr. Guy equally satisfies the second prong that he was a "U.S. national" in light of 8 U.S.C. § 1101(a)(22) which embraces both United States citizens and non-citizens who owe permanent allegiance to the United States. Mr. Guy's allegiance may be presumed by his enlistment in the U.S. military, the oath he took to defend and uphold the Constitution of the United States and the permanent psychological and physical injuries he sustained while defending the United States. His conduct confirms his standing under the FSIA to recover against the defendants. *Peterson v. Islamic Republic of Iran*, 515 F.Supp. 2d 25, 41 n.8 (D.D.C. 2007). By extension, his family members have equal standing to bring their claims as Mr. Guy was a United States national, fighting as a United States Marine on October 23, 1983.

**Testimony of Earl Guy**

Earl Guy resides in Ohio. He was born on June 16, 1963 in London, England to Alice Homes and Earl Hook, an American serviceman stationed in the U.K. at the time. That marriage was soon annulled and Alice became a legal resident of the United States and moved her sons, Earl and Ian to Ohio in August 1965. She married Edward Guy on June 17, 1970 and, in September 1971, Edward adopted Earl and Ian Guy and another child, Joan Marie. Edward and Alice were subsequently divorced; Edward remarried Pamela and they have two sons: Edward Guy Jr. and Adam Guy.

Earl lived with his mother, brother and adoptive father until his parents divorced when he was in the fourth grade. After the divorce, Earl, Ian and Joan continued to live with Edward Guy until at the ages of 17 and 16, respectively, Earl and Ian ran away from home and were eventually placed into a foster home with a woman by the name of Rosetta Washington. Earl testified that Joan remained at their adoptive father's home until she graduated from high school. Earl graduated from high school and immediately enlisted in the Marine Corps. He originally planned to follow in his birth-father's footsteps and join the Air Force, however, the Marines "asked first." At the time of his enlistment, Earl intended to spend four years in the military and then work in the private sector.

Earl testified that his first assignment in the Corps was in "food service." After the Marines, he worked for six years with the United States Postal Service followed by four years at various Ford automotive dealerships. He is currently enrolled at a community college Occupational Therapy Assistant program.

Earl was deployed to Beirut in June 1982. He testified that he was not apprehensive about the assignment, believing "nothing was going to happen." Earl explained that while he

was in Lebanon, he had little contact with Ian who was also "in the military" or with his sister. Earl limited his correspondence to his foster mother and his girlfriend of the time. Earl testified that "I never really explained to them the dangers I was in." His "biggest issue" was frustration over the lack of media attention to "events on the ground."

Earl recalled that, upon first arriving in Beirut, "there was not much going on." Steadily, however, insurgent fighting approached the airport area where the BLT was located. Earl testified that high-level-alert alarms were constantly sounding – signaling incoming rocket and mortar fire. The protocol in place at the time required those stationed at the BLT to proceed to the safety of the basement of the building until the danger had passed.

The evening before the bombing, Earl and two or three other Marines who worked with him in food service, were in the BLT basement drinking beer at the end of their shift. Earl went to bed late that night only to awake the following evening "on a stretcher in another part of the city" being "pushed on the airplane and flying to Landstuhl, Germany." Earl had no recollection of the bombing, but surmises that when he was pulled from the rubble, medics must have administered him morphine rendering him unconscious.

Earl was one of two survivors out of the 15 men who were sleeping in the quarters that night. He suffered from head contusions; scarring on back of his head; black eyes; burns to his body; and a collapsed lung. He was hospitalized in Germany for two weeks, followed by two weeks hospitalization in Bethesda, Maryland. Earl testified that he continues to suffer residual effects from his injuries, including chronic back spasms and post-traumatic stress disorder ("PTSD"). The Veteran's Administration assigned him a disability rating of 50%. He is currently undergoing psychiatric care and has been prescribed a regimen of medication to alleviate the symptoms associated with PTSD.

Earl attended memorial services of those killed on October 23, recalling how difficult it was to see family members of his unit and to reflect on his own survival. He attends no more than one annual reunion of the survivors of the terrorist attack every five years. He testified, "I try not to involve myself" and finds it difficult to talk about the bombing with anyone.

Earl believes he was "trying to mentally shield [himself]" from reflecting on the events of October 23 and avoided seeking treatment for many years. Gradually realizing that "I had to deal with this issue" and place the bombing into perspective, Earl sought treatment at the VA in 2000. He still has difficulty getting along with others and tends to keep "people at arm's length." His few friends are family members although he admittedly "doesn't always treat them right." Earl explained that he "doesn't know how" to recover from the emotional effects of the bombing. "I don't see it ever going away." Earl testified that he would "like to be there" for his son but he's unable to nurture an emotional attachment. He believes he suffers from "survivor's guilt," questioning, "[h]ow could I survive when the guy I loved so much he was in the bunk next to me died."

**Testimony of Ian Guy – Earl Guy's Brother**

Ian Guy was born on April 1, 1964 in London, England and currently lives in Virginia. He is married and has been serving in the Army since 1982. Ian is a United States citizen, having been nationalized in June 1992.

Ian testified that he was not apprehensive about his brother's deployment. He recalled that on the morning of the bombing, television media carried reports of the Beirut bombing and were "scrolling down the names of the Marines who were injured and killed." He recalls Earl's name listed as "KIA." Ian went to his chain of command to find additional information about his brother. He was informed that "no one had any information."

Ian was placed on emergency leave and went home to see his foster mother, Rosetta Washington. When he arrived, she told him that Earl had called and told her that he was injured in the blast and in a hospital in Germany. Earl returned to the United States a day or two later.

Ian testified that he and Earl maintained a close "brotherly bond" despite having "brutal parents." Ian picked Earl up from the airport when he returned to Ohio on convalescent leave.

Ian was "very upset" about the bombing. He testified, "my emotions were very amplified given the way I found out by seeing my brother's name listed as KIA on television." He could not wait to see Earl and "help to take care of him." He recalled that when Earl first returned home, Earl was very jumpy and "going through some things that only he could deal with." Ian offered, "I can only imagine losing all your friends."

**<u>Testimony of Joan Crawford – Early Guy's Sister</u>**

Joan Crawford was born in Ohio in 1967. She is United States citizen. She could not recall exactly when Earl was born but believes she is approximately five years his junior. Joan testified that of her four brothers, she was closest to Earl; "he's the one I could go to and talk to. He helped me out when I was young, you know, played with me and read to me. He was the one that spent the most time with me."

Joan described Earl as "very outgoing" young man who played basketball and football in high school. She believes that he joined the Marine Corps to "make a better life, make a better person out of himself." Joan recounted that Ian left home when he was 14 and Earl when "he was 16, still in high school." She testified that Earl finished high school before enlisting in the Marine Corps.

Joan learned of the bombing from television news reports. There was no way she could reach Earl, so she stayed home from school in order to find out what she could from the news.

She "did not get a chance to see him until about three weeks after he got home, cause of course I didn't drive." Joan observed that Earl was "withdrawn" and "he didn't really want to talk about what happened." She was "just glad he made it back alive, because he's been there for me, when nobody else has been there for me. I mean he's took me in a couple of times and I appreciate that so much." She explained that, since his return, she has grown even closer to Earl; she feels that Earl is "more of a father figure to me than a brother."

Joan testified that Earl still has nightmares – several of which she witnessed when she stayed with Earl for extended periods of time during her adulthood. She notes that Earl has difficulty with stressful situations, "but he's got his wife to help him through it."

**<u>Testimony of Eddie Guy, Jr. – Earl Guy's Half-Brother</u>**

Eddie Guy was born in 1978 in Ohio, where he currently resides. He was unable to recall exactly in England where Earl was born, nor could he remember what year Earl was born. Eddie testified that the age difference between the two is "about fifteen years." Eddie described his half-brother Earl as, "humble, quiet, just a good person."

Eddie recalls Earl deploying to Beirut, although he was only about five years old at the time. When testifying as to the effect the bombing had on the family, he remembered, "it was pretty sad cause a lot of people died. Earl could have been one of them." Right after the bombing, he "just knew something bad happened, but you know, I was pretty young." He does remember "a different type of atmosphere" in the house "like when something bad happens."

Eddie recalled Earl returning home "a year or two" after the bombing, "acting a little different." Eddie observed of Earl, "maybe he's a little more quiet, sometimes he keeps to himself." Eddie also noticed that Earl avoids crowded places or tall buildings.

**Testimony of Adam Guy – Earl Guy's Half-Brother**

Adam Guy was born in 1980 in Ohio where he currently resides. He is 16 years younger than his half-brother, Earl. Adam was approximately two years old when Earl enlisted and three at the time of the Beirut bombing.

Adam believed Earl "was in the military for a long time when I was little." Adam recalled Earl returning home on leave and playing basketball with him and going for drives in Earl's Corvette.

Adam's knowledge of the Beirut bombing is based on what he was told years later. He is aware that "someone drove the tank into the building," and that "there were numerous dead bodies in the building." According to Adam, Earl suffers from nightmares as a result of the bombing. Adam testified, "I don't want to get in detail with him about something that's so bad that happened to him." Beyond this, Adam only had a "hunch" that Earl was treated at the Veterans Administration and testified, "[i]t's just things in his daily or work life that would probably affect him." He feels that "anything that would mirror or simulate those types of conditions that he dealt with over in Beirut wouldn't be good, you know."

**ANALYSIS**

Standard of Review

To recover damages, "a FSIA default winner must prove damages –in the same manner and to the same extent' as any other default winner." *Hill v. Republic of Iraq*, 328 F.3d 680, 684-85 (D.C.Cir. 2003) (*citation omitted*). Upon consideration of the facts presented, and in light of the aforementioned legal framework, the Special Master must consider whether Mr. Guy and his siblings are entitled to compensatory damages for the pain and suffering they have endured.

### a. Pain and Suffering

In determining an appropriate amount of damages for Mr. Guy, the Special Master is informed by prior decisions awarding damages for pain and suffering to victims of terrorist attacks. *See Valore v. Islamic Republic of Iran*, 700 F.Supp.2d 52 (D.D.C. 2010). The Special Master is mindful that "there is no exact comparison, and, indeed, strict application of precedent could lead to conflicting conclusions about an appropriate award"). As Judge Huvelle correctly noted, "it is 'undeniably difficult' to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Brewer v. Islamic Republic of Iran*, 664 F.Supp.2d 43, 57 (D.D.C. 2009 (*quoting Blais v. Islamic Republic of Iran*, 459 F.Supp.2d 40, 59 (D.D.C. 2006)).

A review of court decisions confronted with similar issues is instructive and reveals a trend to take into account several factors when assessing damages for surviving victims: "the severity of the pain immediately following the injury, the length of hospitalization, and the extent of the impairment that will remain with the victim for the rest of his or her life." *Peterson*, 515 F.Supp.2d at 52 n. 26 (*quoting Blais*, 459 F.Supp.2d at 59)).

Similarly instructive are the reference points courts have employed for assessing damages owed to wounded servicemen. For example, both in *Peterson* and in *Valore*, the Court appeared to award a baseline amount of $5 million for pain and suffering of the surviving servicemen. The Court deemed that amount appropriate, for example, where the evidence revealed a compound fracture on one leg, injuries to the toes on one foot as well as wounds and scars (Marvin Albright); or where the serviceman suffered a broken jaw, severe flesh wounds and who suffered scars on his arms, legs and face and loss of teeth (Pablo Arroyo); or where shrapnel caused soft tissue damage to the chest and sternum area, flash burns, resulting in lingering back

problems, internal maladies and physical scarring (Danny Wheeler) or in the presence of a shoulder injury and continuous neck, shoulder and back pain (Joseph P. Jacobs).

Courts have departed upward from this baseline when presented with evidence of more severe injuries such as: loss of sight and hearing ($7.5 million – Anthony Banks); skull fracture, shattered cheekbone, eyebrow and right eye orbit, crushed arms, a broken left leg, bruised right leg, two collapsed lungs, burns on arms and back, and internal bleeding ($9 million – Jeffrey Nashton); subdural hematoma, perforated right eardrum, crushed left ankle, collapsed left lung, and other shrapnel wounds that became infected ($7.5 million – Truman Dale Garner) or a broken neck resulting in permanent quadriplegia ($12 million – Larry Gerlach).

The Court has similarly departed downward in the face of lesser evidence such as unspecified injuries in the back, arm and head from being hit with shrapnel ($3 million – Glenn Dolphin); nerve pain and foot numbness ($2 million – Charles Frye) and no physical injuries but "severe and lasting psychological harm" ($1.5 million – Frank Comes, Jr.). It bears noting that, in rendering these awards, the Court observed that all of these servicemen suffered "lasting and severe psychological problems from the attack."

The testimony cited above coupled with and reinforced by the documentation provided to the Special Master indicates that Mr. Guy has a VA disability rating of 50% attributable to PTSD. The records also indicate that Mr. Guy suffered extensive physical injuries including a collapsed lung, black eyes and third degree burns on the posterior of his right arm. He has scarring on his face, back and calves. Accordingly, the Special Master finds that Mr. Guy is entitled to compensatory damages for injuries resulting from the Marine Barracks Bombing in the amount of Five Million Dollars ($5,000,000).

### b. Solatium

Solatium damages are available to FSIA plaintiffs when extreme and outrageous conduct has caused grief and anguish to those closely related to and impacted by a victim of terrorism. 28 U.S.C. §1605A(c)(4). *See Flatow v. Islamic Republic of Iran,* 999 F.Supp. 1, 12-13 (D.D.C. 1998). Spouses and relatives in direct lineal relationships are presumed to suffer damages for mental anguish insofar as "acts of terrorism are by their very definition extreme and outrageous and intended to cause the highest degree of emotional distress, literally, terror [.]" *Stethem v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C. 2002).

Unlike a claim for lost wages, however, the amount to be awarded for the loss of solatium "cannot be defined through models and variable." *Flatow*, 999 F.Supp. at 32. Accordingly, courts look to previous awards for guidance. *See Jenco v. Islamic Republic of Iran,* 154 F.Supp.2d 27, 39-40 (D.D.C. 2001). *See also* Amended Administrative Plan Governing Appointed Special Masters (directing that the Special Masters be "guided" in their decisions by the *Flatow*, *Eisenfeld* and *Jenco* decisions).

As stated, the testimonial and documentary record before the Special Master amply demonstrate that Earl Guy's physical emotional trauma as a result of the bombing had a permanent impact on his siblings. The general framework for compensatory awards for the parents, spouses, siblings and children of surviving victims of terrorist attacks has been established by the *Peterson* Court which opined that, "the appropriate amount of damages for family members of surviving servicemen are as follows: spouse ($4 million); parents ($2.5 million); children ($2.5 million); siblings ($1.25 million). *Id.* 515 F.Supp.2d at 52. The *Peterson* Court also held that "siblings of half-blood to the servicemen in this case are presumed to recover as a full-blood sibling would." *Id*.

The record demonstrates that the Guy family was impacted by the events that took place on October 23, 1983. There is, however, nothing in the record before the Special Master compelling a finding that an upward departure is warranted from the baseline established in *Peterson*. For these reasons, the Special Master concludes, as a matter of law that the appropriate monetary compensation is as follows: $1,250,000 (One Million Two Hundred and Fifty Thousand Dollars) for Ian Guy; $1,250,000 (One Million Two Hundred and Fifty Thousand Dollars) for Joan Crawford; $1,250,000 (One Million Two Hundred and Fifty Thousand Dollars) for Eddie Guy, Jr. and $1,250,000 (One Million Two Hundred and Fifty Thousand Dollars) for Adam Guy.

Dated: October 3, 2011                              Respectfully submitted,


                                                    /s/ Alan L. Balaran
                                                    Alan L. Balaran, Esq.
                                                    Special Master