**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Caroline Davis, et al.
         Plaintiffs

      v.                                     Civil No. 1:07-cv-01302
                                                          Judge Royce C. Lamberth

The Islamic Republic of Iran, et al.
         Defendants

**REPORT OF SPECIAL MASTER**
**PURSUANT TO ORDER OF REFERENCE**
**CONCERNING COUNTS LVII – LX, CCXI**

**Bartholomew, Mark**

In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below.  This is an action for emotional damage resulting from an act of state-sponsored terrorism on the part of the Defendants and their agents occurring on and prior to October 23, 1983 at the United States Marine Barracks in Beirut, Lebanon.

The following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence and have been established by clear-and-convincing documentary evidence and testimony.

1. Mark Edward Bartholomew was born February 28, 1963, in the United States of America and has been at all times throughout his life a citizen of the United States of America.

2. On October 23 1983, Mark Edward Bartholomew was a member of the United States Marines, having enlisted on June 25, 1981, and was stationed in Beirut, Lebanon.

3. On October 23 1983, the Marine Barracks building housing the Marine Battalion in Beirut was attacked by a suicide bomber who was driving a truck that penetrated to the center of the building where the truck, which was carrying a large quantity of explosives, detonated, collapsing the building resulting in the deaths of 241 American personnel.

4. As a result of the explosion, Mark Edward Bartholomew suffered severe injuries which have consequently affected his physical and emotional well being to this day.  Mr. Bartholomew's injuries have also impeded his ability to work and have, therefore, resulted in a loss of wages estimated by Dr. Jerome Paige, who testified under oath, at **$1,917,355.00** discounted to the present value in accordance with *District of Columbia V. Barritaeu*, 399 A.2d 563 (D.C. App. 1979).

5. The following testimony clearly establishes that the victim and his family have never recovered from the effects of the Marine Barracks Bombing on October 23, 1983.  The emotional trauma they sustained is permanent and significant.

## **MARK BARTHOLOMEW**

Mark was born in February of 1963 in Cincinnati, Ohio.  Mark joined the Marines in March of 1982.  It seemed like the thing to do at the time.  One of Mark's close friends had joined and Mark decided to join after hearing people in his home town talk about his friend.  Mark wasn't sure if he was going to stay in the Marine Corps as a career, but he knew he wanted to go to college after four years.

Mark did well in the Marine Corps.  He rose to the rank of Corporal.  Mark got a GED the day he deployed to Beirut.  He was upset he had to deploy because his wife was pregnant.  He wanted to be there when his child was born.  If Mark's deployment had been delayed, he

would have gone to Grenada.

Mark wasn't nervous about going to Beirut, but his parents were. His dad told him to keep his head down. Mark wrote home once a week.

Mark was in charge of an amphibious assault vehicle in the Marine Corps. His vehicle carried up to 25 Marines. It was armed with a .50 caliber machine gun. If the Marines had withdrawn quickly, Mark would have driven them off the beach and back to the ship.

When Mark arrived in Beirut, it was sandy and dusty. There was one big hill and shanty houses around the airport. There wasn't shooting when the Marines got there, but when the Israelis pulled out, the Marines started taking fire. They took small arms fire from the hill next to their base. Mark directed a tank to return fire once. The man operating the tank turret told Mark that he wasn't allowed to fire enough to kill the attackers, just enough to make them go away. This was frustrating.

Mark avoided telling his family the disturbing details of what was happening in Beirut.

Mark was on duty from 6:00 p.m. until 6:00 a.m. from the evening of October 22, 1983 until the morning of the 23rd. When he got off duty, he went to his sandbagged tent. The Marines had been taking mortars all the time. There was a big boom and Mark thought it must have been a close mortar hit. He had his friend walked out of their tent and saw a mushroom cloud in the sky. A couple of seconds later, a similar bomb went off at the French base. Mark and some of the other Marines had met the French paratroopers.

Mark and the other Marines at his position expected an attack and loaded their weapons. Mark figured the peacekeepers would soon be attacked and overrun. He knew they did not have enough men to hold their position in the event of an enemy offensive.

Mark and the other Marines got word from the command vehicle that the barracks had

been destroyed by a bomb.  They were updated that many of the Marines had been killed.  The entire barracks had come down with Mark's close friend Ricky in it.  Ricky had had mess duty.  Mark, his friend Bob, and two other Marines volunteered to dig out survivors the first chance they got, on the 24th.

Mark felt helpless.

Mark couldn't contact his family and let them know he was alive until four days later.  He got a thirty-second phone call with his parents.  Mark told them that everything was fine and they should not worry about him.

Mark returned from Beirut on December 7, 1983.  He went to memorial services after he got back and has been going to them since.  He went to the 20th Anniversary Memorial with his friend Bob.

Mark developed Post Traumatic Stress Disorder when he got back.  His family doctor repeatedly told him to get help for his problems.  Mark brushed off the advice.  He tried to convince himself that his problems were no big deal.

Mark left the Marine Corps in March of 1986.  He turned down a promotion to sergeant and a bonus to leave.

Mark's symptoms would come and go and he ignored advice to get help until the 9/11 terrorist attacks.  Mark began having flashbacks afterwards and could not sleep well for a month.  He began having nightmares again.  His family doctor gave him prescription drugs to help him sleep.  His doctor again advised him to see a psychologist or psychiatrist.

Mark is hesitant to talk to people he doesn't know now.  He still remembers everything that happened in Beirut like it was yesterday.  Mark tried to go back to school, but found he couldn't concentrate and needs to work with his hands to keep himself busy and occupied.  Mark

is disabled now. He has three herniated disks in his lower back from working heavy construction jobs for a number of years.

When Mark got back from Beirut, he knew he was quieter, but he didn't feel different. His mother pointed out that he had changed. His emotional difficulties affected his first marriage negatively. His current wife has known about his problems since before they got married and only has trouble when Mark wakes up in the middle of the night with a nightmare.

Mark hopes this lawsuit hurts Iran financially. He thinks that will discourage them from bombing Americans again. He hopes they understand that if they continue to hurt Americans, we will take their money and hold them accountable.

Mark also hopes that his friend Richie's wife gets some compensation out of this case, because she deserves it. Both Richie and his wife were at Mark's wedding.

### TERESA BARTHOLOMEW WITT

Teresa and Mark were married January 3, 1980. They had two children, Crystal and Mark Jr. Mark joined the Marine Corps in 1982. He wanted to serve his country.

Teresa attended Mark's graduation at Parris Island. Mark was at his first duty station, Camp Lejeune, when Mark and Teresa got married. Mark loved being a Marine. Mark wanted to make the Marine Corps a career.

Teresa was pregnant when Mark deployed to Beirut. She was apprehensive but Mark didn't have a second thought about going. He wanted to serve his country and would have gone anywhere the Marine Corps told him to go.

Mark wrote letters home and Teresa recalls that Mark got to call home when Crystal was born in May of 1983.

On October 23, 1983, Teresa was at her parents' house on Long Island, where she was staying. She was taking care of her baby and saw news about the bombing on television. Teresa, her mother and Mark's mother kept calling, trying to get news about Mark, but they couldn't get any. The situation was chaos. Teresa remembered Mark writing that he had been on guard duty at the barracks before. She didn't have any idea whether he had been in the building or not.

Mark finally called and talked to Teresa or her mother and said that he was alright. Teresa can't remember exactly who took the call. Mark had just gotten off duty and gone to sleep when the bombing happened.

Mark came home around Thanksgiving or Christmas. He seemed like a different person. Mark had been really outgoing, but came back from Beirut quiet and reserved. Loud noises would make Mark dive to the ground.

The changes in Mark's personality put stress on their relationship, with Mark and Teresa being separated for a long time and eventually divorcing in 1990. Teresa doesn't think Mark will ever recover from his experience in Beirut.

Teresa thinks the terrorists in Tehran should know that they hurt the families of the Marines as well as the Marines themselves. Both of Teresa's children have been in the military and her son plans on going back to the military. Neither of them has had a good relationship with their father.

### **CRYSTAL A. YOUNG**

Crystal is Mark Bartholomew's daughter. She was born on May 21, 1983. Crystal grew up living with her mother and her grandparents. She and her brother saw their father, Mark, on the weekends. She remembers being upset when she had to leave her house to go spend time

with her father, but was fine once she was at her father's place. Mark used to take Crystal and her brother to the races and the arcade. Crystal recalls that Mark would never go out with just Crystal and her brother. Mark would always have a friend along as well.

Mark lived with his parents. Mark was around for Crystal when she was a young child. Mark disappeared from her life as she got older. From the time Crystal graduated from high school and for seven years after Crystal did not speak to Mark.

Crystal joined the military after high school, but decided to leave. Mark disapproved of her decision to leave the military. This and other disagreements Crystal has had with Mark have strained their relationship.

Crystal doesn't know much about Mark's time in Beirut, except that one of Mark's best friends died there. They had both been billeted in the barracks, but Mark was in the field at the time of the bombing. Crystal found out Mark had been in Beirut when the bombing happened when she was a teenager. Crystal learned about the bombing in school and her mother told her that Mark had been in Beirut at that time. Crystal told the other kids in school that her father had been there. Crystal and her dad did not spend much time together and Crystal was disdainful of her father's treatment of her brother. Mark had a harsh parenting style and yelled at Crystal's brother frequently. As a result, Crystal avoided Mark.

Crystal's mother told her that when Mark came back from Beirut, he drank too much and they got into fights. One time, Mark drove Crystal's mother's car off a bridge.

Crystal tries to keep a distant relationship with her father. Mark has already told her that, if she has children, he doesn't want to be a part of their lives. Crystal's husband is not white and, inexplicably, Mark is the only person in Crystal's family that has a problem with this. None of her grandparents and none of her aunts and uncles have a problem with Crystal's being in a

relationship with someone of another race.  Crystal can conclude that Mark's views must have been influenced by his time overseas.

Crystal's stepmother has told her that Mark wakes up sometimes with nightmares.  Crystal's brother spent more time around Mark when they were growing up.  Crystal would like it if Mark was part of her life, but Mark does not want this.

Mark went to at least one of the Beirut Memorials.  Crystal hopes her father would be a different person, but for the Beirut bombing.  She thinks he would be and understands that traumatic experiences can change people.  She thinks it's possible that Mark and her mother might still be together.

Crystal has nothing to say to the terrorists in Tehran.  They don't care about her family or theirs.  Mark was only in the Middle East because people in that part of the world can't solve their own problems.  Trying to solve their problems for them has only resulted in problems in the United States and American lives lost abroad.

If Crystal did have anything to say to the people over there, it would be to let them know that cleaning up their messes is destroying American families.

### **MARK BARTHOLOMEW JR.**

Mark Bartholomew Jr. is the son of Mark Bartholomew.  He was born on May 20, 1985.

Growing up, Mark mainly saw his father on weekends.  He lived with his mother and they moved around.  At one point, when his family moved to Virginia, Mark didn't see his father for about two years.  When Mark was a teenager, he spent a summer with his father and moved in with his father after that summer until he was eighteen.  When Mark visited his father, they got along, but things changed when Mark moved in with his dad.  From that point on, they had a

contentious relationship.  When Mark wasn't set to graduate on time, Mark Sr. kicked him out of the house.

Mark doesn't know why his father joined the Marine Corps.  He doesn't talk to his father much.  Mark joined the Army, but was discharged because he has a bad knee.  His father, Mark Sr., doesn't believe that he has a knee problem and stopped talking to him because he left the Army.

Mark Sr. doesn't talk much about his time in the Marine Corps.  Mark Sr. did not talk about the bombing at all.  When Mark Jr. joined the Army, his father told him a few stories about getting shot at but never shared any details about his experiences on October 23, 1983.  Mark does know that one of his father's best friends died in Beirut.  He thinks this may have had an impact on how his father behaves.

Mark did some work on his own, around eighth or ninth grade, to better understand the Beirut bombing, because his father would not tell him anything about it.

Mark believes that whatever happened to his father in Beirut changed him.  He thinks about what his father would be like if he had not have had awful experiences overseas.  Mark doesn't have a very strong bond with his father.

Mark hopes that this litigation helps right a wrong that was done on October 23, 1983.  Nothing can ever bring back the Marines who died in the barracks, though.

## JERRY BARTHOLOMEW

Jerry Bartholomew is the father of Mark Bartholomew.  Mark was born in Cincinnati, Ohio.  Mark joined the Marine Corps right after he left high school.  Mark had been a senior in high school, but did not graduate.  While Mark was very patriotic and wanted to serve his

country, he was also a bit lost.  Later, in the Marine Corps, he got his GED.  At the time, Jerry thought that joining the Marine Corps was a great thing for Mark to do.  It seemed to suit Mark's patriotism and Jerry hoped that Mark would find some direction.

Jerry and Joyce, Mark's parents, attended his graduation from basic training.  Mark then went to California and learned how to operate heavy equipment.  Mark was excited about the Marine Corps and enjoyed being a Marine.  He enjoyed his first deployment.  Mark operated boats and halftracks in Beirut.  As his tour in Beirut wore on, Mark became disillusioned with the Marine Corps because the Marines were in Beirut but not allowed to stop the fighting that was going on between factions there and the Marines were not even allowed to protect themselves.  Mark felt helpless to change the situation in Beirut.

Jerry was not worried about Mark going to Beirut because it was not supposed to be a hot war.  It was just supposed to be a peacekeeping mission.  Mark's wife was not happy about Mark deploying because she was pregnant with their first child.  They had gotten married while Mark was on furlough.

Jerry and Joyce heard from Mark regularly.  He wrote frequently and called every couple of weeks.  Mark told his parents about how he had talked to locals in Beirut and how he had been invited into their homes.  As conditions got worse, Mark wrote about how the Marines were often restricted to base and had less exposure to the locals.

Jerry was at home on Sunday, October 23, 1983 when he found out about the bombing. He and Joyce had to wait until the following Thursday, when Mark called them from Beirut, to find out he had not been in the building and had not been injured.

Mark had been digging the bodies out of the rubble and taking them back to the ships with the heavy equipment.  One of Mark's friends, who had gotten killed in the bombing, had

baked Mark a cake when his daughter was born, because Mark was in Beirut and couldn't see her. Mark had always been happy-go-lucky, but after returning from Beirut, he grew increasingly disenchanted with the Marine Corps. He was angry that the Marines had not been allowed to load their weapons and defend themselves. He didn't smile for almost two years.

Mark was sullen and drank a lot after he got back. He seemed like a changed person. Jerry attributes Mark's ongoing struggle with alcohol to his experience in Beirut. Jerry was saddened by Mark's experience and our country's weak response to the bombing. He believes the people who perpetrated the bombing need to be wiped off the face of the earth.

Mark is remarried now and seems to be happy and doing better than he was. He seemed happier since he went back to school, but he was injured on the job and is now on disability. Mark and his parents still keep in contact with one of Mark's friends from the Marine Corps, but don't go to memorials.

Jerry wants the leaders in Iran to know that if they keep killing Americans, they will end up like Saddam Hussein.


## **JOYCE BARTHOLOMEW**

Joye Bartholomew is the mother of Mark Bartholomew.

Joyce thought Mark should be a conscientious objector. She told Mark that she believed in her draft. When Mark asked what that was, she replied that she believed it would be alright if everyone served two years in the military after high school. That would make other countries more hesitant to attack the US and everyone would have to do it. Mark agreed that that would be alright. Shortly after that, Mark enlisted in the Marine Corps.

Joyce didn't know if the Marines would be good for Mark, but after basic training, Mark

11

started to talk about how the Marines wanted all their guys to be educated and she liked that. Mark went to California after basic training and learned to operate heavy equipment. Mark liked the Marine Corps. Mark said he had joined the Marines because his mother had told him to join the best and the Marines were the best.

Mark's sister was very worried when he deployed to Beirut. Mark wrote to his parents and his wife. They would exchange this information. They heard that one of Mark's friends had baked him a cake when his daughter was born. Mark had also made friends with one of the communication specialists on the ship and called his parents from the ship, beginning his calls with "I am at my friend's house."

Mark didn't talk about the danger in Beirut, but he did write about the Marines' rules of engagement. He was frustrated that the Marines couldn't defend themselves.

On October 23, 1983, Joyce saw news of the bombing on television. Mark's wife called. She had been on Long Island with her new baby. They had no information for days, until Mark was allowed to call his wife from Beirut and tell her that he was alive and uninjured. His call lasted only two minutes. She called Joyce and Jerry to let them know Mark was alive. When Joyce called her daughter's school to tell her that Mark was alive, she could hear cheers in the background.

As a child, Mark had always been pulling pranks. He had been happy go lucky. Joyce didn't see Mark smile for two years. She thinks Mark has had survivor's guilt all these years. He has had nightmares and flashbacks. Mark finally agreed to go to counseling. His doctor insisted because the nightmares were disrupting his sleep badly. Mark has been fixated on a friend who died in Beirut and talks about him frequently. When Joyce made him a Marine quilt, Mark said he would not use it, but would rather give the quilt to his friend's wife.

Joyce deeply saddened by the changes in Mark's personality after the bombing. He began drinking heavily. Mark had been planning on leaving the Marine Corps and going into business with his father-in-law. By the time Mark and his wife, Teresa, moved back north, she wanted a divorce. She said Mark had changed. Teresa moved after the divorce. Joyce describes the neighborhood as a ghetto and the impact it has had on her granddaughter as disastrous. Mark was a different person when he got back from Beirut. Mark Jr. eventually came to live with Mark.

Mark still has flashbacks. Joyce cried for an hour when she realized what the flashbacks were. For years, it had not dawned on her that Mark was having flashbacks.

At the time of the deposition, Mark and one of his close friends were planning on going to the 25th Beirut Memorial. Joyce still wonders whether Mark can overcome his problems. She worries about Mark. Joyce hopes that this litigation helps in the cause of peace.

## **CONCLUSIONS OF LAW**

1.  Lost Wages

As a result of Mark Bartholomew's injuries, his ability to work and earn money has been severely affected. His economic losses are detailed in a report submitted to the court by Dr. Jerome Paige under oath and amount to **$1,917,355.00**, discounted to the present value in accordance with *District of Columbia V. Barritaeu*, 399 A.2d 563 (D.C. App. 1979).

2.  Pain and Suffering.

The above testimony as well as other admitted evidence clearly indicates that Mark Bartholomew suffered emotional injury as a result of the actions of the Islamic Republic of Iran and its agents. This court offered guidance in determining awards for pain and suffering in these

cases in *Valore v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84 (D.D.C. 2010). The special master concludes that the following is appropriate compensation to the Plaintiffs: Mark Edward Bartholomew is entitled to **$1,500,000.00**.

3.   Solatium

The Foreign Sovereign Immunities Act provides for an award for solatium consisting of emotional injury inflicted upon persons other than the victim by the actions of the Defendants and/or their agents.  The Court in *Flatow v. Iran*, 999 F. Supp. 1 (D.D.C. 1998) stated that this is an item of damages which belongs to the individual family members personally for the injuries to the feelings and the loss of the victim's comfort, support, and society.  The unexpected type of injury and its emotional impact may be taken into consideration in gauging the emotional impact to those family members.  In the present case, the impact upon the family was profound and is permanent.

This court offered guidance in determining awards for solatium in these cases in *Valore v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84 (D.D.C. 2010).

However, the Court has yet to examine the standing of children born after the date of the bombing and who have brought solatium or intentional infliction of emotional distress claims against the Defendants under the terrorism exception to foreign sovereign immunity, 28 U.S.C. §1605A.  Issues relating to Plaintiffs' standing in litigation arising out of the terrorist bombing of the Marine Barracks go back to this Court's opinion dismissing those plaintiffs who were domiciled in Pennsylvania and Louisiana.  *See Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25 (D.D.C. 2007) [hereinafter *Peterson II*].  Those Plaintiffs' claims were dismissed because no state law cause of action was available under the predecessor statute, 28 U.S.C. §1605(a)(7).  *Id*.

Prior to the passage of 28 USC 1605A (and subsequent to the Court of Appeals' decisions in *Acree v. Iraq*, 370 F.3d 41, 361 U.S. App. D.C. 410 (2004) and *Ciccippio-Puleo v. Iran* 353 F.3d 1024; 359 U.S. App. D.C. 299 (2004, this Court was constrained to apply state law causes of action to those cases brought under the terrorism exception to the Foreign Sovereign Immunities Act. *Peterson II*. The forerunner of §1605A, 1605(a)(7), provided only the jurisdiction to sue a foreign nation. *Id*. Under this rubric, the Court was looked to the restatement of torts and state law to fashion causes of action under which plaintiffs could collect. *In re Terrorism Litigation*, 659 F.Supp. 2d 31, 96 (D.D.C. 2009).

Even so, the court recognized an almost universal exception to the presence requirement in intentional infliction of emotional distress claims where state law left any ambiguity. *Jenco v. Islamic Republic of Iran*, 154 F.Supp. 2d 27, 36 (2001 D.D.C.). The Court did this because the Defendants' conduct was "sufficiently outrageous and intended to inflict severe emotional harm" on the plaintiffs. *Id*.

Relying in disparate state law causes of action resulted in inconsistent results. *In re Terrorism Litigation*, 659 F.Supp. 2d at 96. Congress sought to remedy this disparity by enacting a federal cause of action, which removed reliance on state law causes of action and the "pass-through" problem. *Gates v. Syrian Arab Republic*, 580 F.Supp. 2d 53 (2008). The new statute did not stop there, however. Where, previously, non-adoptive step parents had been dismissed from suits under 1605(a)(7), they had standing to sue under the new statute, 28 U.S.C. §1605A. Compare *Peterson II* with *Heiser v. Islamic Republic of Iran*, 659 F.Supp. 2d 20 (D.D.C. 2009). Thus, §46 of the Second Restatement of Torts ceased to bound the limitations of intentional infliction of emotional distress. Where previously, 28 U.S.C. §1606 placed severe

15

limits on the scope of causes of action under the old statute, this Court noted that it is doubtful that §1606 continues to have this effect:

> In cautioning against the use of federal common law, the Court of Appeals in *Bettis* relied heavily on § 1606 of the FSIA. That provision provides in relevant part: "As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." The Court reasoned that § 1606 "in effect instructs federal judges to find relevant law, not to make it." 315 F.3d at 333. At this juncture, however, it is unclear whether § 1606 should even apply in cases that rely on the new federal cause of action in § 1605A. For starters, § 1606 by its plain terms applies only to sections § 1605 and § 1607 of the FSIA. Moreover, § 1606 conflicts with § 1605A because it provides that punitive damages are not available in actions against foreign states, whereas § 1605A expressly authorizes punitive damages in cases against state sponsors of terrorism. Notably, Congress did not make any changes or updates to § 1606 when it repealed § 1605(a)(7) in the 2008 NDAA, and yet Congress did include a lengthy list of "Conforming Amendments" in § 1083(b) to ensure that both § 1605A and other reforms relating to terrorism actions, such as § 1610(g), were properly integrated into the larger statutory scheme of the FSIA. Thus, this Court can reasonably infer that Congress' failure to update § 1606 to include a reference to § 1605A evinces Congress intent that those standards pertaining to the scope of foreign state liability in § 1606 do not apply in actions against state sponsors of terrorism under § 1605A.

*In re Terrorism Litigation*, 659 F.Supp. 2d 31, n.20 (D.D.C. 2009).

Here, the Special Master can draw no distinction between the life lived by daughter Crystal Bartholomew – who was born while her father was on deployment to Beirut but before the date of the bombing – and her brother Mark who was born one-and-a-half years after the bombing. Both were clearly denied an attentive father who was capable of meeting their emotional needs – that is, both were equally damaged by the terrorist attack. The actions of the Defendants were of such a nature that their effect continued beyond the immediacy of the October 1983 bombing.

Given those facts, and consistent with §1605A and the reasoning in the *Jenco* opinion, the Special Master finds that children born after the date of the bombing have the same standing

to assert a claim for intentional infliction of emotional distress or solatium as those children born before the bombing.

Accordingly, the Special Master concludes as a matter of law that Defendants are jointly and severally liable to Plaintiffs in the following amount:

Teresa Bartholomew Witt, former spouse of Mark Bartholomew, **$4,000,000.00**;

Crystal A. Bartholomew, daughter of Mark Bartholomew, **$2,500,000.00**;

Mark E. Bartholomew, Jr., son of Mark Bartholomew, **$2,500,000.00**;

Jerry Bartholomew, father of Mark Bartholomew, **$2,500,000.00**; and

Joyce Bartholomew, mother of Mark Bartholomew, **$2,500,000.00**.

**TOTAL DAMAGES:**                                                                 **$17,417,355.00**

March 6, 2012                                                                                     Paul G. Griffin, Esq.
Date                                                                                                    Special Master