**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

Caroline Davis, et al.
               Plaintiffs

        v.                                     Civil No. 1:07-cv-01302
                                              Judge Royce C. Lamberth

The Islamic Republic of Iran, et al.
               Defendants

**REPORT OF SPECIAL MASTER
PURSUANT TO ORDER OF REFERENCE
CONCERNING COUNTS CXXV – CXXIX**

**Richardson, Bruce**

In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below.  This is an action for emotional and physical damage resulting from an act of state sponsored terrorism on the part of the Defendants and their agents occurring on and prior to the 23rd day of October 1983 at the United States Marine Barracks in Beirut, Lebanon.

The following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence and have been established by clear and convincing documentary evidence and testimony.

1. Bruce Richardson was born May 26, 1962, in the United States of America and has been at all times throughout his life a citizen of the United States of America.

2. On October 23, 1983, Bruce Richardson was a member of the United States Navy, having

enlisted on September 1, 1981, and was stationed in Beirut, Lebanon or at sea off shore from Beirut supporting those service members deployed there.

3.  On October 23, 1983, the Marine Barracks building housing the Marine battalion in Beirut was attacked by a suicide bomber who was driving a truck which penetrated to the center of the building where the truck, which was carrying a large quantity of explosives, detonated, collapsing the building resulting in the deaths of 241 American personnel.

4.  As a result of the attack, Bruce Richardson suffered severe mental injuries that have consequently affected his emotional well being to this day.  Mr. Richardson has received a 100% disability rating from the Veterans Administration and his injuries have impeded his ability to work.  Dr. Jerome Paige, who testified under oath, has estimated the resulting loss of wages discounted to the present value at **$2,053,158.00** in accordance with *District of Columbia v. Barritaeu*, 399 A.2d 563 (D.C. App. 1979).

5.  The following testimony clearly establishes that the victim and his family have never recovered from the effects of the Marine Barracks Bombing on October 23, 1983.  The significant emotional trauma they sustained, as well as the physical injury sustained by Bruce Richardson, is permanent.

### TESTIMONY OF BRUCE RICHARDSON

Bruce grew up in a small town in Massachusetts.  He went camping with his family.  His father would take a week off during the summer and they would camp around Revolutionary War sites.  They camped in New York, western Massachusetts and New Jersey.  Bruce also used to go to camp during the summer for a month.

Bruce played football and played the trumpet in a band.  He made the Massachusetts All

State Band. He played in a local orchestra as well. He didn't see a need to go to college as long as he had a good trade.

Bruce joined the Navy right after high school. He figured it would be a good way to learn a trade. He also wanted to see the world. Bruce didn't want his father to have to pay for college. Bruce and his father went to different recruiters and liked the training that the Navy offered him. Bruce received an honorable discharge after six and a half years as a petty officer third class.

Bruce was a crew member on the USS Iwo Jima when the MAU was deployed to Beirut. His first assignment was as a night watch baker and a commands watch butcher. He was then assigned as a cook at the Officer's Club.

Bruce planned on making the Navy a career but decided against it because he saw a lot of favoritism. He felt scapegoated over a few matters and decided to leave the service in 1985.

Bruce was excited to go to Beirut. He was concerned about the mission. He worried about who his purported allies were in Beirut. Bruce got to know his shipmates pretty well on the ride over. He liked listening to the radio traffic.

Bruce didn't know why his family was concerned about his going to Beirut. Later, when Bruce did some research of his own, he knew why they had been so worried. Bruce promised his father that he would write once a week but ultimately did not write that often. He wrote to his father right after the bombing, saying that he had been helping in the recovery efforts. That was a hard letter to write. He was listed as missing in action. No one knew whether he was aboard the ship or ashore.

Bruce had been working nights in the officer's mess and serving the guys who had the night watch. Bruce got off work on October 23, 1983 and looked off the ship towards the city.

He saw the sun rising over Beirut.  Then he heard a boom.  He saw a mushroom cloud going up into the sky.  His stomach knotted up.  He knew something bad had happened.  The captain came on and advised the crew to prepare for mass casualties.  Bruce didn't sleep for two days while he aided in the rescue efforts.  Bruce carried one man out of a helicopter and the man died on the way to triage.  Bruce was still holding the man's hand when the man died.  Bruce remembers talking to the chaplain who told him to go back up and help someone who needed it.

After these first two days, Bruce volunteered to go ashore and help with the recovery efforts there.  He spent about two weeks there.  They had to wear gas masks to kill the stench of rotting tissue.  They wore gloves and taped up their clothes.  They were using heavy equipment to lift the slabs of concrete.  They did find one man alive in the basement after eight days.  He had had an air vent right next to his head.  Most of what Bruce did was remove bodies from the building.  Bruce broke a toe and cut his thumb, but most of his injuries are emotional.  He wasn't offered counseling when he came back from Beirut.

Bruce's family knew he had survived within a week after the Red Cross told his parents.  His parents never talked about the bombing.  His mother is the type of person who liked to think about the good things.  His parents grew up during the Great Depression and they didn't take things for granted.

Bruce was married shortly after he got back from Beirut, but got divorced in 1987.  He has one daughter, Elizabeth Marie Richardson.  Bruce went back to the Mediterranean in 1985.  Before Bruce left the ship to go back to Beirut, he threw his medals overboard.  It was his way of saying goodbye.

Bruce has been unable to let go of the things he saw in the two weeks after the bombing in Beirut.  He has been diagnosed with PTSD and is 100% service-connected disabled as a result.

After bouncing from one job to another for ten years, he went to the VA. They gave him a Mississippi Means Test. The doctor told him he should consider medication to help him deal with his problems. Bruce lives his life one day at a time. He thinks about the things that could kill him from one day to the next. He wishes he could take a pill and forget that stuff. Most of Bruce's friends were in Vietnam. They compare stories. Bruce thinks that they all had their own hells.

Bruce remembers one time, when he was having a nightmare, his wife tried to wake him up and he accidentally punched her. He doesn't think she knew what he went through. Bruce doesn't think his daughter would understand what he went through. He doesn't think she understands what PTSD has done to him. Bruce paid child support after he divorced, but it hurt him financially and he only got to see his daughter about twice a year. That made it difficult to have a good relationship with her. He always worried that he would have an outburst around his daughter. Bruce was upset that his daughter got married young and didn't go to college. She also got divorced young. Bruce sees a lot of himself in her. She just has to learn some things the hard way.

Bruce has bought a home closer to her and their relationship is improving. He lives an hour and a half from her. He likes being able to see her. Bruce has shared some of his experiences in Beirut with his daughter and has sent her websites that detail what the Marines did and what happened there.

Bruce believes that the PTSD and his excessive alcohol use in the years after the bombing cost him his marriage. It took ten years for him to realize that his problems were caused by Beirut. The second hardest time in his life was when his wife left with his daughter.

After the Navy, Bruce worked for a company that maintained equipment at gas stations.

Bruce owned a tractor trailer and made money hauling stuff for people for four years. He worked odd jobs for a year after that. Bruce doesn't work now. He collects disability from the VA and Social Security Administration.

Bruce has only made two real friends since he left the Navy. He feels they are the only people he can count on. He has trouble getting to know people and is afraid that he will hurt them or they will hurt him.

Bruce went to the dedication service when the Beirut Memorial was dedicated in Boston. It took him twenty four years to get to the memorial in Jacksonville. He considers the men he saw their brothers and he is glad that he went.

Bruce thought about the bombing all the time while he was still on active duty. He wondered why the Marines had been bombed and if the bombers knew the Marines were there to help them. Time and medication has helped Bruce, but the 9/11 attacks brought all the memories back. Bruce sat in a chair and cried.

Bruce is a different person since Beirut. He remembers his father telling him that he had changed after the bombing. He asked whether it was for good or bad and his father replied "Both." Bruce doesn't think he will ever recover from his emotional injuries. The bombing and the friends he lost will always be in the back of his mind. Bruce feels like the Beirut vets have been forgotten. The guys who died in Beirut are Bruce's heroes.

Bruce hopes this litigations leads to justice for him and the Marines, sailors, and other service members who died. He also hopes it helps bring peace to the Middle East. He hopes this litigation sends a message to Iran's leaders that they have to change their ways. He wants them to understand that we all have to coexist on this planet.

**TESTIMONY OF ELIZABETH STRUBLE**

Elizabeth Stuble is the daughter of Bruce Richardson. She was born on March 30, 1986.

When Elizabeth was growing up her father wasn't around as he was 1,200 miles away. Apart from the occasional phone call, she didn't have much contact with him. After her mother remarried, her step-father was around. She never had a close relationship with her father.

Bruce told Elizabeth that he had been in Beirut during the bombing once when she was very young. The only time he went into great detail about the bombing was the night before Elizabeth graduated from high school. Bruce had had a few beers celebrating. Bruce talked about how most of the 400 people who came to Beirut on the ship died in the bombing and how he had helped to dig through the rubble and identify the bodies.

Bruce has post traumatic stress disorder. He also has severe hearing loss and lost use of a toe in the aftermath of the bombing. The PTSD is the worst of his injuries. Bruce just moved to be closer to his daughter. He has always had trouble opening up to her and they have had trouble having a normal parent/child relationship. This is the most Elizabeth has ever seen of her father.

Elizabeth understands that Bruce used to rent rooms in his house and that one night a renter saw him outside, crouched in the bushes with a gun. He was sleepwalking. The tenant summoned the police to deal with the situation.

Elizabeth thinks she would have a closer relationship with her dad if he didn't suffer from PTSD.

Elizabeth wants the people who carried out the bombing to know the effect they have had on her life and on other people's lives.

**CONCLUSIONS OF LAW**

1.    Economic Damages.

The Plaintiffs have provided evidence from the expert, Dr. Jerome Paige, clearly detailing the loss of income suffered by Bruce Richardson. These calculations are detailed and supported by the evidence set forth in the report whose summary page is annexed to this report and have been established pursuant to sound guidelines without question. The Special Master concludes as a matter of law that judgment should be entered for this element of damages for Bruce Richardson in the amount of **$2,053,158.00**.

2.  Pain and Suffering.

The above testimony as well as other admitted evidence clearly indicates that Bruce Richardson suffered physical and emotional injury as a result of the actions of the Islamic Republic of Iran and its agents.

This court offered guidance in determining awards for pain and suffering in these cases in *Valore v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84 (D.D.C. 2010). There the granted a baseline award of $5 million to individuals suffering such physical injuries as compound fractures, severe flesh wounds, and wounds and scars from shrapnel, as well as "lasting and severe psychological pain." *Id.* at 45-46 (citing *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007) [hereinafter *Peterson II*]). The Court further held that a downward departure was warranted for less serious injuries. *Id.*

Here, Bruce Richardson suffered physical injury (a broken toe and hearing loss) in the days *following* the bombing when he was part of the rescue and recovery effort (Mr. Richardson was aboard ship when the bombing occurred; thus there is no evidence that his injuries – particularly his hearing loss – occurred as a direct result of the explosion).

While in no way attempting to minimize Mr. Richardson's injuries, the Special Master does not find that they rise to a level sufficient enough to warrant a monetary award, above and apart from any rating Mr. Richardson may receive from the VA for his physical injuries.

Therefore, based on this Court's prior holdings the Special Master recommends a downward departure to **$0 (zero dollars)** for Mr. Richardson's physical injuries. *See, e.g., Peterson II*, 515 F. Supp. 2d at 54 ("In awarding pain and suffering damages, the Court must take pains to ensure that individuals with similar injuries receive similar awards.").

However, Mr. Richardson is entitled to compensation based on the emotional distress he suffered. As set forth above, Mr. Richardson spent some two weeks in Beirut with a good portion of that time spent removing dead bodies of his fellow service members. Indeed, he and others found it necessary to wear gas masks to kill the stench of rotting tissue. Because of these activities Mr. Richardson is rated 100% disabled by the VA with a diagnosis of PTSD. Counsel for Mr. Richardson has produced current medical records from Mr. Richardson's mental-health provider further establishing his injury.

Therefore, the special master concludes that Bruce Richardson is entitled to **$1,500,000.00** in compensatory damages due to the demonstrated emotional injury caused by his role in the recovery efforts in the aftermath of the Marine Barracks Bombing.

2. Solatium

The Foreign Sovereign Immunities Act provides for an award for solatium consisting of emotional injury inflicted upon persons other than the victim by the actions of the Defendants and/or their agents. The Court in *Flatow v. Iran*, 999 F. Supp. 1 (D.D.C. 1998) stated that this is an item of damages which belongs to the individual family members personally for the injuries to the feelings and the loss of the victim's comfort, support, and society. The unexpected type of

9

injury and its emotional impact may be taken into consideration in gauging the emotional impact to those family members. In the present case, the impact upon the family was profound and is permanent.

This court offered guidance in determining awards for solatium in these cases in *Valore v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84 (D.D.C. 2010).

However, the Court has yet to examine the standing of children born after the date of the bombing and who have brought solatium or intentional infliction of emotional distress claims against the Defendants under the terrorism exception to foreign sovereign immunity, 28 U.S.C. §1605A. Issues relating to Plaintiffs' standing in litigation arising out of the terrorist bombing of the Marine Barracks go back to this Court's opinion dismissing those plaintiffs who were domiciled in Pennsylvania and Louisiana. *See Peterson II*. Those Plaintiffs' claims were dismissed because no state law cause of action was available under the predecessor statute, 28 U.S.C. §1605(a)(7). *Id*.

Prior to the passage of 28 USC 1605A (and subsequent to the Court of Appeals' decisions in *Acree v. Iraq*, 370 F.3d 41, 361 U.S. App. D.C. 410 (2004) and *Ciccippio-Puleo v. Iran* 353 F.3d 1024; 359 U.S. App. D.C. 299 (2004), this Court was constrained to apply state law causes of action to those cases brought under the terrorism exception to the Foreign Sovereign Immunities Act. *Peterson II*. The forerunner of §1605A, 1605(a)(7), provided only the jurisdiction to sue a foreign nation. *Id*. Under this rubric, the Court was looked to the restatement of torts and state law to fashion causes of action under which plaintiffs could collect. *In re Terrorism Litigation*, 659 F.Supp. 2d 31, 96 (D.D.C. 2009).

Even so, the court recognized an almost universal exception to the presence requirement in intentional infliction of emotional distress claims where state law left any ambiguity. *Jenco v.*

*Islamic Republic of Iran*, 154 F.Supp. 2d 27, 36 (2001 D.D.C.). The Court did this because the Defendants' conduct was "sufficiently outrageous and intended to inflict severe emotional harm" on the plaintiffs. *Id*.

Relying in disparate state law causes of action resulted in inconsistent results. *In re Terrorism Litigation*, 659 F.Supp. 2d at 96. Congress sought to remedy this disparity by enacting a federal cause of action, which removed reliance on state law causes of action and the "pass-through" problem. *Gates v. Syrian Arab Republic*, 580 F.Supp. 2d 53 (2008). The new statute did not stop there, however. Where, previously, non-adoptive step parents had been dismissed from suits under 1605(a)(7), they had standing to sue under the new statute, 28 U.S.C. §1605A. Compare *Peterson II* with *Heiser v. Islamic Republic of Iran*, 659 F.Supp. 2d 20 (D.D.C. 2009). Thus, §46 of the Second Restatement of Torts ceased to bound the limitations of intentional infliction of emotional distress. Where previously, 28 U.S.C. §1606 placed severe limits on the scope of causes of action under the old statute, this Court noted that it is doubtful that §1606 continues to have this effect:

> In cautioning against the use of federal common law, the Court of Appeals in *Bettis* relied heavily on § 1606 of the FSIA. That provision provides in relevant part: "As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." The Court reasoned that § 1606 "in effect instructs federal judges to find relevant law, not to make it." 315 F.3d at 333. At this juncture, however, it is unclear whether § 1606 should even apply in cases that rely on the new federal cause of action in § 1605A. For starters, § 1606 by its plain terms applies only to sections § 1605 and § 1607 of the FSIA. Moreover, § 1606 conflicts with § 1605A because it provides that punitive damages are not available in actions against foreign states, whereas § 1605A expressly authorizes punitive damages in cases against state sponsors of terrorism. Notably, Congress did not make any changes or updates to § 1606 when it repealed § 1605(a)(7) in the 2008 NDAA, and yet Congress did include a lengthy list of "Conforming Amendments" in § 1083(b) to ensure that both § 1605A and other reforms relating to terrorism actions, such as § 1610(g), were properly integrated into the larger statutory scheme of the FSIA. Thus, this Court can reasonably infer that

> Congress' failure to update § 1606 to include a reference to § 1605A evinces Congress intent that those standards pertaining to the scope of foreign state liability in § 1606 do not apply in actions against state sponsors of terrorism under § 1605A.

*In re Terrorism Litigation*, 659 F.Supp. 2d 31, n.20 (D.D.C. 2009).

Here, the Special Master can draw no meaningful distinction between the life lived by the children here – who were born after the date of the bombing – and those children who were born before the bombing and who were too young to have remembered the incident themselves. All the children of survivors were clearly denied an attentive father who was capable of meeting their emotional needs – that is, all were equally damaged by the terrorist attack. The actions of the Defendants were of such a nature that their effect continued beyond the immediacy of the October 1983 bombing.

Given those facts, and consistent with §1605A and the reasoning in the *Jenco* opinion, the Special Master finds that children born after the date of the bombing have the same standing to assert a claim for intentional infliction of emotional distress or solatium as those children born before the bombing.

Accordingly, the Special Master concludes as a matter of law that Defendants are jointly and severally liable to Plaintiffs in the following amounts:

Elizabeth Struble, daughter of Bruce Richardson **$2,500,000.00.**

**TOTAL DAMAGES:** **$6,053,158.00**

March 6, 2012                                                                          s/s Paul G. Griffin
Date                                                                                        Paul G. Griffin, Esq.
                                                                                                Special Master