# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Caroline Davis, et al.
>            Plaintiffs

>            v.                                    Civil No. 1:07-cv-01302
>                                                  Judge Royce C. Lamberth

The Islamic Republic of Iran, et al.
>            Defendants

## <u>REPORT OF SPECIAL MASTER</u>
## <u>PURSUANT OF REFERENCE</u>
## <u>CONCERNING COUNTS CLXXV – CLXXIX</u>

## <u>Wilkes, Gerald</u>

In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below.  This is an action for emotional damage resulting from an act of state-sponsored terrorism on the part of the Defendants and their agents occurring on and prior to October 23, 1983 at the United States Marine Barracks in Beirut, Lebanon.

The following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence and have been established by clear-and-convincing documentary evidence and testimony.

1.  Gerald Wilkes Jr. was born February 12, 1964, in the United States of America and has been at all times throughout his life a citizen of the United States of America.

2.  On October 23, 1983, Gerald Wilkes was a member of the United States Marine Corps and was stationed in Beirut, Lebanon.

3.  On October 23, 1983, the Marine Barracks building housing the Marine Battalion in Beirut was attacked by a suicide bomber who was driving a truck that penetrated to the center of the

building where the truck, which was carrying a large quantity of explosives, detonated, collapsing the building resulting in the deaths of 241 American personnel.

4.   As a result of the explosion, Gerald Wilkes suffered severe injuries that have consequently affected his physical and emotional well being to this day.  Mr. Wilkes has received a 100% disability rating from the Veterans Administration and his injuries have impeded his ability to work.  Dr. Jerome Paige, who testified under oath, has estimated the resulting loss of wages discounted to the present value at **$2,551,385.00** in accordance with *District of Columbia v. Barritaeu*, 399 A.2d 563 (D.C. App. 1979).

5.   The following testimony clearly establishes that the victim and his family have never recovered from the effects of the Marine Barracks Bombing on October 23, 1983.  The emotional trauma they sustained, as well as the physical injury sustained by Gerald Wilkes Jr. is permanent and significant.

## **GERALD WILKES JR.**

Gerald was born in February of 1964 in Westminster, California.  His father was a career Marine.  Gerald was never very close with his family.  He wasn't subjected to any trauma in the Marine Corps, though.  They moved often when Gerald was growing up.  Their last move was to Albany, New York.  Gerald was a witty student and was athletic in high school.  He wanted to serve his country after he graduated.  He planned on going to college after four years in the Marine Corps.  He dreamed of being a doctor one day.  Gerald joined the Marine Corps's Delayed Entry program and entered in 1982.

Gerald worked in supply in the Marine Corps.  He enjoyed his time in the Marine Corps and enjoyed serving his country.  He was always in good physical and mental health.  Gerald volunteered to go to Beirut.  His father fought in Korea and Vietnam and encouraged him to go.

2

Gerald got to Beirut around Memorial Day of 1983.  Little kids threw rocks and stones at them and yelled "Yankee, go home!"  Gerald was stationed at the airport, a hundred yards from the barracks.  There was hardly any violence around the Marines when Gerald got there.  It was like a vacation.  That began changing in June when the rocket and artillery bombardments began.

Gerald wrote to his family from Beirut describing his frustration with the Rules of Engagement and that the Marines couldn't protect themselves.

In Beirut, Gerald's job was to supply the Marines with food and other equipment.  Gerald injured his clavicle, dislocated his shoulder and was knocked unconscious six weeks prior to the bombing in Beirut.  He returned to Beirut the day before the bombing and returned to the airport.

On the morning of the bombing, Gerald woke up a little after six in the morning to use the restroom.  He heard a truck go by and looked at it.  The truck driver waved at him.  Gerald waved back.  He didn't think anything of it.  He got into his tent and two other Marines asked him if he wanted to go to the barracks for food.  He wanted to sleep more because he had to go to the barracks at 8 AM to see Dr. Hudson.  As soon as he closed his eyes, he heard gunfire.  When he opened his eyes the bomb exploded.  He and the other Marines at the airport were choking on the smoke and the dust.  The force of the explosion was so strong that he believes he suffered a concussion from the blast.  His tent had collapsed and he had to climb out.

The Marines mustered in the basement.  They went through roll call and Gerald and a lance corporal were sent to gather up body bags.  In the supply area, they told the sergeant that the barracks was gone.

Gerald and the other Marine grabbed the body bags and went to the makeshift clinic.  There were bodies and pieces of bodies everywhere.  Gerald was in disbelief.  Marines were digging through the building.  They were trying to recover Marines from the building.  Gerald

3

was assigned to line up the dead and conduct a head count.  Gerald picked up one Marine whose arm then came off.

Gerald and the other Marines worked throughout the day excavating the building and trying to find their comrades.  They tried to get to one Marine who was alive, suspended between floors.  They couldn't get to him in time and he died awaiting rescue.  They worked into the night.

A major told Gerald to dig out one Marine who still had a pulse.  He tried to pull out something spongy and the Marine's brain came out in his hands.  Gerald looked down and saw that the man's head had been cut in half.  He got sick and had to walk away to compose himself.  Gerald's sergeant slapped him and told him the Marines needed him.  He went back to work.

Gerald didn't sleep until sometime the next day.  A sergeant took their home phone numbers and had his wife phone the Marines' families.  Gerald was assigned to guard the excavated material when he woke up.  He left Beirut in the middle of November.

Between the bombing and the Marines' departure, the Marines were on constant alert.  They took artillery fire constantly.  Heading out of Beirut in trucks, they got one last look at the landscape.

The Marines went directly back to Camp LeJeune.  Gerald hoped that his parents would meet him, but no one did.  He went out drinking with another Marine the night he got back.  Gerald couldn't sleep when he got back.  He was depressed.  He couldn't bring himself to go to any funerals for the dead Marines.

Gerald went on another med float before he left the Marine Corps.

Gerald's opinions about serving his country changed after the bombing.  He began drinking heavily.  He was discharged August of 1986.  He suffers from Post-Traumatic Stress

Disorder and depression.  It has affected his family life.  He tries to be a good father to his children and his family understands his limitations.  Gerald is permanently disabled from both the PTSD from bombing and the shoulder injury he suffered sex weeks prior to the bombing.  Gerald's shoulder dislocates all the time and he wears a sling.  Surgery has not helped.

His PTSD has gotten worse over the years.  Gerald had to stop seeing his therapist because he couldn't meet her in the building that her office was in.  He can't go to the mall and hates crowds.  If he had to take his kids to the mall before, he would run in and run out, now he drops them off and waits in the car.

Gerald hasn't had friends since high school.  He feels like his need for security has bled into his family members as well.

Gerald wants the terrorists to know that terrorism sucks and they should use diplomacy.


## JOY WILKES

Joy Wilkes is the wife of Gerald Wilkes.  She is from Sharington, Connecticut.  Gerald was a friend of her sister's and in 1985, Joy was asked to be the godmother of her sister's child while Gerald was the godfather.  They started talking and really connected.  They were married in 1987.

Joy thought Gerald was anti-social and liked to be by himself.  He didn't want to go out with people.  She never thought it was a result of a bombing.  Gerald has only mentioned the bombing in passing.  He has never sat down and told Joy about what happened there.

Joy has had to make all the decisions in their relationship.  Gerald avoids decision making and shuts down when he is confronted with a difficult decision.  Their children have reacted to this by staying close to home.  As their oldest son has become an adult, he has grown

out of this and goes further from home. Their other two children have had severe speech and hearing problems. Joy has to get them treatment on her own and had to take them out by herself.

Joy has come to understand Gerald's problems better. She used to get angry and take out her frustration on Gerald. She tries to avoid putting Gerald in situations that make it difficult for him to function. Gerald has tried medication for PTSD, but he doesn't like how they made him feel and stopped taking them.

Joy does not think Gerald will ever recover. She wishes the terrorists in Beirut had thought about the effect they would have on innocent people.


## **GERALD WILKES III**

Gerald Wilkes III is the son of Gerald Wilkes Jr. Gerald III was born on December 11, 1987. Gerald Wilkes III, joined the Marine Corps right after high school. He wanted to serve his country. Gerald Jr. is still proud of his service.

Gerald III first learned of the bombing when he was about eight-years old. Gerald Jr. has told his son that on October 23, 1983, he saw the truck bomb driving outside the barracks before it drove into the barracks and exploded. Gerald Jr. badly injured his shoulder in Beirut. His emotional injuries from the bombing have been severe. Everyone that was there has emotional injuries from the bombing. He has PTSD and also respiratory problems from breathing in debris.

Gerald Jr. doesn't like to go out in public. If he does go out, he doesn't stay out for long. He doesn't like groups of people or tall buildings. He is quiet. Gerald Jr. has been to counseling for his injuries.

Gerald Jr.'s wife, Joy, can tell when something is wrong with him.

Gerald III has overcome speech and hearing impairment when he was a child to have a

normal life today.  Gerald spends most of his time at home.  He doesn't like going out.  He has gotten used to being at home most of the time because that's how his childhood was.

Gerald III doesn't think his father will ever recover from his experiences in Beirut.  He hopes all the Marines get some compensation out of this litigation.  He hopes the terrorists stop murdering Americans and compensate their victims.  The bombing never should have happened.

## JUSTIN WILKES

Justin Wilkes is the son of Gerald Wilkes Jr.  Justin was born on January 17, 1990 in Albany, New York.  When Justin was growing up, he recalls that his father would see something that reminded him of Beirut and would relate a short story, telling Justin what he was thinking about.  Although they never had a long, sit-down discussion, Justin has pieced together most of what happened there.

Justin knows that a suicide bomber drove a truck into the building.  He knows that many of his father's friends died and that his father was one of the first to respond after the bombing.

The bombing has affected Gerald tremendously.  Justin wondered why he couldn't do things with his dad that the other kids were doing when he was growing up.  He understands now that it is because of the bombing.  Gerald can't go out into crowds.  His family tends to stay to themselves.  Justin has the easiest time making friends and talking to new people.

Since childhood, Justin, along with the rest of his family, has conducted rounds before bed time to inspect their house and make sure it is secure before they turn in.  Justin has found it difficult to break away from this habit.  Justin is a junior in college.  He plans on moving to wherever he can get a job after graduation.  He prides himself on his independence.  At college, Justin is very careful to lock himself into his dorm room at night and makes sure to always check

the lock when he leaves.  He maintains the routines that he kept when he lived at home.

Justin's life has been influenced by the bombing.  His upbringing has ingrained a need for security.  He also wonders is any other Beirut veterans have had children with disabilities, like him and his brothers.

Justin thinks the terrorists' actions were heinous.  He thinks attacking sleeping men is cowardly and one of the worst things someone can do.  They could have tried to get what they wanted through non-violent means.

### JOSHUA WILKES

Joshua Wilkes is the son of Gerald Wilkes Jr.  Joshua was born June 9, 1991.  He recalls hearing about the Beirut bombing from his father in bits and pieces.  The bombing has made his father very focused on his security.  He missed out on doing things with his father because his father could not go out in public.  He especially disliked shopping malls.

The bombing has affected Joshua's outlook on the world.  Like his father, he is very concerned with security.

Joshua was in his second year of college at the time of the deposition.  He tends to only go out with people he knows very well.  Joshua lives with his parents and never brings friends to his home.

Joshua thinks the bombing was extreme and shouldn't have happened.  He wishes the terrorists had opted for a non-violent course of action.

### GERALD WILKES SR.

Gerald Wilkes Sr. is the father of Gerald Wilkes Jr.  Gerald Jr. was born on February 12,

1964.  In high school, he was an athlete.  He especially liked track.  He intended to go to college at some point.  Gerald Sr. attended his son's graduation from basic training in 1982.  Gerald Jr. was assigned to supply in the Marine Corps.  Gerald enjoyed being a Marine and wanted to make it his career.

Gerald Sr. was apprehensive about his son's going to Beirut.  The rest of his family felt that same way.  They heard from Gerald Jr. once a week by phone and by letter.  Gerald Jr. was a supply clerk in Beirut.  Six weeks prior to the bombing, Gerald Jr. was injured badly enough that he had to be temporarily evacuated to a Navy ship for treatment.  Among other things, he suffered a dislocated shoulder.  On October 23, Gerald Jr. was ashore, in a supply tent next to the barracks.

On October 23, 1983, Gerald Sr. got a call from his daughter telling him that the barracks had been bombed.  Eventually, Gerald Jr. called and said that he had survived the bombing and was alright.

Gerald Jr. came back to the United States in November, but didn't see his family until December.  Gerald Sr. thought he had changed.  He looked different and spent a lot of time by himself.  He wasn't outgoing and active, like he had been.  He even ignored phone calls.  He distanced himself from everyone else.

Gerald Sr. thinks the leaders of Iran should be tried in an international criminal court for what they have done.  He thinks they should be held accountable somehow, at least.

## PEGGIE WILKES

Peggie Wilkes is the mother of Gerald Wilkes Jr.  Gerald joined the Marines because his father, Gerald Sr., was a Marine.  Peggie went to Gerald Jr.'s graduation from basic training at Parris Island.  Gerald liked being a Marine.  Gerald did well in school and Peggie thinks that he

would have eventually gone to college, but for the bombing.

When Gerald went to Beirut, Peggie was worried because of the violence there. Peggie heard from Gerald every week while he was in Beirut. Gerald mostly wrote home, but occasionally he got to call. Gerald was a supply clerk in Beirut.

On October 23, 1983, Peggie found out about the bombing by phone. She turned on the TV and saw footage of the collapsed barracks.

Gerald had been injured before the bombing but returned to service shortly before the bombing. Gerald was a changed person when he returned home. Gerald couldn't be around crowds. He couldn't go shopping. Peggie doesn't think Gerald will ever get over the emotional impact the bombing has had on him.

Peggie thinks the Iranians who planned the bombing should be punished for what they did to the Marines.

## CONCLUSIONS OF LAW

1.    Lost Wages

As a result of Gerald Wilkes Jr.'s injuries, his ability to work and earn money has been severely affected. His economic losses are detailed in a report submitted to the court by Dr. Jerome Paige under oath and amount to **$2,551,385.00** discounted to the present value in accordance with *District of Columbia V. Barritaeu*, 399 A. 2d563 (D.C. App. 1979).

2.    Pain and Suffering.

The above testimony as well as other admitted evidence clearly indicates that Gerald Wilkes suffered physical and emotional injury as a result of the actions of the Islamic Republic of Iran and its agents. This court offered guidance in determining awards for pain and suffering in these cases in *Valore v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84

(D.D.C. 2010). The special master concludes that Gerald Wilkes is entitled to **$5,000,000.00**

Dollars in compensatory damages due to the demonstrated injury caused in the Marine Barracks

Bombing.

3.      Solatium

The Foreign Sovereign Immunities Act provides for an award for solatium consisting of

emotional injury inflicted upon persons other than the victim by the actions of the Defendants

and/or their agents.  The Court in *Flatow v. Iran*, 999 F. Supp. 1 (D.D.C. 1998) stated that this is

an item of damages which belongs to the individual family members personally for the injuries

to the feelings and the loss of the victim's comfort, support, and society.  The unexpected type of

injury and its emotional impact may be taken into consideration in gauging the emotional impact

to those family members.  In the present case, the impact upon the family was profound and is

permanent.

This court offered guidance in determining awards for solatium in these cases in *Valore

v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84 (D.D.C. 2010).

However, the Court has yet to examine the standing of children born after the date of the

bombing and spouses who married after the date of the bombing who have brought solatium or

intentional infliction of emotional distress claims against the Defendants under the terrorism

exception to foreign sovereign immunity, 28 U.S.C. §1605A.  Issues relating to Plaintiffs'

standing in litigation arising out of the terrorist bombing of the Marine Barracks go back to this

Court's opinion dismissing those plaintiffs who were domiciled in Pennsylvania and Louisiana.

*See Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25 (D.D.C. 2007) [hereinafter *Peterson

II*].  Those Plaintiffs' claims were dismissed because no state law cause of action was available

under the predecessor statute, 28 U.S.C. §1605(a)(7).  *Id*.

11

Prior to the passage of 28 USC 1605A (and subsequent to the Court of Appeals' decisions in *Acree v. Iraq*, 370 F.3d 41, 361 U.S. App. D.C. 410 (2004) and *Ciccippio-Puleo v. Iran* 353 F.3d 1024; 359 U.S. App. D.C. 299 (2004, this Court was constrained to apply state law causes of action to those cases brought under the terrorism exception to the Foreign Sovereign Immunities Act. *Peterson II*. The forerunner of §1605A, 1605(a)(7), provided only the jurisdiction to sue a foreign nation. *Id*. Under this rubric, the Court was looked to the restatement of torts and state law to fashion causes of action under which plaintiffs could collect. *In re Terrorism Litigation*, 659 F.Supp. 2d 31, 96 (D.D.C. 2009).

Even so, the court recognized an almost universal exception to the presence requirement in intentional infliction of emotional distress claims where state law left any ambiguity. *Jenco v. Islamic Republic of Iran*, 154 F.Supp. 2d 27, 36 (2001 D.D.C.). The Court did this because the Defendants' conduct was "sufficiently outrageous and intended to inflict severe emotional harm" on the plaintiffs. *Id*.

Relying in disparate state law causes of action resulted in inconsistent results. *In re Terrorism Litigation*, 659 F.Supp. 2d at 96. Congress sought to remedy this disparity by enacting a federal cause of action, which removed reliance on state law causes of action and the "pass-through" problem. *Gates v. Syrian Arab Republic*, 580 F.Supp. 2d 53 (2008). The new statute did not stop there, however. Where, previously, non-adoptive step parents had been dismissed from suits under 1605(a)(7), they had standing to sue under the new statute, 28 U.S.C. §1605A. Compare *Peterson II* with *Heiser v. Islamic Republic of Iran*, 659 F.Supp. 2d 20 (D.D.C. 2009). Thus, §46 of the Second Restatement of Torts ceased to bound the limitations of intentional infliction of emotional distress. Where previously, 28 U.S.C. §1606 placed severe

limits on the scope of causes of action under the old statute, this Court noted that it is doubtful

that §1606 continues to have this effect:

> In cautioning against the use of federal common law, the Court of Appeals in *Bettis* relied heavily on § 1606 of the FSIA. That provision provides in relevant part: "As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." The Court reasoned that § 1606 "in effect instructs federal judges to find relevant law, not to make it." 315 F.3d at 333. At this juncture, however, it is unclear whether § 1606 should even apply in cases that rely on the new federal cause of action in § 1605A. For starters, § 1606 by its plain terms applies only to sections 1605 and 1607 of the FSIA. Moreover, § 1606 conflicts with § 1605A because it provides that punitive damages are not available in actions against foreign states, whereas § 1605A expressly authorizes punitive damages in cases against state sponsors of terrorism. Notably, Congress did not make any changes or updates to § 1606 when it repealed § 1605(a)(7) in the 2008 NDAA, and yet Congress did include a lengthy list of "Conforming Amendments" in § 1083(b) to ensure that both § 1605A and other reforms relating to terrorism actions, such as § 1610(g), were properly integrated into the larger statutory scheme of the FSIA. Thus, this Court can reasonably infer that Congress' failure to update § 1606 to include a reference to § 1605A evinces Congress intent that those standards pertaining to the scope of foreign state liability in § 1606 do not apply in actions against state sponsors of terrorism under § 1605A.

*In re Terrorism Litigation*, 659 F.Supp. 2d 31, n.20 (D.D.C. 2009).

Here, the Special Master can draw no meaningful distinction between the life lived by the

children here – who were born after the date of the bombing – and those children who were born

before the bombing and who were too young to have remembered the incident themselves.  All

the children of survivors were clearly denied an attentive father who was capable of meeting

their emotional needs – that is, all were equally damaged by the terrorist attack.  The actions of

the Defendants were of such a nature that their effect continued beyond the immediacy of the

October 1983 bombing.

Further, while one could argue that no damages should be awarded a wife who married a

Marine after the bombing – under the theory that she knew what she was getting into when she

married him – it would have been impossible for Joy Wilkes, the wife of Gerald Wilkes, to have grasped just what she was in for when she married her husband.[1]  No person could have expected that the amount of damage her new husband had endured would have been so severe that he would have denied their children the attentiveness that each child needs and would have denied her the stability she reasonably had expected when marrying him.

Given those facts, and consistent with §1605A and the reasoning in the *Jenco* opinion, the Special Master finds that after-born children and spouses who married after the date of the bombing have the same standing to assert a claim for intentional infliction of emotional distress or solatium as those children born and spouses married before the bombing.

Accordingly, the Special Master concludes as a matter of law that Defendants are jointly and severally liable to Plaintiffs in the following amounts:

Joy Wilkes, spouse of Gerald Wilkes Jr., **$4,000,000.00**;

Gerald Wilkes III, son of Gerald Wilkes Jr., **$2,500,000.00**;

Justin Wilkes, son of Gerald Wilkes Jr., **$2,500,000.00**;

Joshua Wilkes, son of Gerald Wilkes Jr., **$2,500,000.00**;

Gerald Wilkes, Sr., father of Gerald Wilkes Jr., **$2,500,000.00**; and

Peggie Wilkes, mother of Gerald Wilkes Jr., **$2,500,000.00**.

TOTAL DAMAGES:                                             **$24,051,385.00**

March 6, 2012                                         s/s Paul G. Griffin
Date                                                 Paul G. Griffin, Esq.
                                                     Special Master

---

[1] *See Revised Clinical & Forensic Expert Witness Evaluation/Consultation: John Santos and Family Members* by Plaintiffs' expert Dr. Glen D. Skoler, attached to Report of Special Master Pursuant To Order of Reference Concerning Counts XLIX – LII (Santos, John) at 15 (filed under seal).