**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Caroline Davis, et al.
Plaintiffs

v.

Civil No. 1:07-cv-01302
Judge Royce C. Lamberth

The Islamic Republic of Iran, et al.
Defendants

**REPORT OF SPECIAL MASTER**
**PURSUANT TO ORDER OF REFERENCE**
**CONCERNING COUNT CXCIII**

**Albright, Marvin (family members only)**

In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below. This is an action for emotional damage resulting from an act of state-sponsored terrorism on the part of the Defendants and their agents occurring on and prior to October 23, 1983 at the United States Marine Barracks in Beirut, Lebanon.

The following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence and have been established by clear-and-convincing documentary evidence and testimony.

1. Marvin Albright was born January 2, 1963 in the United States of America and has been at all times throughout his life a citizen of the United States of America.

2. On October 23 1983, Marvin Albright was a member of the United States Marines, having enlisted on July 29, 1981, and was stationed in Beirut, Lebanon.

3. On October 23, 1983, the Marine Barracks building housing the Marine Battalion in Beirut was attacked by a suicide bomber who was driving a truck that penetrated to the center of the

building where the truck, which was carrying a large quantity of explosives, detonated, collapsing the building resulting in the deaths of 241 American personnel.

4. As a result of the explosion, Marvin Albright suffered severe injuries that have consequently affected his physical and emotional well being to this day.

5. The following testimony clearly establishes that Mr. Albright and his family have never recovered from the effects of the Marine Barracks Bombing on October 23, 1983. The emotional trauma they sustained is permanent and significant.

6. This report concerns only those members of Mr. Albright's family who were not parties in *Peterson v. Islamic Republic of Iran*, 1:01-cv-02094 RCL (D.D.C. 2007). That report on the Peterson docket concerns counts CDLXXXV – CDLXXXIX.

**FAITH ALBRIGHT WASHINGTON**

Faith Albright Washington was married to Marvin Albright. They were married in February of 1983 and divorced in 1992. Marvin is from South Carolina originally. Faith is from Bridgeport, Connecticut. They met towards the end of 1981.

Marvin joined the Marines because he wanted to serve his country and he liked that the Marines were the toughest. He joined right after high school. Marvin planned to make the Marine Corps a career. Marvin was in communications. He liked his job and it made him feel important.

Faith was disappointed when Marvin found out he was going to Beirut. She had hoped he would be assigned to somewhere like Hawaii. She remembers that a lot of the wives were upset. The mission was not supposed to be dangerous, but Faith didn't quite believe that.

Marvin wrote from Beirut often. He was only able to call a couple of times. Faith sent

Marvin packages. Marvin wrote about his friends and how much he wanted to come home. In only one letter did Marvin admit to being scared. Normally Marvin would never admit to being scared.

On October 23, 1983, Faith flew back to Connecticut. She had been in Kansas, where Marvin's twin brother was getting married. She had seen news of the bombing before she left, but Marvin's brother told her that he was sure Marvin was fine. Faith had a feeling something had happened to Marvin. Faith was very upset as she watched news footage of Marines being pulled from the remains of the building. She was hoping she would see Marvin. She thought she had seen him a couple of times.

On the morning of October 24, 1983 an officer and a chaplain showed up at Faith's mother's house early in the morning. Faith assumed they had come because Marvin had died and she became hysterical. They calmed Faith down and told her that Marvin was alive, but injured and in a hospital in Cyprus. Faith talked to Marvin on the phone. He sounded weak. Marvin said one of his friends had woken him up on the morning of the bombing and the last thing he remembered was putting his foot on the floor. His friend died and Marvin would have died too, if he had not have woken up and moved.

Marvin was flown to Camp Lejeune, where Faith met him. Marvin had a broken arm and leg. He was in a wheelchair. His body was covered in lacerations. His psychological damage was much worse. His personality changed after the bombing. Marvin became quiet and kept to himself. He still doesn't talk much. He didn't like the dark. Marvin and Faith went to Marvin's mother's house so Marvin could recuperate. When Marvin was in bed, Faith turned out the light and Marvin started yelling and screaming. The dark reminded Marvin of being buried alive. Marvin has never been the same.

Faith didn't have a support group. No one told her how to best support Marvin and deal with his problem. She had to learn how to deal with Marvin's problems through trial and error. She felt alone.

In 1988, Faith and Marvin had a son, Marvin, Jr. Marvin had wanted children badly. Having a baby distracted Faith and Marvin from Marvin's problems for a little while. Marvin's problems eventually crept back into their lives. Faith feels that her children never had the father they deserved. Marvin has never really been capable of parenting because of his psychological problems. Faith tried to ignore Marvin's problems. She knew he was incapable of acting normally and that he wasn't trying to aggravate her. Since the bombing, Marvin has had trouble communicating with his family. He rarely talks to his mother or his children. He has only seen his granddaughter once, and she is two-years old.

Faith feels like she was abandoned by the military after Marvin was injured. She resents that no one helped her deal with Marvin's problems and thinks that her life could have been much more normal and less stressful if Marvin's problems had been treated after he got back. Faith thinks Marvin's problems could have been treated.

Marvin was not diagnosed with Post-Traumatic Stress Disorder until years later. Marvin returned to active duty once his physical wounds healed, but he could not behave like a Marine. He had trouble being punctual and would not show up when he was supposed to. Marvin would also drink to excess, sometimes on base. One time, Marvin was AWOL. Marvin's superiors never identified the source of the problem. Faith remembers explaining Marvin's troubles to an officer once, but no action was taken.

Faith does not think Marvin will ever recover. Marvin loves his children, but he has been incapable of caring for them. Marvin's children understand that the bombing has changed

Marvin, but they have still been disappointed by his shortcomings from time to time.

Faith still talks to Marvin about their kids. She can see that he is still different and troubled as a result of the bombing. Marvin has never talked to Faith about the bombing. Faith wishes her kids had had the chance at a real relationship with their dad, especially her daughter, who has a lot of health problems and has had a kidney transplant.

Faith hopes this litigation lets the families of the deceased Marines know that they did not lose their family members in vain. Faith lost a great marriage because of the bombing because Marvin was changed by the bombing. She wants the survivors to get some compensation for what they have suffered through. She thinks the families deserve some compensation for everything the bombing took away from them. Faith suffered stress and depression as a result of the bombing. Her family suffered financially and had to worry about food and shelter as a result of the bombing and Marvin's problems. She and her family still suffer because of the bombing.

Faith wants the Iranians to stop training and financing terrorism. She wants everyone to be safe from terrorism, not just Americans and wants the damage to families that is caused by terrorist attacks to stop. The bombing has changed Faith's family. It has robbed Marvin of his potential to be a good father and his ability to work.

## MARVIN ALBRIGHT JR.

Marvin Albright Jr. is the son of Marvin Albright. He was born on June 26, 1987. Marvin knows his father, Marvin Sr., does not like the dark. Every time he has gotten mad at his father, his grandmother has told him that his father cannot help the way he is. He was injured in a bombing and it has affected his state of mind every since.

Marvin Sr. has made a habit of calling and saying he will come to visit, and changing his

mind at the last minute. He won't tell anyone he has changed his mind and won't answer his phone for weeks if he decides not to show.

Marvin recalls really understanding what the bombing was and what happened to his father around second grade. He didn't fully understand the bombing until middle school.

Marvin didn't see his father much when he was growing up. Even when they both lived in Connecticut during the summers, his father didn't visit often. His father has never talked to him about the bombing. Marvin feels like he never bonded with his father. He was lucky to talk to his father on the phone every couple of months. Marvin is more understanding of his father's limitations, now that he is an adult. He still looks forward to talking with his father when he has the chance.

Marvin thinks the people who carried out the attack should pay for what they have done. Marvin's life is still affected by the bombing. He wishes his daughter has a grandfather who was involved in her life. He hopes the outcome of this case will make life easier for him and his family.

**SHATERIA ALBRIGHT**

Shateria Albright is the daughter of Marvin Albright. She was born on August 22, 1990. Shateria understands that her father was injured very badly in the bombing. When she was a young child, she simply believed he had gotten hurt in a war. As she got older, she gained a greater understanding of her father's injuries. She has asked him about pictures of him, taken when he was recovering, but he will not discuss them. Marvin does like pointing out a picture of him with President Reagan taken while he was recovering.

When Shateria lived close to her father, she would see him as often as twice a week, but sometimes, she would only see him twice a year.

Shateria has suffered kidney failure and has had a kidney transplant and has had other surgeries as a result of problems with the transplant. Marvin Sr. only made it to see her once when she was in the hospital.

Shateria hopes that this case brings recognition to the Marines who fought in Lebanon and makes the families feel better about their sacrifice.

## **CONCLUSIONS OF LAW**

1. Solatium

The Foreign Sovereign Immunities Act provides for an award for solatium consisting of emotional injury inflicted upon persons other than the victim by the actions of the Defendants and/or their agents. The Court in *Flatow v. Iran*, 999 F. Supp. 1 (D.D.C. 1998) stated that this is an item of damages which belongs to the individual family members personally for the injuries to the feelings and the loss of the victim's comfort, support, and society. The unexpected type of injury and its emotional impact may be taken into consideration in gauging the emotional impact to those family members. In the present case, the impact upon the family was profound and is permanent.

This court offered guidance in determining awards for solatium in these cases in *Valore v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84 (D.D.C. 2010).

However, the Court has yet to examine the standing of children born after the date of the bombing and who have brought solatium or intentional infliction of emotional distress claims against the Defendants under the terrorism exception to foreign sovereign immunity, 28 U.S.C. §1605A. Issues relating to Plaintiffs' standing in litigation arising out of the terrorist bombing of the Marine Barracks go back to this Court's opinion dismissing those plaintiffs who were domiciled in Pennsylvania and Louisiana. *See Peterson v. Islamic Republic of Iran*, 515

F.Supp.2d 25 (D.D.C. 2007) [hereinafter *Peterson II*]. Those Plaintiffs' claims were dismissed because no state law cause of action was available under the predecessor statute, 28 U.S.C. §1605(a)(7). *Id*.

Prior to the passage of 28 USC 1605A (and subsequent to the Court of Appeals' decisions in *Acree v. Iraq*, 370 F.3d 41, 361 U.S. App. D.C. 410 (2004) and *Cicippio-Puleo v. Iran* 353 F.3d 1024; 359 U.S. App. D.C. 299 (2004), this Court was constrained to apply state law causes of action to those cases brought under the terrorism exception to the Foreign Sovereign Immunities Act. *Peterson II*. The forerunner of §1605A, 1605(a)(7), provided only the jurisdiction to sue a foreign nation. *Id*. Under this rubric, the Court was looked to the restatement of torts and state law to fashion causes of action under which plaintiffs could collect. *In re Terrorism Litigation*, 659 F.Supp. 2d 31, 96 (D.D.C. 2009).

Even so, the court recognized an almost universal exception to the presence requirement in intentional infliction of emotional distress claims where state law left any ambiguity. *Jenco v. Islamic Republic of Iran*, 154 F.Supp. 2d 27, 36 (2001 D.D.C.). The Court did this because the Defendants' conduct was "sufficiently outrageous and intended to inflict severe emotional harm" on the plaintiffs. *Id*.

Relying in disparate state law causes of action resulted in inconsistent results. *In re Terrorism Litigation*, 659 F.Supp. 2d at 96. Congress sought to remedy this disparity by enacting a federal cause of action, which removed reliance on state law causes of action and the "pass-through" problem. *Gates v. Syrian Arab Republic*, 580 F.Supp. 2d 53 (2008). The new statute did not stop there, however. Where, previously, non-adoptive step parents had been dismissed from suits under 1605(a)(7), they had standing to sue under the new statute, 28 U.S.C. §1605A. Compare *Peterson II* with *Heiser v. Islamic Republic of Iran*, 659 F.Supp. 2d 20

(D.D.C. 2009). Thus, §46 of the Second Restatement of Torts ceased to bound the limitations of intentional infliction of emotional distress. Where previously, 28 U.S.C. §1606 placed severe limits on the scope of causes of action under the old statute, this Court noted that it is doubtful that §1606 continues to have this effect:

> In cautioning against the use of federal common law, the Court of Appeals in *Bettis* relied heavily on § 1606 of the FSIA. That provision provides in relevant part: "As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." The Court reasoned that § 1606 "in effect instructs federal judges to find relevant law, not to make it." 315 F.3d at 333. At this juncture, however, it is unclear whether § 1606 should even apply in cases that rely on the new federal cause of action in § 1605A. For starters, § 1606 by its plain terms applies only to sections § 1605 and § 1607 of the FSIA. Moreover, § 1606 conflicts with § 1605A because it provides that punitive damages are not available in actions against foreign states, whereas § 1605A expressly authorizes punitive damages in cases against state sponsors of terrorism. Notably, Congress did not make any changes or updates to § 1606 when it repealed § 1605(a)(7) in the 2008 NDAA, and yet Congress did include a lengthy list of "Conforming Amendments" in § 1083(b) to ensure that both § 1605A and other reforms relating to terrorism actions, such as § 1610(g), were properly integrated into the larger statutory scheme of the FSIA. Thus, this Court can reasonably infer that Congress' failure to update § 1606 to include a reference to § 1605A evinces Congress intent that those standards pertaining to the scope of foreign state liability in § 1606 do not apply in actions against state sponsors of terrorism under § 1605A.

*In re Terrorism Litigation*, 659 F.Supp. 2d 31, n.20 (D.D.C. 2009).

Here, the Special Master can draw no meaningful distinction between the life lived by the children here – who were born after the date of the bombing – and those children who were born before the bombing and who were too young to have remembered the incident themselves. All the children of survivors were clearly denied an attentive father who was capable of meeting their emotional needs – that is, all were equally damaged by the terrorist attack. The actions of the Defendants were of such a nature that their effect continued beyond the immediacy of the October 1983 bombing.

Given those facts, and consistent with §1605A and the reasoning in the *Jenco* opinion, the Special Master finds that children born after the date of the bombing have the same standing to assert a claim for intentional infliction of emotional distress or solatium as those children born before the bombing.

Accordingly, the Special Master concludes as a matter of law that Defendants are jointly and severally liable to Plaintiffs in the following amounts: Faith Albright Washington, former spouse of Marvin Albright, **$4,000,000.00**;

Marvin Albright Jr., son of Marvin Albright **$2,500,000.00**; and

Shateria Albright, daughter of Marvin Albright, **$2,500,000.00**.

**TOTAL DAMAGES: $9,000,000.00**

March 6, 2012
Date

Paul G. Griffin, Esq.
Special Master