**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

Caroline Davis, et al.
        Plaintiffs

      v.                                        Civil No. 1:07-cv-01302
                                                  Judge Royce C. Lamberth

The Islamic Republic of Iran, et al.
        Defendants

**REPORT OF SPECIAL MASTER**
**PURSUANT TO ORDER OF REFERENCE**
**CONCERNING COUNTS CXCVIII**

**Garner, Truman (family members only)**

       In accordance with the Order of Reference entered pursuant to the provisions of Federal Rule 53, the Special Master has received evidence with regard to all issues of compensatory damages from witnesses as set forth below.  This is an action for emotional damage resulting from an act of state-sponsored terrorism on the part of the Defendants and their agents occurring on and prior to October 23, 1983 at the United States Marine Barracks in Beirut, Lebanon.

       The following findings of fact are based upon the sworn testimony and documents entered into evidence in accordance with the Federal Rules of Evidence and have been established by clear-and-convincing documentary evidence and testimony.

1. Truman Dale Garner was born April 22, 1962, in the United States of America and has been at all times throughout his life a citizen of the United States of America.

2. On October 23, 1983, Mr. Garner was a member of the United States Marine Corps, having enlisted in 1980, and was stationed in Beirut, Lebanon.

3.  On October 23, 1983, the Marine Barracks building housing the Marine Battalion in Beirut was attacked by a suicide bomber who was driving a truck that penetrated to the center of the building where the truck, which was carrying a large quantity of explosives, detonated, collapsing the building resulting in the deaths of 241 American personnel.

4.  This report only concerns those claims of members of Mr. Garner's family for solatium. Mr. Garner himself was a party in *Peterson v. Islamic Republic of Iran*, 1:01-cv-02094 (D.D.C. 2007) and a report detailing his injuries has been entered on that docket, reported as Counts DXV – DXIX.

5.  The following testimony clearly establishes that those members of Mr. Garner's family testifying for this report have never recovered from the effects of the Marine Barracks Bombing on October 23, 1983.  The emotional trauma they sustained is permanent and significant.

### Joseph Matthew Garner

Joseph Matthew Garner is the son of Truman Dale Garner.  He was born on January 3, 1984.  He has two younger sisters.  Joseph is himself a Marine.  His Military Occupational Specialty is 6073 and he is a mechanic.  His father, Truman Garner, joined the Marine Corps in 1980.  Joseph isn't quite sure why he joined.  Truman left the Marine Corps in 1984.  He was an anti-tank guy.  He loved being a Marine.  He wanted to be a career Marine.

After leaving the Marine Corps, Truman was a truck driver for a while, before working for a couple of different companies.  He helped his father do some carpentry work as well.

Truman never talked about Beirut until Joseph was about fifteen years old.  When Truman got treatment for his psychological problems and started taking medication, he began to talk about his experiences.  Truman told Joseph that he was watching TV in the barracks before

he went to sleep.  The next thing he remembers was waking up in Germany three days later.  An officer walked in and told him what had happened, that the barracks had been bombed and a lot of Marines had died.  He couldn't believe it at first.

Truman had a blood clot in his brain.  He had crushing injuries to his lower back and ankle.  A piece of rebar was forced through his torso.  He also developed Post-Traumatic Stress Disorder in the aftermath of the bombing.  When Joseph was growing up, Truman avoided crowds and still avoids them to this day.  Though Joseph says Truman was a good dad, little things would set him off.  He was paranoid about little things.

Truman's psychological issues put stress on his marriage.  They didn't know what PTSD was at the time.  Looking back, Joseph can attribute much more to PTSD than anyone in the family did at the time.  Truman would go through periods of mental instability and went through some periods of substance abuse as well.

Joseph would like to give the terrorists a piece of his mind and ask them what they were thinking when they bombed the barracks.  He would like them to know that they will pay for their actions.

### Justina Nicole Garner

Justina Nicole Garner is the daughter of Truman Dale Garner.  She was born April 18, 1985.  Truman has told Justina stories about his time in the Marine Corps and enjoyed being a Marine.  The first time Justina remembers hearing anything about the bombing was when one of Truman's friends wrote a poem about it and gave the poem to Truman.  Growing up, it was a topic that Justina's mother told her to stay away from and not to bring up in conversation.  Truman has only begun to talk about his experiences in Beirut on his own in the last couple of years.  He has shown Justina pictures of Beirut.

Justina is aware that her father has PTSD.  Justina's understanding of PTSD is when someone has been through a traumatic experience, like a war, and has issues with stress because of their experiences and cannot move on with their life.  Truman was edgy and irritable with everyone.  Truman put his hands around Justina's neck one time when she made a sarcastic comment as a teenager.

Truman avoids crowded places and sits with his back to the wall so he can see everything around him.  He has a constant fear of people sneaking up on him.  He has paranoid tendencies.

Justina knows Truman broke his ankles in the bombing and has a plate in his head still.  He damaged his ears and his hearing.  Truman seemed afraid to go to sleep and suffered from nightmares for years.  He would oftentimes be awake during the night when Justina was growing up.  He seemed unstable when Justina was growing up.

Justina's relationship with her father has gotten better, but she thinks she would have always had a better relationship with her father if not for Beirut.  Justina's parents used to fight when she was growing up and she attributes much of that to his PTSD as well.  The bombing has hurt Justina's relationship with her father.  She knows her father loves her, but the psychological result of the bombing kept her father from doing things with her and put stress on her mother as well.  Truman is a good person and is a better father now.

Justina hopes that the families of the victims of the bombing are compensated.  She thinks the people who carried out the bombing should pay for what they have done.  Truman and the other Marines had not done anything to them.

### **Reva Paige Garner**

Reva Paige Garner is the daughter of Truman Dale Garner.  She was born on October 27,

1988.  Truman worked for a trucking company and for the post office when Reva was growing up.

Reva remembers her father having flashbacks when she was a kid.  It made her childhood quite stressful.  She started understanding what had happened to her father when she was thirteen-years old and she was helping her mother plan a trip to North Carolina for a remembrance.  Truman told her that when the barracks was bombed, he was in a room in the barracks with twelve other Marines and he was the only one who survived.

Reva's mother explained to Reva that Truman's problems had nothing to do with her or her siblings.  Reva asked her father questions about the bombing when she was a senior when she had to prepare an autobiography for school.  Truman told her about the bombing.  He said 241 Marines were killed.

Reva knew his ankles were broken and he had to have a chest tube after the bombing.  He also needed a couple of surgeries.  He has some problems with his back as a result of the bombing.

Truman doesn't like talking about his psychological problems.  There is some stuff that he can't watch on TV because it will make him have flashbacks.  Truman goes to the VA and to another office for help with his psychological problems.  Truman has been unable to hold down a job or work because of his PTSD and that has put a great deal of stress on his family.

Reva understand what soldiers and Marines' families go through.  She hopes people will recognize the sacrifice the Marines made in Beirut.  Reva thinks her dad is a great man who has made it through a lot.

### **Penny Garner**

Penny Garner is the wife of Truman Dale Garner.  Penny and Truman were married in

1984. They have three children.

Truman Garner was born in Jasper, Alabama. Truman's father beat him when he was little, oftentimes with a broomstick, but with whatever was at hand. One time, he pulled out Truman's hair. Truman joined the Marine Corps because he liked their uniforms. Penny knew Truman before the bombing in Beirut, but didn't get to know him well until after the bombing. Penny was a waitress at a bar in Jacksonville, NC and Truman was a part-time bouncer at the bar.

Truman was in the infantry.

During the bombing Truman's torso was pierced by a metal bar in the bombing, puncturing his lung. He had a blood clot in his brain that had to be removed. He broke his ankle and tailbone. He had cuts and bruises as well.

Truman seemed to have more psychological problems as his children grew up. He was extremely irritable. Penny remembers him poking his son, Joseph, in the chest and treating the boy like he was in the military. He has screamed at his son for "not cleaning the barracks" and has grabbed his daughter by the neck. Truman slept with a loaded gun in the bed with them. Truman had nightmares that would make him thrash in his sleep. Truman has survivor's guilt and has been diagnosed with PTSD. A lot of the Marines do and the parents of the Marines who died wonder why their children didn't make it.

Truman currently sees a psychiatrist. He has good days and bad days. On his bad days, he is disconnected from reality. Penny and Truman go to remembrances every five years. Penny remembers at one such event, Truman and his Marine friends were drinking and she heard Truman yell out "The one-eight needs us." She looked up to see Truman dragging four of his friends out the door. She settled him down because she says she knows what sets him off and

what calms him down.

When Truman got out of the Marine Corps, he worked with explosives for a while, breaking rocks with them and moving them around. Truman has had probably thirty jobs in the last ten years. His last job was at the post office. They got two bomb threats and Truman had panic attacks and couldn't go back. He gets jobs that pay well, but he can't hold them down.

Penny feels lucky that her children have stable home lives now. Because of Truman's inability to keep a job, the family had to move a lot when the children were growing up. Penny thought she was going to get divorced four separate times.

Penny would like the terrorist leaders to accept responsibility for what they did.

## **CONCLUSIONS OF LAW**

1.   Solatium

The Foreign Sovereign Immunities Act provides for an award for solatium consisting of emotional injury inflicted upon persons other than the victim by the actions of the Defendants and/or their agents. The Court in *Flatow v. Iran*, 999 F. Supp. 1 (D.D.C. 1998) stated that this is an item of damages which belongs to the individual family members personally for the injuries to the feelings and the loss of the victim's comfort, support, and society. The unexpected type of injury and its emotional impact may be taken into consideration in gauging the emotional impact to those family members. In the present case, the impact upon the family was profound and is permanent.

This court offered guidance in determining awards for solatium in these cases in *Valore v. Iran*, 03-cv-1959, 06-cv-516, 2010 U.S. Dist. LEXIS 31259, 84 (D.D.C. 2010).

However, the Court has yet to examine the standing of children born after the date of the bombing and spouses who married after the date of the bombing who have brought solatium or intentional infliction of emotional distress claims against the Defendants under the terrorism exception to foreign sovereign immunity, 28 U.S.C. §1605A. Issues relating to Plaintiffs' standing in litigation arising out of the terrorist bombing of the Marine Barracks go back to this Court's opinion dismissing those plaintiffs who were domiciled in Pennsylvania and Louisiana. *See Peterson v. Islamic Republic of Iran*, 515 F.Supp.2d 25 (D.D.C. 2007) [hereinafter *Peterson II*]. Those Plaintiffs' claims were dismissed because no state law cause of action was available under the predecessor statute, 28 U.S.C. §1605(a)(7). *Id*.

Prior to the passage of 28 USC 1605A (and subsequent to the Court of Appeals' decisions in *Acree v. Iraq*, 370 F.3d 41, 361 U.S. App. D.C. 410 (2004) and *Cicippio-Puleo v. Iran* 353 F.3d 1024; 359 U.S. App. D.C. 299 (2004, this Court was constrained to apply state law causes of action to those cases brought under the terrorism exception to the Foreign Sovereign Immunities Act. *Peterson II*. The forerunner of §1605A, 1605(a)(7), provided only the jurisdiction to sue a foreign nation. *Id*. Under this rubric, the Court was looked to the restatement of torts and state law to fashion causes of action under which plaintiffs could collect. *In re Terrorism Litigation*, 659 F.Supp. 2d 31, 96 (D.D.C. 2009).

Even so, the court recognized an almost universal exception to the presence requirement in intentional infliction of emotional distress claims where state law left any ambiguity. *Jenco v. Islamic Republic of Iran*, 154 F.Supp. 2d 27, 36 (2001 D.D.C.). The Court did this because the Defendants' conduct was "sufficiently outrageous and intended to inflict severe emotional harm" on the plaintiffs. *Id*.

Relying in disparate state law causes of action resulted in inconsistent results. *In re Terrorism Litigation*, 659 F.Supp. 2d at 96. Congress sought to remedy this disparity by enacting a federal cause of action, which removed reliance on state law causes of action and the "pass-through" problem. *Gates v. Syrian Arab Republic*, 580 F.Supp. 2d 53 (2008). The new statute did not stop there, however. Where, previously, non-adoptive step parents had been dismissed from suits under 1605(a)(7), they had standing to sue under the new statute, 28 U.S.C. §1605A. Compare *Peterson II* with *Heiser v. Islamic Republic of Iran*, 659 F.Supp. 2d 20 (D.D.C. 2009). Thus, §46 of the Second Restatement of Torts ceased to bound the limitations of intentional infliction of emotional distress. Where previously, 28 U.S.C. §1606 placed severe limits on the scope of causes of action under the old statute, this Court noted that it is doubtful that §1606 continues to have this effect:

> In cautioning against the use of federal common law, the Court of Appeals in *Bettis* relied heavily on § 1606 of the FSIA. That provision provides in relevant part: "As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or section 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances." The Court reasoned that § 1606 "in effect instructs federal judges to find relevant law, not to make it." 315 F.3d at 333. At this juncture, however, it is unclear whether § 1606 should even apply in cases that rely on the new federal cause of action in § 1605A. For starters, § 1606 by its plain terms applies only to sections § 1605 and § 1607 of the FSIA. Moreover, § 1606 conflicts with § 1605A because it provides that punitive damages are not available in actions against foreign states, whereas § 1605A expressly authorizes punitive damages in cases against state sponsors of terrorism. Notably, Congress did not make any changes or updates to § 1606 when it repealed § 1605(a)(7) in the 2008 NDAA, and yet Congress did include a lengthy list of "Conforming Amendments" in § 1083(b) to ensure that both § 1605A and other reforms relating to terrorism actions, such as § 1610(g), were properly integrated into the larger statutory scheme of the FSIA. Thus, this Court can reasonably infer that Congress' failure to update § 1606 to include a reference to § 1605A evinces Congress intent that those standards pertaining to the scope of foreign state liability in § 1606 do not apply in actions against state sponsors of terrorism under § 1605A.

*In re Terrorism Litigation*, 659 F.Supp. 2d 31, n.20 (D.D.C. 2009).

Here, the Special Master can draw no distinction between the life lived by the children here – who were born after the date of the bombing – and those children who were born before the bombing and who were too young to have remembered the incident themselves. All the children of survivors were clearly denied an attentive father who was capable of meeting their emotional needs – that is, all were equally damaged by the terrorist attack. The actions of the Defendants were of such a nature that their effect continued beyond the immediacy of the October 1983 bombing.

Further, while one could argue that no damages should be awarded a wife who married a Marine after the bombing – under the theory that she knew what she was getting into when she married him – it would have been impossible for Penny Garner, the wife of Truman Garner, to have grasped just what she was in for when she married her husband.[1] No person could have expected that the amount of damage her new husband had endured would have been so severe that he would have denied their children the attentiveness that each child needs and would have denied her the stability she reasonably had expected when marrying him.

Given those facts, and consistent with §1605A and the reasoning in the *Jenco* opinion, the Special Master finds that after-born children and spouses who married after the date of the bombing have the same standing to assert a claim for intentional infliction of emotional distress or solatium as those children born and spouses married before the bombing.

Accordingly, the Special Master concludes as a matter of law that Defendants are jointly and severally liable to Plaintiffs in the following amounts:

Penny Garner, spouse of Truman Dale Garner, **$4,000,000.00;**

---

[1] *See Revised Clinical & Forensic Expert Witness Evaluation/Consultation: John Santos and Family Members* by Plaintiffs' expert Dr. Glen D. Skoler, attached to Report of Special Master Pursuant To Order of Reference Concerning Counts XLIX – LII (Santos, John) at 15 (filed under seal).

Joseph Matthew Garner, son of Truman Dale Garner, **$2,500,000.00**;

Justina Niocle Garner, daughter of Truman Dale Garner, **$2,500,000.00**; and

Reva Paige Garner, daughter of Truman Dale Garner, **$2,500,000.00.**

**TOTAL DAMAGES:**                                              **$11,500,000.00**

| | |
|---|---|
| Date | Paul G. Griffin, Esq. |
| March 6, 2012 | Special Master |